1   Edward T. Colbert (Admitted to Practice)
    William M. Merone (*pro hac vice*)
2   Erik C. Kane (*pro hac vice*)
    KENYON & KENYON LLP
3   1500 K Street, N.W.
    Washington, D.C. 20005
4   Telephone: (202) 220-4200
    Facsimile: (202) 220-4201
5   Email: ecolbert@kenyon.com

6   Frank L. Bernstein (SBN 189504)
    KENYON & KENYON LLP
7   1801 Page Mill Road, Suite 210
    Palo Alto, California 94304
8   Telephone: (650) 384-4700
    Facsimile: (650) 384-4701
9   Email: fbernstein@kenyon.com

10  *Counsel for Defendant*
    *and Counter-Plaintiff*
11  *Pintrips, Inc.*

12

13                  **UNITED STATES DISTRICT COURT**

14                 **NORTHERN DISTRICT OF CALIFORNIA**

15                    **SAN FRANCISCO DIVISION**

16

17

18  PINTEREST, INC.,
    a Delaware corporation,
19                                          Case No.  3:13-cv-4608-HSG
            *Plaintiff and Counter-Defendant*,
20
    v.                                      **DEFENDANT'S TRIAL BRIEF**
21
    PINTRIPS, INC.,
22  a Delaware corporation,

23          *Defendant and Counter-Plaintiff*

24

25

26

27

28

**TABLE OF CONTENTS**

Page

I.   BACKGROUND ........................................................................................ 2

    A.   In the Technology Space, "Pin" Means "to Attach" a Virtual Object ........ 2

    B.   Pintrips Uses "Pin" for its Common and Descriptive Purpose ................... 6

II.  ARGUMENT ........................................................................................... 8

    A.   Use of the Term "Pin" for its Descriptive Purpose is Not Actionable........ 8

        1.   Plaintiff Does Not Have the Exclusive Right to Use "Pin"........... 8

        2.   Pintrips Only Uses "Pin" Descriptively........................................11

    B.   There is No "Confusion" Due to Trademark-Related Reasons  ................13

        1.   Plaintiff's Surveys Did Not Show Any Confusion.......................13

        2.   The Sleekcraft Factors Do Not Suggest Confusion is Likely........16

            a.   The PINTEREST and PINTRIPS Marks are Dissimilar ........................................................................16

            b.   Both Marks are Distinctive .......................................17

                i.   Conceptual Strength ....................................17

                ii.   Commercial Strength ..................................18

            c.   The Parties' Services Are Unrelated .......................................18

            d.   Pintrips' Intent in Selecting the PINTRIPS Mark ..................18

            e.   There Has Been No Evidence of Actual Confusion ...............19

            f.   The Marketing Channels Used by the Parties ........................20

            g.   Travel Planning is Not a "Zone of Expansion" for a Scrapbooking Site................................................................20

            h.   Consumers Must Establish a Relationship With Pintrips........21

    C.   Plaintiff Offered No Proof of Fame or Dilution.........................................21

    D.   Plaintiff's PIN Registrations are Invalid if they Cover "Pinning"................................................................................................24

III. CONCLUSION ......................................................................................25

**Cases**                                               **Page(s)**

*A.J. Canfield Co. v. Honickman*,
   808 F.2d 291 (3d Cir. 1986) ............................................................................... 8

*America Online v. AT&T Corp.*,
   243 F.3d 812 (4th Cir. 2001) ............................................ 1, 13, 18, 25

*American Cyanamid Corp. v. Connaught Lab., Inc.*,
   800 F.2d 306 (2d Cir. 1986) ............................................................................. 17

*AMF, Inc. v. Sleekcraft Boats*,
   599 F.2d. 341 (9th Cir. 1979) ........................................................................... 16

*Avery Dennison Corp. v. Sumpton*,
   189 F.3d 868 (9th Cir.1999) .............................................................................. 22

*Big Island Candies, Inc. v. Cookie Corner*,
   269 F.Supp.2d 1236 (D. Hawaii 2003) ............................................................... 8

*Brooktree Corp. v. Advanced Micro Devices, Inc.*,
   977 F.2d 1555 (9th Cir. 1992) .......................................................................... 16

*Builders Square, Inc. v. Wickes Companies, Inc.*,
   1985 WL 5469, (C.D. Cal. 1985) ...................................................................... 17

*Cairns v. Franklin Mint Co.*,
   24 F.Supp.2d 1013 (C.D. Cal. 1998) ........................................................... 15, 20

*Cairns v. Franklin Mint Co.*,
   292 F.3d 1139 (9th Cir. 2002) .......................................................................... 12

*Eastern Air Lines, Inc. v. New York Air Lines, Inc.*,
   559 F. Supp. 1270 (S.D.N.Y. 1983) ................................................................. 13

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) .......................................................................... 18

*Hanginout, Inc. v. Google, Inc.*,
   54 F.Supp.3d 1109 (S.D. Cal. 2014) ................................................................ 21

*Henri's Food Products Co., Inc. v. Kraft, Inc.*,
   717 F.2d 352 (7th Cir. 1983) ............................................................................ 16

*In re Chamber of Commerce of the U.S.*,
   675 F.3d 1297 (Fed. Cir. 2012) .............................................................. 11, 12, 24

*In re Stereotaxis Inc.*,
   429 F.3d 1039 (Fed. Cir. 2005) .................................................................. 12, 24

*Kern v. Mindsource, Inc.*,
   225 F.3d 663, *3 (9th Cir. 2000) ...................................................................... 20

*KP Permanent Make–Up Inc. v. Lasting Impression I*,
   408 F.3d 596 (9th Cir. 2005) ............................................................................ 12

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   543 U.S. 111 (2004) ......................................................................................... 12

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de .C.V.*,
   762 F.3d 867 (9th Cir. 2014) ..................................................................... passim

*Levi Strauss & Co. v. Blue Bell, Inc.*,
   778 F.2d 1352 (9th Cir. 1985) .................................................................... 10, 11

KENYON & KENYON
LLP
PALO ALTO

*Morgan Creek Prod., Inc. v. Capital Cities/ABC, Inc.,*
  1991 WL 352619 (C.D. Cal. 1991) ............................................................. 17

*National Customer Engineering Inc. v. Lockheed Martin Corp.,*
  1997 WL 363970 (C.D. Cal. 1997) ............................................ 11, 12, 24

*Nissan Motor Co. v. Nissan Computer Corp.,*
  378 F.3d 1002 (9th Cir. 2004) ............................................................ 21, 22

*Nutri/System, Inc. v. Con-Stan Industries, Inc.,*
  809 F.2d 601 (9th Cir. 1987 ........................................................................ 19

*Playboy Enters., Inc. v. Netscape Comm. Corp.,*
  354 F.3d 1020 (9th Cir. 2004) .................................................................... 20

*Rearden LLC v. Rearden Commerce Inc.,*
  2007 WL 2220921 (N.D. Cal. 2007) ......................................................... 21

*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC,*
  680 F. Supp. 2d 1107 (N.D. Cal. 2010) .................................................... 21

*Sara Lee Corp. v. Kayser–Roth Corp.,*
  81 F.3d 455 (4th Cir. 1996) ........................................................................ 15

*Saul Zaentz Co. v. Wozniak Travel, Inc.,*
  627 F. Supp. 2d 1096 (N.D. Cal. 2008) .................................................... 20

*Self–Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n,*
  208 F.Supp.2d 1058 (C.D. Cal. 2000) ...................................................... 22

*Stark v. Diageo & Estate Wines Co.,*
  907 F. Supp. 2d 1042 (N.D. Cal. 2012) .............................................. 18, 19

*Suh v. Yang,*
  987 F. Supp. 783 (N.D. Cal. 1997) ............................................................ 16

*Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,*
  437 F.2d 566 (2d Cir. 1971) ...................................................................... 16

*Thane Int'l., Inc. v. Trek Bicycle Corp.,*
  305 F.3d 894 (9th Cir. 2002) ...................................................................... 22

*The Learning Network, Inc. v. Discovery Communications, Inc.,*
  153 F.Supp.2d 785 (D. Md. 2001) ............................................................ 14

*Tie Tech, Inc. v. Kinedyne Corp.,*
  296 F.3d 778 (9th Cir. 2002) ................................................................ 10, 11

*Toyota Motor Sales, U.S.A., Inc. v. Tabari,*
  610 F.3d 1171 (9th Cir. 2010) .................................................................... 21

*Tu Thien The, Inc. v. Tu Thien Telecom, Inc.,*
  2014 WL 3898617 (C.D. Cal. 2014) ......................................................... 22

*United Tactical Sys., LLC v. Real Action Paintball, Inc.,*
  2014 WL 6788310 (N.D. Cal. 2014) ......................................................... 22

*Veronica's Auto Ins. Services, Inc. v. Veronica's Services, Inc.,*
  2014 WL 7149530 (C.D. Cal. 2014) ......................................................... 11

*Visa Intern. Service Ass'n v. JSL Corp.,*
  590 F.Supp.2d 1306 (D. Nev. 2008) ......................................................... 23

*Visa Int'l Service Ass'n v. Eastern Financial Credit Union,*
  1992 WL 138231 (9th Cir. 1992) .............................................................. 15

**Statutes**

15 U.S.C. § 1052(e) ............................................................................... 1, 11, 24

15 U.S.C. § 1052(f) ....................................................................................... 11

15 U.S.C. § 1064(1) ....................................................................................... 24

15 U.S.C. § 1115(a) ....................................................................................... 10

15 U.S.C. § 1125(c) ...................................................................... 21, 22, 23, 24

15 U.S.C. § 1125(c)(2)(A) ............................................................................. 22

15 U.S.C. § 1125(c)(2)(A)(i)-(iii) .................................................................. 23

15 U.S.C. § 1125(c)(2)(B) ............................................................................. 24

15 U.S.C. § 1125(c)(2)(B)(i) ......................................................................... 24

15 U.S.C. § 1125(c)(2)(B)(iii) ....................................................................... 24

15 U.S.C. §§ 1115(b)(4) ...................................................................... 1, 12, 13

Cal. Bus. & Prof. Code § 14247(a) .................................................... 21, 22, 23

**Other Authorities**

*J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition,* ...................... 11, 13, 22

Jacob Jacoby, *Trademark Surveys,* Vol. 1 (2013) ........................................ 14, 15

Restatement (Third) of Unfair Competition, § 28 cmt. b (1995) .................................. 12

*Trademark Manual of Examining Procedure,* (Jan. 2015) ...................................... 11, 17

*U.S. Acceptable Identification of Goods and Services Manual* (2015) ........................................ 10

1      This case turns on the answer to a single factual question: Is Pintrips using the term "pin"

2      for one of its common, ordinary meanings by putting it on a website button that, when clicked,

3      attaches (or "pins") information to a website user's "board"?  If the answer is "yes," then all five

4      causes of action asserted by Plaintiff, Pinterest, Inc., fall away.  As was made clear by how

5      Plaintiff presented its case, all of Plaintiff's claims depend heavily on the assumption that

6      Pintrips' use of "pin" is supposedly unlawful.  *See* Doc. No. 134, ¶¶ 29, 38, 46, 50, 57; *see also,*

7      *e.g.,* Trial Tr. ("Tr."), 21:21-22:1; *but see* 15 U.S.C. §§ 1115(b)(4) (fair use of a term for its

8      descriptive meaning is a defense).  Plaintiff has offered no evidence that any consumer (let alone

9      an appreciable number of them, which is the test) supposedly believes that Pintrips' travel

10     planning website is connected with Plaintiff or its online scrapbooking service solely because of

11     *actionable trademark-related reasons*—that it, just because of Pintrips' use of the *name*

12     PINTRIPS.  Thus, if Pintrips' use of "pin" was proper, Plaintiff cannot prevail on any claims.

13         An affirmative answer to the "pin" question also resolves Pintrips' counterclaims, thus

14     making the issue truly case dispositive.   If "pin" can denote the function of attaching one virtual

15     object to another, then any party is legally free to use the term for that descriptive purpose,

16     whether as a word or in graphic form.  *See* Doc. No. 136 (Counts I-III); *see also* 15 U.S.C. §§

17     1115(b)(4); *America Online v. AT&T Corp.*, 243 F.3d 812, 820-23 (4th Cir. 2001).  Furthermore,

18     because Plaintiff asserts that the descriptions of goods and services in its two federal trademark

19     registrations for "PIN" are supposedly broad enough to encompass Pintrips' particular use of the

20     term, *see* Doc. No. 134, ¶ 17; Tr., 16:6-17:6, TX25, TX26, a finding that Pintrips is using "pin"

21     for a common, ordinary meaning also compels cancellation of Plaintiffs' registrations as to those

22     overbroad goods and services.  *See* Doc. No. 136 (Counts IV, V); *but cf.* 15 U.S.C. §§ 1052(e) (a

23     mark cannot be registered for goods or services for which it is merely descriptive), 1064(1).

24         Thus, what this Court ultimately must ask is "What information does 'pin' convey to

25     consumers when used on a button on the Pintrips website?"  The answer to that question, though,

26     is no mystery.  Both the inherent meaning conveyed by the word "pin" when it appears on a

27     button and the specific context in which consumers encounter Pintrips' button (alongside text that

28     tells them they can use the button to "shop around for flights **and pin** the ones [they] want to save

into a personal trip board"; *see* TX240) (emphasis added) tell consumers what the Pintrips "pin" button *does*—namely, that it "pins" flight information. Moreover, that inherent and contextual understanding of "pin" is also consistent with the *historic* use of the term. After all, high technology companies have been training consumers since the early days of the popular Internet that the verb "pin" means "to attach," and thus online "pinning" entered the public lexicon almost a decade before Plaintiff *was even created*. Thus Plaintiff, which notably chose the name "Pinterest" because it wanted to play off that consumer understanding as to what is meant by "pin," s*ee* TX1081, No. 7, may not appropriate the term for its exclusive use now.

## I.    BACKGROUND

### A.    In the Technology Space, "Pin" Means "to Attach" a Virtual Object

The function of "pinning" and the term "pin" are not new and did not originate with Plaintiff, which has only been in existence for five years. *See* Doc. No. 134, ¶ 10. As Peter Kent, an expert on the Internet and an author of multiple Internet guidebooks explained, software designers have traditionally used real-world metaphors—*e.g.*, "folders," "files," "desktops," "bulletin boards"—when naming technological functions. *See* Tr., 542:42-543:5, 544:20-545:21. That metaphorical naming convention gave rise to the idea of "pinning" and the use of "pin."

The first electronic "bulletin board" was described by its creator as being patterned after the kind of "cork board bulletin board" found at grocery stores and to which notices could be attached. Tr., 546:5-547:13, TX1037. The term "pin" was not used very much with the earliest bulletin boards systems because those boards were text-based, not the graphical user interfaces of today that lend themselves more readily to the metaphor of "pinning." *See id.*, 552:18-556:1. Once the graphical World Wide Web became popular in the mid-1990s, however, people began using "pin" and "pinning" as metaphors for attaching virtual objects to electronic bulletin boards:

"Pinning Hopes on Computer Bulletin Boards" (TX1039) (1994)

"There are two kinds of [message] system[s]: 'person to person', and 'computer conferencing'. ... The point of the conference system is that **messages are sent to a bulletin board and left 'pinned up' for future reference**." (TX1040) (1994)

"Learners and instructors …post[] an e-mail message to a bulletin board **in much
the same way that they would pin a note on a cork board.** " (TX0141) (1997)

Tr., 552:5-17, 555:18-557:9, TX1039-TX1041 (emphasis added to all).

Bulletin boards, though, were not the only technological space where the metaphorical
concept of "pinning" was adopted and flourished long before Plaintiff came along. For example,
since the launch of its highly-successful Windows XP operating system (in 2001) Microsoft has
allowed hundreds of millions of computer users to pin items (such as programs, folders, and files)
to their desktop environment by selecting either "Pin to Start" or "Pin to Taskbar." Tr., 557:10-
558:24, TX1053. Microsoft's use of "pin" and "pinning" later expanded to its Office suite of
programs in 2007, which added a visual image of a pin, *see* Tr., 568:12-570:2, and today exists
throughout Microsoft's popular operating systems and web browsers (including Windows 8 and
Internet Explorer 9) for computers and mobile phones, where users can pin almost any item—
including apps, songs, games, live websites, and "active objects"—to their user interface:



* * *



*See id.*, 490:14-22, 492:2-493:20, 559:3-570:10, 599:11-600:4, 603:4-605:12, TX1055-TX1059,
TX1076 (highlighting added here and throughout), TX1334-TX1335, TX1339-TX1340; *see also*
Tr., 601:10-17, 608:14-609:6, TX1338 (third-party "Pin Steam" app), TX1348 ("Pinned Sites").

The Internet giant Google also lets its millions of users pin things, and it has done so for
years. For example, since at least 2004 Google has offered a "toolbar" to which users can pin
buttons using the "Pin button" command. Tr., 570:18-573:6, TX1060. Meanwhile, Google's

KENYON & KENYON
LLP
PALO ALTO

widely-used Android mobile phone operating system lets you "Screen Pin" (which attaches an app to the phone's screen), *see* Tr., 573:10-575:3, TX1069-TX1070, and its Play Music service enables users to take content (namely, music) from third-party websites and "pin" it to a device:

**Take advantage of pinning**

Similarly to caching, using Google Play Music's option to "pin" music to your device is a great way to save on data usage. Pinning is simply on-demand caching of specific albums for offline access. You can pin items that are part of your own uploaded collection, as well as anything you find in the store as part of your All Access subscription. Pinned items will download in the background as soon as you hit the pin icon found in the album view of the app, and will only download via Wifi by default. While Google's default caching does a good job of keeping your most listened-to music available for offline access, it's nice to know you can force a download at any time when you know you'll be without a consistent connection for streaming.

Tr., 575:8-577:6, TX1071-TX1072; *see also* Tr., 487:12-15, 493:7-22 ("Google Maps").

Users of Facebook's popular social media service pin as well, pinning posts to a "group" and messages, photos, and videos to personal "timelines." Tr., 490:6-13, 589:20-592:3, 599:3-10, TX1065, TX1068, TX1333. Millions of Blackberry users are told To pin a file, tap ⬚ and To unpin a file, tap ⬚. *Id.*, 600:6-22, TX1336. Kayak patrons could once click on a "pin" button and "pin [travel] itineraries" to another location, much like Pintrips' customers can do today. Tr., 489:11-25. Visitors to the website HistoryPin.com can pin digital photos and user comments to a virtual map and share those with others. Tr., 592:19-595:4, TX1048-TX1049, TX1337. And consumers interested in The Internet Pinboard, a website publicized roughly two years before Plaintiff was launched, were told that they could use the new website to "pin up" almost any digital object—*e.g.*, photos, notes, music, videos, news items, website links—to a publically viewable graphical user interface that looked like a giant cork pinboard. Tr., 596:15-597:11; TX1341 (explaining the service by using the metaphors of "pinning" and "boards") ("The humble corkboard is about to be catapulted into cyberspace with the launch of Internet Pinboard.").

When writing about the technology space, the media have also regularly used "pin" and "pinning." This media use—including (again) from before Plaintiff was founded—thus reflects that the terms were understood by readers to denote the action of attaching one virtual object to another at the time these articles were written (or else the media would not have used them):

"The UK's largest retailer aims to revolutionise the way people shop online with an interactive desktop that … aims to replicate a typical family fridge door. … **Users can …'pin' digital photos and messages to the screen ….**"
*New Media Age* (Oct. 30, 2008) (TX1339)

"Hallmark and Product Red launched a campaign in 2008 that had **social-network users pinning branded badges to their profile pages**."
*Advertising Age* (March 2, 2009) (TX1340)

"Facebook has no shortage of [photo-centric apps designed for use with social media sites, including] … MyTravel Photo Map (share photos from your adventures around the globe **by pinning them to a map for friends to click through**)." *Edmonton Journal* (June 23, 2010) (TX1344).

"App tiles can be moved around or replaced easily [in Windows Mobile 7] **with a process called 'pinning,' already familiar to Windows 7 users**."
*The Philadelphia Daily News* (Oct. 20, 2010) (TX1342)

"Microsoft … is working on a … publishing system called Montage that lets you throw together a page of content—be it yours, or collected from the Web[.] …. Users can … lock down a Montage in time **by pinning news stories, photos, videos, and more to a page**." CNET.com (Nov. 16, 2010) (TX1343).

 "Facebook was initially the domain of hip young things, single satellites strung out across the globe lighting up cyber space with their witty anecdotes and drink-addled encounters, **while pinning embarrassing photos on their virtual walls**."
*Sunday Age (Melborne)* (Nov. 28, 2010) (TX1347).

"Broadcastr is a social media platform that enables the … sharing of audio content via a map-based interface. … [T]he Broadcastr team has been recording stories … and **pinning those stories to Broadcastrs' interactive online map** of the world." *American Banking and Market News* (Dec. 20, 2010) (TX1345).

Tr., 601:20-610:2, TX1339-TX1343, TX1345, TX1347; *accord* TX205F, p. 2 (defining "pin" when used as a verb to mean "[t]o attach … with or *as with* a pin") (emphasis added).

The media have naturally also used the common terms "pin" and "pinning" to describe the actions of users attaching items to Plaintiff's website.  *See* TX44 (explaining that Pinterest "enables you to 'pin' images to your pinboard and Facebook Timeline"), TX173 (describing Pinterest is an "online scrapbooking website" that "allows people to 'pin' pictures to share images of projects and objects they love"), TX174 ("Pinterest is a pinboard for online photos") ("Unlike most start-up Web site names, 'Pinterest' actually makes sense.  You pin things based on your interests.").  Furthermore, *Plaintiff* has always used "pin" and "pinning" for their common, ordinary meanings, and it fully embraces the metaphorical reference to real-life pinboards.  *See* TX180 (PIN12496) ("Pinterest is a Virtual Pinboard"); *see also* TX127 (reporting that Plaintiff's

co-founder came up with the idea for PINTEREST based on his experiences as a child when he would collect insects and "pin them to a piece of cardboard"); TX133 (PIN17203) (Plaintiff's research found that "pinboard" was one of "[t]he metaphors that people find most compelling" because it is "closest to the name and design of [the] site"). In fact, Plaintiff <u>admitted</u> during discovery that the name PINTEREST is merely "a combination of the words 'pin' and 'interest'" and that it "evokes the metaphor of a pinboard"; *see* TX1081, No. 7—the same "pin" and "board" metaphorical reference that gave rise more than a decade before to use of the term "pin" to denote the action a user takes to attach a virtual object to his or her "board". *Cf. supra.*

**B.      Pintrips Uses "Pin" for its Common and Descriptive Purpose**

Given that "pin" had an established meaning in the technology space when Pintrips was founded in June 2011, *see* Tr., 458:21-462:3, it is hardly surprising that Pintrips has also used the term for a common, ordinary meaning—that is, to denote the action of attaching one virtual object to another. Using the Pintrips website, users create "tripboards" to which they then "pin" flight information taken from third-party airline websites. Tr., 464:2-479:21. And the way a user pins that third-party content to his or her board is by clicking on a "button" labeled "Pin." *See id.*

Moreover, Pintrips' use of "pin" for its common, ordinary meaning was *intentional*. There is no subtlety or hidden meaning here—the website flatly informs users that they can use the "Pin" button to "**Pin any flight from any site,**" and that "[w]ith the Pintrips Pin Button" they can "shop around for flights **and pin the ones [they] want to save into a personal trip board**":



 TX240; Tr. 526:14-528:5; *see also* TX241 ("Pin the flights you like from any site"). In fact, Pintrips' founders picked the PINTRIPS name *because* it was informative—that is, it told

consumers that the website was all about "pinning trips." Tr., 460:4-25 ("[S]ince we were talking from the get-go about pinning travel components, it just made sense to call it Pintrips") (Gotlieb), 645:20-647:10, 648:25-652:22 ("I said 'That's what it is. Pinning trips. Pintrips.'") (Raiteri). The witnesses also testified they were familiar with use of "pinning" by others before selecting the name. *See* Tr., 487:12-15, 489:11-25, 490:16-22, 492:2-493:2, 493:7-22, 650:6-651:10.

The conclusion is thus inescapable that the term "pin" was selected and is being used by Pintrips on its website "button" for its common and descriptive purpose—namely, to indicate to consumers that the purpose of the button is to "pin" things. Pintrips, however, is not relying solely on that common sense conclusion to carry this point. At trial Pintrips also presented scientific evidence in the form of a consumer survey that shows that website users—by an overwhelming two-to-one margin—primarily view the use of "Pin" on the Pintrips Pin Button as informing them of *the function or purpose* of the button rather than carrying brand significance:

**Pin Button**

31% of those who correctly answered both mini-test questions indicated that the "Pin" button "acts as a brand and tells me whose button it is."

62% of those who correctly answered both mini-test questions indicated that the "Pin" button "only tells me what the button does."



| | Total | | Rotation | | | | Mini-Test Result | | | |
| | | | Rotation A – Function First | | Rotation B – Brand First | | Both Correct | | One or Both Incorrect | |
| | Count | % | Count | % | Count | % | Count | % | Count | % |
|---|---|---|---|---|---|---|---|---|---|---|
| Only tells me what the button does | 306 | 61% | 147 | 57% | 159 | 64% | 258 | 62% | 48 | 54% |
| Acts as a brand and tells me whose button it is | 167 | 33% | 93 | 36% | 74 | 30% | 129 | 31% | 38 | 43% |
| I don't know | 32 | 6% | 16 | 6% | 16 | 6% | 29 | 7% | 3 | 3% |
| Total | 505 | 100% | 256 | 100% | 249 | 100% | 416 | 100% | 89 | 100% |

TX1082; Tr., 786:18-787:1; *see also* Tr., 781:20-782:17, 787:16-790:7. Moreover, and as discussed in detail at trial, this assessment of consumer perception as to the primary meaning of "Pin" when used on a website button was made without consideration for anything else on the Pintrips website. *See, e.g.,* Tr., 779:22-780:19, 814:3-815:11, 820:2-19. Had the context provided by the Pintrips site also been considered—including placement of the button alongside

KENYON & KENYON LLP
PALO ALTO

the information meant to be "pinned" and next to explanatory text that informed consumers that they could use the button to "pin the [flights] you want to save into a personal trip board"; *see* TX240 (displayed *supra*)—the percentage of consumers who thought the button "only tells me what the button does" would assuredly have been even higher. Tr., 814:21-815:11, 823:2-824:8.

## II.    ARGUMENT

### A.    Use of the Term "Pin" for its Descriptive Purpose is Not Actionable

#### 1.    Plaintiff Does Not Have the Exclusive Right to Use "Pin"

Plaintiff suggests that because it operates the largest and best-known website that uses the term "pin" in its name (although, of course, even larger companies, such as Microsoft, had been using "pin" descriptively long before), other companies should be enjoined from using the term at all, including on a website "button" that allows users to "pin" things. *See* Doc. No. 134, ¶¶ 9, 22-23; *see also id.*, pp. 12-13; Tr., 194:17-18. Plaintiff, though, is merely attempting to claim rights based on "*de facto* secondary meaning," an argument rejected by courts time and again. *See, e.g., America Online*, 243 F.3d at 822 ("evidence of association may establish what is called 'de facto secondary meaning,' but such secondary meaning does not entitle [a plaintiff] to exclude others from a functional use of the words"); *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986) ("evidence that a generic term is identified with one producer, indicative of a secondary meaning for a descriptive term, proves only what courts call 'de facto' secondary meaning") ("[s]uch evidence indicates only that the producer has dominated the market for a product"); *Big Island Candies, Inc. v. Cookie Corner*, 269 F.Supp.2d 1236, 1251, 1251 n.22 (D. Hawaii 2003).

According to Plaintiff, it uses "pin" as a verb with its online scrapbooking service to denote the act of "taking … digital content … from a third-party website" and saving it to a user's "board." *See* Tr., 25:2-9; *see also id.*, 15:17-25. What Plaintiff describes, however, is merely a common use of "pin." *Cf.* Section I.A, *supra*. After all, technology companies have been using "pin" to refer to the act of taking a virtual object from one digital location and attaching it somewhere else (for example, taking a photo stored on your computer and "pinning" it to a publicly accessible "bulletin board") since long before Plaintiff even entered the field. *See, e.g.,*

Tr., 557:10-558:24, 570:18-573:6, 596:15-597:11; TX1339-TX1341, TX1053, TX1060; *cf.* Tr., 121:2-10, 253:5-13; Doc. No. 134, ¶ 10 (Plaintiff launched in March 2010).  Thus, Plaintiff's ability to control "pin" is no greater than that of any other company, which is to say none.

Plaintiff also boldly suggests that it "pioneered" the use of "pin" as a noun, claiming that "pin" refers to the "digital content" that a user has pinned to Plaintiff's site.  *See* Tr., 15:2-16, 25:2-5.  It hardly takes an English professor, though, to relate the verb and noun forms of "pin."  After all, if you "link" to a website by clicking on a "link," "bookmark" a page with a "bookmark," and "post" a "post" on social media, then you logically would "pin" a "pin."  Moreover, calling that which has been "pinned" a "pin" is not even novel—it is simply an extension of the "pin" metaphor and reflects one of the common meanings of the term.  *See* TX205F, p. 22 (defining a "pin" as a badge that may be attached (or "pinned") to clothing).

More fundamental, however, Plaintiff has <u>no evidence</u> that anyone outside of its trial team identifies Plaintiff as the source of "PIN-branded digital content" (assuming such a thing can even exist).[1]  Plaintiff did not offer a survey testing whether consumers supposedly consider it the sole source of "PIN" content, *accord* Tr., 991:17-993:22, 1084:21-1085:8, and although Plaintiff did introduce a handful of media articles, those merely describe Plaintiff as using "pin" in the same

---

[1] It is actually difficult to imagine how Plaintiff *could* own a trademark for the word PIN as applied to "a piece of digital content on Pinterest."  *Cf.* Tr. 15:2-25, 25:2-5.  Plaintiff admits that *users*, not Plaintiff (the purported trademark owner), select and upload the "content" that appears on the site, oftentimes using material copied from third-party sites.  *See id.*, 13:25-14:10; *see also, e.g., id.*, 56:8-59:16.  A trademark, though, identifies and distinguishes the goods or services *provided by the trademark owner*, and here Plaintiff is not providing any "digital content" (or any other good or service) that it has branded "PIN."  *Cf.* 15 U.S.C. § 1127 (defining a "trademark" as "any word … used by a person … to identify and distinguish **his or her goods** …. from those manufactured or sold by others and to indicate the source of the goods") (defining a "service mark" as "any word … used by a person … to identify and distinguish **the services of one person** …from the services of others and to indicate the source of the services") (emphasis added).  Rather, Plaintiff generically refers to <u>all</u> users postings on its site—*regardless of source*—as "pins."  *See, e.g., Filipino Yellow Pages, Inc., v. Asian Journal Publications, Inc.,* 198 F.3d 1143, 1147 (9th Cir. 1999) (if the primary significance of a term is to "describe the type of product rather than the producer, [it] is a generic term and cannot be a valid trademark").  That is not a trademark use.  *Cf., e.g.,* "A Guide to Proper Trademark Use for the Media and Publishing Professionals," International Trademark Assoc. (2012) ("Trademarks and service marks are proper adjectives.  Not nouns.  Not verbs.  A mark should always be used as an adjective qualifying a generic noun that defines the product or service.") (accessible at http://www.inta.org/Media/Documents/2012_TMUseMediaInternetPublishing.pdf).

way that everyone else has for more than a decade—namely, as a verb to denote the action of attaching one virtual object to another. *See* TX44 (the site "enables you to 'pin' images to your pinboard and Facebook Timeline"), TX151 ("when a user is ready to pin content, they create an account and go wild"), TX168 ("users … enjoy 'pinning' items they find around the Web"), TX169 ("they were pinning and 'liking' decorating concepts"), TX173 ("[t]e site … allows people to 'pin' pictures to share images of projects and objects they love"), TX174 ("[y]ou pin things based on your interests").[2]  <u>None</u> of the articles—including a "puff piece" Plaintiff facilitated; *see* TX127—claim that Plaintiff's use of "pin" was novel or distinctive (or that Plaintiff "pioneered" the idea of "pinning"), *cf.* Tr., 15:2-3, 25:2-9, and in articles where "pin" happened to be used as a noun, no special attention was called to the form of use. *See* TX10 ("the number of pins"), TX127 ("paid pins look identical to unpaid ones"), TX151 ("'Pinning' has [virality] built in because many initial pins start as 'repins' of other people's content.").

Ordinarily, a plaintiff can seek to rely on a federal trademark registration to carry its burden to make an initial showing of trademark rights. *Tie Tech, Inc. v. Kinedyne Corp.*, 296 F.3d 778, 783 (9th Cir. 2002); 15 U.S.C. § 1115(a).  It is well settled, however, that a registration is *prima facie* evidence of a protected interest in a mark for only those goods or services **actually specified** in the registration, *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1354 (9th Cir. 1985), and Plaintiffs' registrations here simply do not cover either "the act of saving digital content from a third-party website" onto Pinterest, or the "digital content" itself.  *See* TX25, TX26; *cf.* Tr., 15:2-25, 25:2-9.[3]  Thus, Plaintiff may not rely on any statutory presumptions.

Furthermore, even if Plaintiff *were* able to rely on its registrations, *but see Levi Strauss*, 778 F.2d at 1354, that would not get Plaintiff far.  A term is "descriptive" if it "describes … [a] function, feature, purpose, or use of the specified goods or services," or if it "immediately

---

[2] The articles Plaintiff submitted as TX150, TX160, and TX170 contain no use of "pin."

[3] Even if Plaintiff *had* applied to register "PIN" for the goods and services Plaintiff now describes (*but see* n.1, *supra*) (Plaintiff is not actually using "PIN" as a mark for *any* good or service), the Trademark Office likely would not have accepted Plaintiff's descriptions.  *Cf. generally U.S. Acceptable Identification of Goods and Services Manual* (2015) (listing pre-approved descriptions of goods and services) (accessible at http://tess2.uspto.gov/netahtml/tidm.html).

KENYON & KENYON
LLP
PALO ALTO

conveys knowledge of a quality, feature, function, or characteristic" of the goods or services, *Trademark Manual of Examining Procedure* ("*TMEP*"), § 1209.01(b) (Jan. 2015) (accessible at http://tmep.uspto.gov/); *see also In re Chamber of Commerce of the U.S.*, 675 F.3d 1297, 1300-02 (Fed. Cir. 2012); *National Customer Engineering Inc. v. Lockheed Martin Corp.*, 1997 WL 363970, *2 n.3 (C.D. Cal. 1997) ("A term is descriptive if it describes or reflects … the intended purpose, function or use of the goods") (citing *McCarthy on Trademarks*, § 11.05[2][a]), and there is little question that when "pin" is used for a website service (however that service may be described) it immediately informs consumers that a function or purpose of the service is to "pin" content to the site   *See* Section I.A., *supra*.   Thus, any presumption would be "pierced," *see Tie Tech.*, 296 F.3d at 783; *see also* 15 U.S.C. § 1052(e) (a mark may not be registered if it is merely descriptive), and Plaintiff would have needed to offer sufficient evidence to bear its burden to prove that its claimed "PIN" mark had previously acquired "secondary meaning" (*see* 15 U.S.C. § 1052(f)), something it failed to do.  *See, e.g.,* Tr., 991:17-993:22, 1084:21-1085:8.[4]

### 2. Pintrips Only Uses "Pin" Descriptively

Of course, even if Plaintiff *could* support a claim of trademark rights in "pin" based on how it has used the term, Plaintiff nonetheless has no right to prevent *others* from using "pin" on a website button to signal or denote the action of attaching one virtual object to another, a fact Plaintiff seemingly now concedes.  *See* Tr., 24:15-25:1.  This is because when used on a button (such as on the Pintrips website) the term "pin" informs users as to the purpose or function of the

---

[4] To establish secondary meaning a party must show that a "substantial segment of consumers and potential consumers" make a mental association "between the alleged mark and **a single source** of the product."  *Levi Strauss*, 778 F.2d at 1354 (emphasis added).  That single-source association, however, must have existed ***before*** the junior user supposedly began infringing.  *See, e.g., Veronica's Auto Ins. Services, Inc. v. Veronica's Services, Inc.*, 2014 WL 7149530, *4 (C.D. Cal. 2014).  Plaintiff, though, has not even attempted to show that it used "PIN" as a trademark before the launch of the PINTRIPS site in September 2011 (*see* Tr., 156:16-22, 222:21-224:12), or even later, *cf.* TX1086 (4/11/14 Office Action) (stating that "PIN" when used on the "PIN IT" button was used as "a shorthand term for the action performed by applicant's customers" and not as  mark), let alone that such use was sufficient to establish Plaintiff as the sole source of "PIN" services.  *Cf. Levi Strauss*, 778 F.2d at 1358 (listing factors to consider when assess secondary meaning, specifically "whether actual purchasers … associate the trademark with the producer," "the degree and manner of advertising under the claimed trademark," "the length and manner of use of the claimed trademark," and " whether use of the claimed trademark has been exclusive").

button—specifically, that the button allows the user to "pin" something. *See* Section I, *supra*; *see also* Tr., 786:18-787:1; TX1082. Thus, the use of "pin" in this manner by others is (again) descriptive. *See In re Chamber of Commerce of the U.S.*, 675 F.3d at 1300-02; *National Customer Engineering*, 1997 WL 363970 at *2 n.3; *see also In re Stereotaxis Inc.*, 429 F.3d 1039, 1040-43 (Fed. Cir. 2005). And the Lanham Act expressly provides that if a defendant is fairly and in good faith using a word for its descriptive meaning, that descriptive use cannot form the basis for a claim of infringement, even if the plaintiff has registered the word as a mark:

> [T]he right to use the registered mark shall be subject to proof of infringement …
> and shall be subject to the following defenses or defects:
>
> > (4) That the use of the … term … charged to be an infringement is a
> > use, otherwise than as a mark, … of a term … **which is descriptive**
> > **of and used fairly and in good faith only to describe the …**
> > **services of such party** …..

15 U.S.C. § 1115(b)(4) (emphasis added); *see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121-22 (2004) ("*KPI*") (explaining that the Lanham Act's Section 33(b)(4) "fair use" defense applies even if the challenged use causes consumer confusion) ("If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well[-]known descriptive phrase.") (quoted authority omitted).[5]

Therefore, even if Plaintiff could carry its burden and prove that "PIN" acquired distinctiveness for Plaintiff's goods or services, *but see supra*, use of "pin" by Pintrips to denote the action of attaching one virtual object to another was proper. *See Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1150–51 (9th Cir. 2002) ("A junior user is always entitled to use a descriptive term in good faith in its primary, descriptive sense other than as a trademark.") (quoting

---

[5] Although the Ninth Circuit later held that consumer confusion can still be a factor in the fair use analysis, *see KP Permanent Make–Up Inc. v. Lasting Impression I*, 408 F.3d 596, 609 (9th Cir. 2005) ("*KPII*"), the confusion would have to be "substantial" to suggest that the defendant's actions were unfair. *See id.* at 608 (citing Restatement (Third) of Unfair Competition, § 28 cmt. b (1995)); *but cf.* 15 U.S.C. § 1115(b)(4) (if a use is ultimately found to be "fair," the defense is absolute). Moreover, any analysis into the "fairness" of the defendant's descriptive use must consider not only the degree of likely confusion (assuming any is established by the plaintiff), but also "the strength of the trademark, the descriptive nature of the term for the product or service being offered by [the plaintiff] and the availability of alternate descriptive terms, the extent of the use of the term prior to the registration of the trademark, and any differences among the times and contexts in which [the plaintiff] has used the term." *KPII*, 408 F.3d at 609.

*McCarthy on Trademarks*, § 11.45); *America Online*, 243 F.3d at 822 (trademark law "protects for public use those commonly used words and phrases that the public has adopted, denying to any one competitor a right to corner those words and phrases by expropriating them from the public 'linguistic commons'"). Pintrips is using the term "pin" other than as a trademark, for its descriptive meaning, and in good faith. *See* Tr., 452:4-456:21, 487:12-15, 489:11-25, 490:16-22, 492:2-493:2, 493:7-22 (Pintrips' founder was aware of "pinning" and created a mock-up showing a pin button long before he had even heard of Plaintiff); *see also id.*, 460:4-25, 645:20-647:10, 650:6-651:10, 648:25-652:22; *cf.* 15 U.S.C. § 1115(b)(4). As such, its use was "fair."

**B.     There is No "Confusion" Due to Trademark-Related Reasons**

**1.     Plaintiff's Surveys Did Not Show Any Confusion**

Once it is recognized that Plaintiff cannot base its infringement claims on Pintrips' use of "Pin" on a button that allows users to pin things, *cf. supra*, Plaintiff's case collapses. Although Plaintiff also claims that calling a travel planning website "PINTRIPS" will supposedly confuse an appreciable number of consumers into thinking that the site is connected with Plaintiff's PINTEREST online scrapbooking service, *see* Doc. No. 134, pp. 9-10, 11-12 (Counts I, II, and IV), those allegations were merely the idle tail of the much larger "Pin" dog. Plaintiff did not even attempt to make out a confusion case based on use of the name PINTRIPS itself.

To realize this, one need look no further than the two litigation surveys Plaintiff commissioned. Plaintiff's first survey, by Dr. Jay, did not even *test* use of the PINTRIPS name.[6] And Plaintiff's second survey, by Dr. Jacoby, actually <u>disproves</u> any "name only" claim.

---

[6] For reasons previously discussed in detail, *see, e.g.,* Doc. No. 150; Tr., 352:25-353:13, Dr. Jay's survey has no relevance to this case. Dr. Jay tested an artificial and contrived hypothetical that did not reflect either current or future marketplace conditions, and her inaccurate and misleading placement of the "pin" button next to social media links for Facebook and Twitter did not test for "confusion" but instead merely invited respondents to name a social media company that they happened to associate with the term "pin." *See* Tr., 1022:3-1028:10; *see also, e.g., id.*, 379:15-381:19, 385:14-25. Thus, evidence that some number of consumers today said "Pinterest" when asked (essentially) to "name a social media company that uses the term 'pin'" (which is all Dr. Jay did) proves nothing. *See America Online*, 243 F.3d at 822 (survey showing that 37% of the public associated "You Have Mail" with the most widespread user of the phrase merely established "*de facto* secondary meaning" and did not prove trademark rights); *Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F. Supp. 1270, 1275 (S.D.N.Y. 1983) (that survey respondents said "Eastern" when they heard the word "shuttle" did not prove that "shuttle" was a protectable trademark; it merely showed "that a likely response to any generic word is the name (continued)

As revealed at trial, Dr. Jacoby's survey design was heavily biased in favor of Plaintiff's position. For example, rather than orient survey takers to the task at hand by providing them with an actual link that would have exposed them to the PINTRIPS name and provided source-identifying information about the website, Dr. Jacoby directly "parachuted" them onto the Pintrips home page—an improper and artificial approach that kept respondents from seeing that important source-identifying information. *See* Tr., 933:6-937:4, 939:19-942:1, 978:7-22; *see also id.*, 1000:8-1001:7; *The Learning Network, Inc. v. Discovery Communications, Inc.*, 153 F.Supp.2d 785, 790 (D. Md. 2001) (excluding survey that, among other things, failed to simulate the route a consumer would actually take to reach the subject website). Dr. Jacoby also inexplicitly chose to deny respondents the further source-identifying information consumers ordinarily see when they visit the website (particularly, the "title bar" and "address bar"), even though in the treatise he wrote Dr. Jacoby expressly warns *other* survey researchers to be "especially careful" not to withhold that important contextual information, *see* Tr., 942:2-945:2, 950:19-951:7, 953:23-954:8, 956:957:3; Jacob Jacoby, *Trademark Surveys*, Vol. 1, pp. 487-88 (2013) (quoting *Learning Network*); *see also* Tr., 1001:21-1004:6, and he then exacerbated those cumulative biasing factors by removing the test stimulus from view before asking respondents his key questions and by pestering respondents until they gave a "Pinterest" answer, which answers he counted even if they were guesses and even if a respondent named *multiple* possible website sources. *See* Tr., 1004:11-1009:21, 1017:14-1019:23, TX206F2; *see also Learning Network*, 153 F.Supp.2d at 790-91 (excluding survey as "severely defective" where the test stimulus used did not include the browser title bar or address bar and where the stimulus was removed from respondents' view before they were asked the key question about the source of the website).

Thus, the deck was stacked against Pintrips from the start. However, *even if* one were to accept Dr. Jacoby's biased research approach as proper, *but see supra*, his results nonetheless show that few people are likely to believe that Pintrips' site is connected with Plaintiff because of

---

of the best known producer or manufacturer of that product"); *see also* Tr., 1086:20-1087:15. Beyond that, there are other problems with Dr. Jay's study as well. *See* Tr., 1028:11-1035:8.

the use of the PINTRIPS name. Specifically, Dr. Jacoby's data reveals that *at most* six respondents (or roughly 2.7% of the test total) provided answers that suggest that confusion could possibly arise because of the use of the PINTRIPS name, *see* TX206F2 (Resp. Nos. 10459, 10533, 10629, 10717, 10984, and 11263), and two of those were clearly just guesses. *See id.* (Resp. Nos. 10533 and 10629).[7] Moreover, even those *de minimus* numbers are suspect because it is well understood that one cannot extract meaningful data from a survey that includes two variables in a single test cell (here, the use of PINTRIPS and the use of "pin" and pin functionality). *See* Tr., 962:9-963; Jacoby, *Trademark Surveys*, pp. 515-16; *see also* Tr., 1010:6-10121:8, 1016:19-1017:11. Thus, a confusion rate of 2.7% represents the *maximum* potential for confusion (even before one accounts for respondent guessing and the biasing design factors discussed above), a number that falls well below the level of confusion considered actionable by courts. *Cf.* Tr. 359:24-360:4 (Dr. Jay) (testifying that courts credit "anything over 10 percent as evidence of the likelihood of confusion"), 900:13-901:1 (Dr. Jacoby) ("most [c]ourts have found … 10 to 20 percent confusion to be actionable"); *see also, e.g., Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1040 (C.D. Cal. 1998) ("[S]urvey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent.") (quoting *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 467 (4th Cir. 1996)); *see also Visa Int'l Service Ass'n v. Eastern Financial Credit Union*, 1992 WL 138231 (9th Cir. 1992) (6.7% confusion rate between marks insufficient to show actual confusion for purposes of preliminary injunction); *Henri's Food Products Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 358 (7th Cir. 1983) (holding that a net 7.6% confusion rate weighs against a finding of infringement and collecting supporting cases).

---

[7] As Dr. Jacoby teaches in his book, it is not proper to count survey respondents as "confused" if their alleged "confusion" was influenced by or attributable to elements a party does not control (such as here the use of the term "pin" for its descriptive purpose or the offering of pinning functionality). *See* Tr., 957:4-962:8, 965:13-22; Jacoby, *Trademark Surveys*, pp. 514-16; *see also, e.g.,* 15 U.S.C. § 1115(b)(4); *Cairns*, 292 F.3d at 1150–51; *America Online*, 243 F.3d at 822; *but see* Tr., 972:6-973:25, 1009:25-1016:3, 1079:5-11 (Dr. Jacoby's survey design nonetheless "scooped up" confusion due to "pin"). Thus respondents who, for example, explained that their answer of "Pinterest" was because the Pintrips website offered "pins" or "pinning" functionality (Resp. Nos. 13063, 13335), or who gave non-trademark reasons in addition to referring to the website name (*see, e.g.,* Resp. Nos. 12224 ["they mentioned trip boards"], 13300 ["the way it works"]), cannot properly be counted as having been confused solely for trademark-related reasons. *See* Tr., 972:6-973:25, 1014:15-1016:3, TX206F2.

## 2. The *Sleekcraft* Factors Do Not Suggest Confusion is Likely

Application of the Ninth Circuit's *Sleekcraft* factors, *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d. 341, 348-49 (9th Cir. 1979), yields the same result. These factors, which "are intended to act as 'guideposts' […] and are adaptable to specific cases," *see La Quinta Worldwide LLC v. Q.R.T.M., S.A. de .C.V.*, 762 F.3d 867, 874 (9th Cir. 2014), simply do not point to any confusion arising from Pintrips' operation of a travel planning website under the name PINTRIPS.

### a. The PINTEREST and PINTRIPS Marks are Dissimilar

Under the first *Sleekcraft* factor, a court "compare[s] the two marks in terms of sight, sound, and meaning, considering the marks as a whole, as [they] appear in the marketplace." *La Quinta Worldwide LLC*, 762 F.3d. at 875. However, by considering Plaintiff's PINTEREST registrations but not citing them against Pintrips' PINTRIPS application, the U.S. Trademark Office has already determined that PINTEREST and PINTRIPS are <u>not</u> confusingly similar, and that the PINTRIPS mark is entitled to a federal registration. *See* Tr., 719:5-727:15, 729:5-730:23; TX24; TX1080, p. 20 ("Notice of Publication") ("[t]he mark of the application identified appears to be entitled to registration"). That agency action and administrative determination is therefore entitled to "great weight." *See Suh v. Yang*, 987 F. Supp. 783, 791 (N.D. Cal. 1997) (although registration decisions by the Trademark Office are "not conclusive," they are "entitled to 'great weight'") (quoting *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569 (2d Cir. 1971)); *cf. Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1574 (9th Cir. 1992) (awarding a claim construction decision by the Patent Office an "especially weighty presumption of correctness" because of a principle of "administrative correctness").[8]

The Trademark Office's decision was also correct. PINTRIPS is a compound word and would be seen by consumers as such—you "PIN" your "TRIPS" using PINTRIPS. *Accord* Tr., 460:4-25, 645:20-647:10, 648:25-652:22; *see also, e.g., id.*, 487:12-15, 489:11-25, 490:16-22,

---

[8] Although Plaintiff has argued that the decision to allow the PINTRIPS mark to issue to registration was not a "final decision" of the Trademark Office, *see* Tr., 733:1-16, that is only because *Plaintiff* initiated an action challenging the Office's administrative decision. *See id.*, 733:22-734:23 ("it's the agency's decision unless challenged"); *see also id.*, 708:20-710:24.

KENYON & KENYON LLP
PALO ALTO

DEFENDANT'S TRIAL BRIEF — 16 — 3:13-CV-4608-HSG

492:2-493:2, 493:7-22, 650:6-651:10.  PINTEREST, on the other hand, is a telescoped word, and tells consumers that it is a site where you "PIN" things that "INTEREST" you.  *See TMEP*, §§ 1213.05(a), (a)(i); TX1081, No. 7; *see also* TX174.  The only commonality between the two is the word "pin"—a term widely used to denote the action of "pinning" one virtual object to another, a functionality both parties' sites offer.  *See* Section I.A., B., *supra*.  Similarity of marks, however, cannot be found from just the shared presence of generic or descriptive terms.  *See, e.g., Morgan Creek Prod., Inc. v. Capital Cities/ABC, Inc.*, 1991 WL 352619, *8 (C.D. Cal. 1991); *Builders Square, Inc. v. Wickes Companies, Inc.*, 1985 WL 5469, *4 (C.D. Cal. 1985) ("Where a common term to two marks is generic, the inquiry as to similarity must focus not only on the confusing similarity of the overall marks, but on the similarity of the nongeneric terms."); *see also American Cyanamid Corp. v. Connaught Lab., Inc.*, 800 F.2d 306, 308 (2d Cir. 1986).  Thus, a consumer must be confused both by the PINTRIPS and PINTEREST marks as a whole <u>and</u> by the "TRIPS" and "INTEREST" portions, and there is no evidence to suggest that is the case.

The marks therefore differ both in sight and in meaning.  They are also aurally distinct: PINTRIPS has two syllables (pin-trips) whereas PINTEREST has three (pin-ter-est).  And here again, the only similarity between the two works is the common use of "PIN."[9]

### b.    Both Marks are Distinctive

"The strength of a mark determines the level of trademark protection it is given."  *La Quinta Worldwide LLC*, 762 F.3d. at 874.  To determine a mark's strength, courts consider two factors: "[i] conceptual strength—that is, where it falls in the spectrum of marks—and [ii] the strength of the mark within the marketplace."  *Id.* at 874-75.

### i.    Conceptual Strength

Both PINTRIPS and PINTEREST may fairly be considered suggestive marks *as a whole*, which is consistent with the Trademark Office's actions in finding them inherently distinctive.

---

[9]  Also, potential aural similarity should have little relevance in this case.  If a prospective consumer mishears "Pintrips" as "Pinterest" (as Plaintiff, without citing evidence, repeatedly suggested could be true), they will never even *see* the PINTRIPS website because to visit the site one needs to type in *the correct name*.  This is not like a consumer product case where a shopper might accidentally buy one product believing it to be the other because the names sound alike.

Again, though, it must be kept in mind *what* they suggest. One suggests you "PIN" your "TRIPS"; the other suggests you "PIN" things in which you have an "INTEREST".

The common portion "PIN," however, is <u>not</u> suggestive—it is highly descriptive as used in the website names and generic when used on a button that *lets you pin things*. *See supra*. As such, the term cannot be appropriated by any party. *E.g., America Online,* 243 F.3d at 820-23. To do so would impair legitimate competition by only allowing one company to offer "pinning."

**ii.      Commercial Strength**

Although Plaintiff claims that the PINTEREST mark is commercially strong, little credible evidence was offered on that point. *See also* Section II.C., *infra*. Furthermore, any evidence of strength is tempered by the widespread use of "PIN" for its common, ordinary purpose, *see* Section I.A., *supra*, particularly as "pin" is the only commonality the marks share.

**c.      The Parties' Services Are Unrelated**

The proximity or relatedness of the services-at-issue is determined by whether they are "(1) complementary; (2) sold to the same class of purchasers; and (3) similar in use and function." *La Quinta Worldwide LLC,* 762 F.3d. at 875. Here, the parties offer different services to different consumers. Plaintiff provides online scrapbooking services—it is where you go when you want to post photos of adorable puppies or of the types of shoes that you love. *See, e.g,* TX174, TX176. Pintrips, on the other hand, provides online travel-planning services, *e.g., id.*,464:2-479:21, 699:18-700:2, something Plaintiff has never offered. *See* Tr., 87:17-88:15 (admitting that Plaintiff is not even *working* on a travel planning feature at present).

**d.      Pintrips' Intent in Selecting the PINTRIPS Mark**

"[T]his factor generally focuses on whether the junior holder of the mark intended to 'palm off' its goods as those of the senior mark-holder." *Stark v. Diageo & Estate Wines Co.,* 907 F. Supp. 2d 1042, 1063 (N.D. Cal. 2012). And even though this factor is of "minimal importance," *see GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000), the corroborated evidence nonetheless shows that Pintrips' founders selected the PINTRIPS mark on or about June 10, 2011, at the end of a three-day meeting, and that they chose the name because they thought it would be an apt descriptor of their new travel planning service. *See* Tr., 457:10-

460: 25, 642:9-647:10, 648:25-652:22, 654:14-655:3; *see also id.*, 655:4-22, 657:2-658:14, TX1106, TX1107, TX1126, TX1172.  They did not even learn about Plaintiff until *after* that June 2011 meeting. *See* Tr., 481:2-482:4, 664:5-667:24, TX1110; *see also* Tr., 452:4-456:21.[10]

### e.   There Has Been No Evidence of Actual Confusion

The failure to prove instances of actual confusion weighs heavily against a finding of a likelihood of confusion when "the particular circumstances indicate such evidence should have been available." *La Quinta Worldwide LLC*, 762 F.3d. at 875.  Here, Plaintiff contends the parties offer similar services.  Assuming Plaintiff is correct, *but see supra*, one would expect that given Plaintiff's claim of millions of users, it would have gathered at least *some* examples of actual confusion having arisen over the past 3+ years.  Yet Plaintiff has failed to present any evidence of actual consumer confusion.[11]  This dearth of evidence suggests no confusion is likely.

Plaintiffs' survey evidence, meanwhile, does not fill the void.  As discussed, *see* Section II.C.1., *supra*, the Jacoby Survey actually shows that confusion between PINTRIPS and PINTEREST is <u>not</u> likely.  As such, this factor weighs heavily in favor of Pintrips and should be difficult to overcome.  *Cf. Cairns*, 24 F.Supp.2d at 1040 ("Survey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent.") (quote omitted).

---

[10] Moreover, the type of "intent" relevant to this factor is an intent to deceive—that is, a desire on the part of the junior user to trick consumers into believing that its goods or services actually come from the senior party. See *Stark*, 907 F. Sup.2d at 1063.  No evidence was offered that Pintrips hoped to lead consumers to believe that it was actually a "PINTEREST" site.  Further, if Pintrips *had* been trying to "palm off" its services as those offered by Plaintiff, it could not have done a worse job.  The PINTRIPS website does not look anything like the PINTEREST site, and Pintrips' green "Pin" button looks nothing like Plaintiff's red-and-white "Pin It" button.

[11] The one document that Plaintiff claims supposedly shows "actual confusion" (TX87) does not actually support Plaintiff's case.  Without the testimony of the sender (Ms. Wiest), Plaintiff can only speculate as to why she wrote "I have signed up for Pinterest but the passwords I've tried are not working." *See* Tr., 334:12-336:15; TX87.  The most logical explanation is that the sender's email system simply "corrected" whatever Ms. Wiest typed, which if true would not be evidence of *consumer* confusion at all.  Regardless, a single example of "confusion" (even if it is accepted as such) in a situation where the defendant has been in operation for more than three years and has received nationwide publicity (such as on the "Today Show"), *see* TX87, is *de minimis*. *Cf., e.g., Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, 606-607 (9th Cir. 1987) (finding the misdirection of several letters and checks to be "insignificant" and "de minimis").

**f.      The Marketing Channels Used by the Parties**

Under the sixth *Sleekcraft* factor, courts examine "where the goods or services are sold, the sales and marketing methods employed, and the class of purchasers exposed to the marketing efforts." *La Quinta Worldwide LLC*, 762 F.3d. at 877. Here, both parties admittedly have an Internet presence. The Ninth Circuit has explained, however, that where the parties merely use the Internet to market their services, "this factor merits little weight" in the confusion analysis. *Playboy Enters., Inc. v. Netscape Comm. Corp.,* 354 F.3d 1020, 1028 (9th Cir. 2004).

**g.      Travel Planning is Not a "Zone of Expansion" for a Scrapbooking Site**

"[A] senior [trademark] user may not prevent use of a mark where the junior user enters a product market outside of the senior user's natural zone of expansion." *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1116 (N.D. Cal. 2008). Furthermore, the senior user must offer more than mere speculation that the natural expansion of its business includes the defendant's business. *See Kern v. Mindsource, Inc.*, 225 F.3d 663 (9th Cir. 2000) (unpublished).

Here, the nature of Plaintiff's online scrapbooking services does not suggest that it would be natural for Plaintiff to expand into the field of travel-planning. After all, if the *content* of what users pin onto Plaintiff's site defined the zone of natural expansion, it presumably would be "natural" for Plaintiff to expand to offer almost <u>all</u> goods and services—including, for the sake of argument, pet store supplies (puppies) and fashion design (shoes). *Cf. also* Tr., 125:22-133:13 (suggesting that Plaintiff could offer retail, pet, and outdoor-related services, just to name a few).

Such an interpretation is irrational and would stretch this factor until it was unrecognizable. Rather, what *is* determinative is that even as of today, more than *three years* after Pintrips first began offering its PINTRIPS service, Plaintiff has not even started *working in-house* on adding a travel-planning feature (or even set a date for when they might start on such a project), nor have they attempted to establish a presence in the travel planning space, such as by attending travel trade shows. *See* Tr., 87:17-88:15; 495:5-499:9. Furthermore, it is also telling that when Plaintiff applied to register "PINTEREST" as a trademark it <u>did not include</u> any travel-related services (Class 39) in the descriptions it selected. *See* Tr., 728:12-729:2, TX23, TX24.

1

**h.    Consumers Must Establish a Relationship With Pintrips**

Under the eighth *Sleekcraft* factor, courts examine "the type of good or service offered and the degree of care one would expect from the average buyer exercising ordinary caution." *La Quinta Worldwide LLC*, 762 F.3d. at 877.    "The likelihood of consumer confusion decreases where the consumer is sophisticated and exercises a high degree of care." *Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107, 1120 (N.D. Cal. 2010).

When examining consumer confusion in the context of products offered over the Internet, the "relevant marketplace is the online marketplace, and the relevant consumer is a reasonably prudent consumer accustomed to shopping online ....   Unreasonable, imprudent and inexperienced web-shoppers are not relevant." *Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010); *see also Hanginout, Inc. v. Google, Inc.*, 54 F.Supp.3d 1109, 1129-30 (S.D. Cal. 2014).   Above and beyond that, however, to access Pintrips' travel-planning services, consumers must establish **a relationship** with Pintrips and download a special browser extension, a process that would likely dispel any confusion a consumer might have.   *See generally* Tr., 464:2-468:5. Moreover, any travel page a user visits must be accessed *through* the PINTRIPS website, *see id.*, 468:22-474:16, a process that further ameliorates the risk that any confusion might arise.

**C.    Plaintiff Offered No Proof of Fame or Dilution**

Plaintiff also makes a putative claim of dilution (under both federal and state law), *see* Doc. No. 134, pp. 11, 12, but it failed to present any real evidence in support.   To sustain a claim for dilution a trademark owner must prove that its mark was famous at the time the allegedly dilutive use began, *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1013 (9th Cir. 2004); *Rearden LLC v. Rearden Commerce Inc.*, 2007 WL 2220921, *3 (N.D. Cal. 2007), which in this case was September 2011.   *See* Tr., 156:16-22, 222:21-224:12.   Moreover, the fame of a mark must be established among the general consuming public as opposed to just among a subgroup (or "niche").   *See* 15 U.S.C. § 1125(c); Cal. Bus. & Prof. Code § 14247(a); *see also Tu*

*Thien The, Inc. v. Tu Thien Telecom, Inc.*, 2014 WL 3898617 (C.D. Cal. 2014) (explaining that "[t]he analysis of dilution claims under federal and California law is the same").[12]

Courts regularly consider four non-exclusive factors when evaluating "fame": (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) "whether the mark was registered" under federal law. *See* 15 U.S.C. § 1125(c)(2)(A); *see also* Cal. Bus. & Prof. Code § 14247(a). The analysis, however, is not meant to be a mechanical one. Instead, courts tend to "take an approach more akin to Justice Stewart's test for obscenity: we know it when we see it. Unless a mark rises to the level of 'KODAK' or 'COKE,' it is not considered famous and thus not afforded protection from dilution." *Self–Ins. Inst. of Am., Inc. v. Software & Info. Indus. Ass'n*, 208 F.Supp.2d 1058, 1077 (C.D. Cal. 2000). Consequently, even extensive use, substantial advertising, and significant sales are not enough to impart fame. *See Avery Dennison Corp. v. Sumpton*, 189 F.3d 868, 876–77 (9th Cir.1999) (finding marks not famous despite decades of use, $3 billion in annual sales, and over $5 million in advertising). To meet the rigorous and demanding definition of "famous," a mark must at its core truly be a "household name." *Nissan Motor*, 378 F.3d at 1011 (quoting *Thane Int'l., Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911 (9th Cir. 2002)); *see also United Tactical Sys., LLC v. Real Action Paintball, Inc.*, 2014 WL 6788310, *20 (N.D. Cal. 2014) ("Courts agree that a mark must be truly prominent and renowned to be granted the extraordinary scope of exclusive rights created by the Federal Antidilution Act.") (quote omitted); *cf. McCarthy on Trademark*, § 24:106 (proposing that to qualify as "famous," a mark should achieve "a minimum threshold survey response … in the range of 75% of the general consuming public").

Plaintiff has presented no evidence that PINTEREST was a "household name" either at the time of Pintrips' first use in September 2011 or in November 2012, when Pintrips released its

---

[12] The most notable exception being that under state law the geographic area in which fame must be shown can be limited to California or a part thereof rather than nationwide. *See* Cal. Bus. & Prof. Code § 14247(a). Also, California law considers whether a party owns a state trademark registration. *See id.* However, because Plaintiff has not confined its case to California or offered any proof of a California registration, these minor differences may be ignored.

public "beta" and ran a PR campaign. *See* Tr., 170:17-20, 506:20-508:23; TX6; TX33.  To be sure, Plaintiff has provided some basic numbers about its user base, *see* Tr., 92:1-4, 110:22-111:2 (suggesting that Plaintiff had one million users in August 2011 and about twenty million users in May 2012), but that data is not a surrogate for consumer brand awareness and, regardless, even if those numbers are accepted, they represent but a fraction of the American public.[13]

Meanwhile, Plaintiff offered no advertising numbers, no sales or revenue data, no "fame" survey or consumer testimonials about brand recognition,[14] and only a handful of media articles, meaning there is little evidence upon which a fame determination could be made. *Cf.* 15 U.S.C. § 1125(c)(2)(A)(i)-(iii); Cal. Bus. & Prof. Code § 14247(a)(1)-(3).  Moreover, the few articles Plaintiff *did* offer were either from little-read technology publications (TX33, TX150, TX151, TX160) or focused on the Plaintiff's status as a "hot new start-up" (TX127, TX168-TX170, TX173, TX174), neither of which suggests that "PINTEREST" was a "household name" among the general consuming public who live outside of the echo chamber of Silicon Valley.

---

[13] Furthermore, the data Plaintiff presented was incomplete.  For example, there is no information about how many of the users were businesses (rather than individuals), how many were minors, or how many represented duplicate accounts controlled by the same person.

[14] Although one of Plaintiff's executives (Mr. Yamartino) testified that Plaintiff commissioned a "brand-messaging" survey in mid-2012 that he claims showed that "three-quarters of [respondents] had heard of Pinterest and recognized the name Pinterest," *see* Tr., 116:11-117:4, TX133, the referenced study proves nothing of the sort, which is perhaps why Plaintiff did not put on testimony from the survey professional who actually *designed and conducted* the study.  To begin with, although Mr. Yamartino did not mention the survey universe (which to show "fame" should be the "general consuming public"; *see* 15 U.S.C. § 1125(c)), one can determine by reviewing the data that to qualify a respondent had to be **a regular Facebook user** and had to spend ***at least* 90 minutes a day online** for their personal life (not including time spent online for work).  *See* TX133 at PIN17216 (Q3) (all respondents reported spending at least 90 minutes a day online) and PIN17217 (Q6-8) (all respondents identified "Facebook" as a website they "use most often").  That is hardly representative of the "general consuming public of the United States."  Furthermore, while it is true that in response to Q17 three-quarters of "respondents" (read: dedicated Facebook users) said that they were familiar with Pinterest "at least a little bit," *see* Tr., 118:15-119:8, Mr. Yamartino fails to mention that both throughout the survey and in the "awareness" question itself, respondents *were repeatedly told* that "Pinterest" was a website.  *See* TX133 at PIN17217 (Q6-8) and PIN17218(Q14, Q14-16, Q17).  Thus, it is hardly notable that so many respondents claimed to be "familiar" with Pinterest—they were essentially asked "Who is buried in Grant's tomb?"  In fact, given the survey design used here (which bears no resemblance to an actual "fame" study, *cf., e.g., Visa Intern. Service Ass'n v. JSL Corp.*, 590 F.Supp.2d 1306, 1315 (D. Nev. 2008) (providing an example of the type of unaided "open ended" question commonly used in fame studies) (survey was conducted among respondents drawn from a nationwide sample)), it is surprising that the reported results were not even higher.

The PINTEREST mark thus cannot be considered to have been famous at the time Pintrips launched its travel planning site. Moreover, Plaintiff has also not carried its burden to show that dilution was likely to result from Pintrips' activities, even assuming "fame." *Cf.* 15 U.S.C. § 1125(c)(2)(B) (providing a non-exclusive list of factors a court may consider). For example, the only direct evidence in the record pertaining to "similarity" is that the U.S. Trademark Office considered the PINTRIPS and PINTEREST marks to be <u>dis</u>similar, *see* Tr., 729:5-730:23; TX24; TX1080; *cf.* 15 U.S.C. § 1125(c)(2)(B)(i) (considering "the degree of similarity between the [accused] mark … and the famous mark"), and while Plaintiff's use of "PINTEREST" *as a whole* may well have been "substantially exclusive," *see* 15 U.S.C. § 1125(c)(2)(B)(iii), Plaintiff most assuredly has <u>not</u> made exclusive use of the "PIN" element—and that is the only portion of the two parties' marks that has any "degree of similarity."

## D.    Plaintiff's PIN Registrations are Invalid if they Cover "Pinning"

Finally, Pintrips has asserted through its counterclaims that <u>if</u> Plaintiff's PIN registrations are construed broadly enough to include within their descriptions the manner in which Pintrips uses the term—namely, to denote the action of attaching one object to another—the registrations should be canceled at least in part. *See* Doc. No. 136 (Counts IV, V). A party cannot register a word as a mark for any goods or services for which it is "merely descriptive," *see* 15 U.S.C. § 1052(e), and as discussed above (*see* Sections I.B., II.A.2., *supra*) the term "pin" is merely descriptive when used on a website button because it immediately informs users of the purpose or function of the button—specifically, that the button allows the user to "pin" things. *Cf., e.g., In re Chamber of Commerce of the U.S.*, 675 F.3d at 1300-02; *National Customer Engineering*, 1997 WL 363970 at *2 n.3; *see also In re Stereotaxis Inc.*, 429 F.3d at 1040-43. Thus, Plaintiff's PIN registrations must be cancelled where there is overlap. *See* 15 U.S.C. § 1064(1).[15]

---

[15] An overbroad description of services is certainly not the only failing of Plaintiff's registrations. As alluded to elsewhere, Plaintiff has not actually used "PIN" in a manner that consumers would perceive as use as a mark, let alone for the multitude of services for which Plaintiff is claiming exclusive rights. *Cf.* TX25 (Plaintiff, for example, claims to have used the term "PIN" as a brand to designate the source of, among other things, "downloadable publications in the nature of blogs, photographs, and graphic arts in the field of general human interest"). Those more technical registration defects, however, are not before this Court, *cf., e.g.*, Doc. No. 136 (Counts IV, V), and thus need not be addressed here. Instead, they will be raised before the Trademark Trial (continued)

## III.  CONCLUSION

Follow.  Like.  Pin.  Print.  Search.  Select.  These are just some of the words that make up the language of the Internet.  Each word denotes an action or function—when put on a website "button" each tells the user what the button *does*—and no company can monopolize them.

Pintrips has shown that Plaintiff was not the first to use "pin" to denote attaching one virtual object to another, and it assuredly will not be the last.  Plaintiff may be having its moment in the sun for now as the "hot" new "pinning" website, but that doesn't mean it gets to expropriate "pin" or "pinning" from "the public 'linguistic commons'" and linguistically impoverish the next generation of websites.  *See America Online*, 243 F.3d at 821.  Trademarks are forever, and Plaintiff cannot be permitted to remove "pin" from the public domain and gain a permanent advantage in the marketplace.  All of Plaintiff's claim should thus be denied.


Respectfully submitted,


Dated:  July 3, 2015          By:     /s/ Frank L. Bernstein
                                       Edward T. Colbert (Admitted to Practice)
                                       William M. Merone (*pro hac vice*)
                                       Erik C. Kane (*pro hac vice*)
                                       KENYON & KENYON LLP
                                       1500 K Street, NW
                                       Washington, D.C.  20005
                                       Telephone: (202) 220–4200
                                       Facsimile: (202) 220–4201
                                       Email: ecolbert@kenyon.com

                                       Frank L. Bernstein (SBN 189504)
                                       KENYON & KENYON LLP
                                       1801 Page Mill Road, Suite 210
                                       Palo Alto, California 94304
                                       Telephone: (650) 384-4700
                                       Facsimile: (650) 384-4701
                                       Email: fbernstein@kenyon.com

                                       *Attorneys for Defendant and*
                                       *Counter-Plaintiff Pintrips, Inc.*

and Appeal Board at the U.S. Trademark Office in an appropriate cancelation proceeding.