1   Edward T. Colbert (Admitted to Practice)
    William M. Merone (*pro hac vice*)
2   Erik C. Kane (*pro hac vice*)
    KENYON & KENYON LLP
3   1500 K Street, N.W.
    Washington, D.C. 20005
4   Telephone: (202) 220-4200
    Facsimile: (202) 220-4201
5   Email: ecolbert@kenyon.com

6   Frank L. Bernstein (SBN 189504)
    KENYON & KENYON LLP
7   1801 Page Mill Road, Suite 210
    Palo Alto, California 94304
8   Telephone: (650) 384-4700
    Facsimile: (650) 384-4701
9   Email: fbernstein@kenyon.com

10  *Counsel for Defendant*
    *and Counter-Plaintiff*
11  *Pintrips, Inc.*

12

13                          UNITED STATES DISTRICT COURT

14                         NORTHERN DISTRICT OF CALIFORNIA

15                            SAN FRANCISCO DIVISION

16

17  PINTEREST, INC.,
    a Delaware corporation,

18                                              Case No.  3:13-cv-4608-HSG
           *Plaintiff and Counter-Defendant,*

19
    v.                                          **DEFENDANT AND COUNTER-**
20                                              **PLAINTIFF PINTRIPS, INC.'S**
    PINTRIPS, INC.,                             **PROPOSED POST-TRIAL FINDINGS OF**
21  a Delaware corporation,                     **FACT AND CONCLUSIONS OF LAW**

22         *Defendant and Counter-Plaintiff*

23

24

25

26

27

28

# TABLE OF CONTENTS

## Findings of Fact

I.     WHAT IS PINTRIPS? .......................................................................................... 1

II.    HISTORY OF PINTRIPS ..................................................................................... 1

III.   WHAT IS PINTEREST? ....................................................................................... 3

IV.    THE PUBLIC UNDERSTANDS PIN OR PINNING TO MEAN THE
       FUNCTION OF AFFIXING ONE VIRTUAL OBJECT TO ANOTHER ......................... 4

V.     THE LACK OF CONFUSION BETWEEN THE PARTIES' TRADEMARKS
       AND PIN BUTTONS .......................................................................................... 8

## Conclusions of Law

I.     PLAINTIFF'S CLAIMS FOR RELIEF ................................................................. 13

       A.    Claims I, II, and IV – Trademark Infringement & Unfair Competition ............... 13

             1.    Plaintiff Cannot Establish Ownership Rights In Pin It or Pin as a
                   Trademark ........................................................................................ 14

             2.    The Term Pin Is Merely Descriptive or Generic ..................................... 15

             3.    Likelihood of Confusion Analysis Under Sleekcraft ............................... 18

                   a.    Similarity of the Marks ................................................ 19

                   b.    The Strength of the Mark ............................................. 21

                         (1)    Conceptual Strength .......................................... 21

                         (2)    Commercial Strength ......................................... 22

                   c.    The Proximity or Relatedness of the Goods or Services ............... 23

                   d.    Evidence of Actual Confusion ....................................... 25

                   e.    Marketing Channels Used ............................................ 27

                   f.    Types of Services and Degree of Care ........................... 28

                   g.    Defendant's Intent in Selecting the Mark ..................... 30

                   h.    Likelihood of Expansion .............................................. 31

                   i.    The Balance of Sleekcraft Factors Favors Defendant ................... 32

             4.    Defendant's Use of Pin Is Fair Use ....................................................... 32

       B.    Claims III and V - Dilution ........................................................................ 33

             1.    Plaintiff's PINTEREST Mark is Not "Famous" ...................................... 34

             2.    No Likelihood of Dilution by Blurring .................................................. 36

II.    DEFENDANT'S COUNTERCLAIMS FOR RELIEF ............................................... 37

KENYON & KENYON
LLP
PALO ALTO

PROPOSED POST-TRIAL FINDINGS OF
FACT AND CONCLUSIONS OF LAW

- i -

3:13-CV-4608-HSG

**TABLE OF AUTHORITIES**

### Cases

*Advertise.com, Inc. v. AOL Adver., Inc.*,
  616 F.3d 974 (9th Cir. 2010) ................................................................ 16

*Airwair Int'l. Ltd v. Vans, Inc.*,
  2013 WL 3786309 (N.D.Cal., July 17, 2013) .................................... 34

*America Online, Inc. v. AT & T Corp.*,
  243 F.3d 812 (4th Cir. 2001) ....................................... 17, 22, 33

*AMF, Inc. v. Sleekcraft Boats*,
  599 F.2d. 341 (9th Cir. 1979) ..................................................... passim

*Board of Regents v. KST Electric, Ltd.*,
  550 F. Supp. 2d 657 (W.D. Tex. 2008) .............................................. 35

*Bosley Medical Institute, Inc. v. Kremer*,
  403 F.3d 672 (9th Cir. 2005) ............................................... 25, 32

*Brookfield Commc'ns, Inc. v. West Coast Entertainment Corp.*,
  174 F.3d 1036 (9th Cir. 1999) .................................................. passim

*Builders Square, Inc. v. Wickes Companies, Inc.*,
  1985 WL 5469 (C.D. Cal. 1985) ........................................................ 20

*Cairns v. Franklin Mint Co.*,
  24 F. Supp. 2d 1013 (C.D. Cal. 1998) ......................................... 27, 33

*Celebrity Chefs Tour, LLC v. Macy's Inc.*,
  16 F. Supp. 3d 1159 (S.D. Cal. 2014) ........................................ 13, 14

*Cleary v. News Corp.*,
  30 F.3d 1255 (9th Cir.1994) .............................................................. 14

Coach Servs., Inc. v. Triumph Learning LLC,
  668 F.3d 1356 (Fed. Cir. 2012) ......................................................... 34

*Cohn v. Petsmart, Inc.*,
  281 F.3d 837 (9th Cir. 2002) ............................................................. 21

*Comedy III Productions, Inc. v. New Line Cinema*,
  200 F.3d 593 (9th Cir. 2000) (*en banc*).......................................... 16

*Credit One Corp. v. Credit One Financial, Inc.*,
  661 F. Supp. 2d 1134 (C.D. Cal. 2009) ............................................ 31

*Eastern Air Lines, Inc. v. New York Air Lines, Inc.*,
  559 F. Supp. 1270 (D.C.N.Y. 1983) ................................................. 17

*Electropix v. Liberty Livewire Corp.*,
  178 F. Supp. 2d 1125 (C.D. Cal. 2001) ............................................ 29

*Entrepreneur Media, Inc. v. Smith*,
  279 F.3d 1135 (9th Cir. 2002) ........................................................... 15

KENYON & KENYON
LLP
PALO ALTO

PROPOSED POST-TRIAL FINDINGS OF
FACT AND CONCLUSIONS OF LAW

- ii -

3:13-CV-4608-HSG

*Filipino Yellow Pages, Inc. v. Asian Journal Publ'ns Inc.*,
   198 F.3d 1143 (9th Cir.1999) ........................................................................ 16

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*,
   618 F.3d 1025 (9th Cir. 2010) ................................................................ 18, 19

*Hanginout, Inc. v. Google, Inc.*,
   2014 WL 5113601 (S.D. Cal., May 13, 2014) ........................................ 24, 28, 29

*Instant Media, Inc. v. Microsoft Corp.*,
   2007 WL 2318948 (N.D. Cal., Aug. 13, 2007) ............................................ 24

*Jada Toys, Inc. v. Mattel, Inc.*,
   518 F.3d 628 (9th Cir. 2007) ........................................................................ 34

*Keebler Co. v. Murray Bakery Products*,
   866 F.2d 1386 (Fed. Cir. 1989) .................................................................... 20

*Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*,
   150 F.3d 1042 (9th Cir. 1998) ...................................................................... 14

*Kern v. Mindsource, Inc.*,
   225 F.3d 663 (9th Cir. 2000) ........................................................................ 31

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   408 F.3d 596 (9th Cir. 2005) ........................................................................ 16

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*,
   543 U.S. 111 (2004) ...................................................................................... 32

*La Quinta Worldwide LLC v. Q.R.T.M., S.A. de .C.V.*,
   762 F.3d 867 (9th Cir. 2014) ................................................................ passim

*Lang. Retirement Living Pub. Co., Inc.*,
   949 F.2d 576 (2d Cir. 1991) .......................................................................... 26

*Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*,
   633 F.3d 1158 (9th Cir. 2011) ...................................................................... 36

*Levi Strauss & Co. v. Blue Bell, Inc.*,
   778 F.2d 1352 (9th Cir. 1985) ...................................................................... 14

*M2 Software, Inc. v. Madacy Entm't*,
   421 F.3d 1073 (9th Cir. 2005) ...................................................................... 19

*Marketquest Group, Inc. v. BIC Corp.*,
   2015 WL1757766 (C.D. Cal., April 17, 2015) .............................................. 33

*Mattel, Inc. v. MCA Records, Inc.*,
   28 F. Supp. 2d 1120 (C.D. Cal. 1998) .......................................................... 26

*Network Automation, Inc. v. Advanced Systems Concepts, Inc.*,
   638 F.3d 1137 (9th Cir. 2011) ................................................................ 22, 24

Nissan Motor Co. v. Nissan Computer Corp.,
   378 F.3d 1002 (9th Cir. 2004) ...................................................................... 35

*Petroliam Nasional Berhad v. GoDaddy.com, Inc.*,
    2010 WL 3619780 (N.D. Cal., Sept. 9, 2010) ............................................................... 32

*Planet Coffee Roasters, Inc. v. Hung Dam*,
    2010 WL 625343 (C.D. Cal., Feb. 18, 2010) ................................................................. 23

*Playboy Enters., Inc. v. Netscape Commc'ns Corp.*,
    354 F.3d 1020 (9th Cir. 2004) ....................................................................................... 28

*Sand Hill Advisors, LLC v. Sand Hill Advisors, LLC*,
    680 F. Supp. 2d 1107 (N.D. Cal. 2010) ................................................................... 19, 28

*Saul Zaentz Co. v. Wozniak Travel, Inc.*,
    627 F. Supp. 2d 1096 (N.D. Cal. 2008) ......................................................................... 31

*Self-Insurance Institute of America, Inc. v. Software and Information Industry Ass'n.*,
    208 F. Supp. 2d 1058 (C.D. Cal. 2000) ......................................................................... 30

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*,
    59 F.3d 902 (9th Cir. 1995) ........................................................................................... 22

*Stark v. Diageo Chateau & Estates Wines Co.*,
    907 F. Supp.2d  1042 (N.D. Cal. 2012) .................................................................... 22, 30

*SunEarth, Inc. v. Sun Earth Solar Power Co., Ltd.*,
    2013 WL 4528539 (N.D. Cal.  2013) ............................................................................. 31

*Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*,
    349 F.3d 601 (9th Cir. 2003) ......................................................................................... 14

*The Learning Network, Inc. v. Discovery Communications, Inc.*,
    153 F.Supp.2d 785 (D. Md. 2001) ................................................................................. 26

*Time, Inc. v. T.I.M.E. Inc.*,
    123 F. Supp. 446 (S.D. Cal. 1954) ................................................................................ 20

Toyota Motor Sales, U.S.A., Inc. v. Tabari,
    610 F.3d 1171 (9th Cir. 2010) ....................................................................................... 29

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
    505 U.S. 763 (1992) ....................................................................................................... 14

*United Tactical Systems, LLC v. Real Action Paintball, Inc.*,
    2014 WL 6788310 (N.D. Cal., Dec. 2, 2014) ........................................................... 34, 36

*Urban Home, Inc. v. Cordillera Inv. Co., LLC*,
    2012 WL 3704031 (C.D. Cal., June 19, 2014) .............................................................. 35

*Visa Int'l Service Ass'n v. Eastern Financial Credit Union*,
    1992 WL 138231 (9th Cir. 1992) .................................................................................. 27

*Walter v. Mattel, Inc.*,
    31 F.Supp.2d 751 (C.D. Cal. 1998) ............................................................................... 20

*Xen, Inc. v. Citrix Systems, Inc.*,
    2012 WL 5289609 (C.D. Cal., Oct. 25, 2012) ............................................................... 35

*Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove*,
    419 F.3d 925 (9th Cir. 2005) .............................................................. 14, 16

*Yelp Inc. v. Catron*,
    2014 WL 966706 (N.D. Cal., Oct. 1, 2014) ............................................ 14

*Zobmondo Entertainment, LLC v. Falls Media, LLC*,
    602 F.3d 1108 (9th Cir. 2010) ..................................................... 14, 16, 21

**Statutes**

15 U.S.C. § 1052 ............................................................................... 15, 39

15 U.S.C. § 1064 ............................................................................... 38, 39

15 U.S.C. § 1114 ............................................................................... 13, 32

15 U.S.C. § 1115(b) ................................................................................. 32

15 U.S.C. § 1119 ...................................................................................... 38

15 U.S.C. § 1125(a) ........................................................................... 13, 32

15 U.S.C. § 1125(c) ........................................................................... 13, 33

15 U.S.C. § 1127 ...................................................................................... 38

28 U.S.C. § 2201(a) ........................................................................... 37, 38

Cal. Bus. & Prof. Code § 14247 ........................................................ 13, 33

Cal. Bus. & Prof. Code § 17200 .............................................................. 13

**Treatises**

2 J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 12:47 ........ 16

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 21:104 (4th ed. 2014) .................. 35

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 24:19 (2014) .............................. 31

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:48 ........................................... 20

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:49 .......................................... 20

*4* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 12:13 .......................................... 16

4 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:66 ........................................... 17

Jacob Jacoby, *Trademark Surveys*, Vol. 1, (2013) ................................................. 26, 27

Defendant and Counter-Plaintiff Pintrips, Inc. hereby submits the following proposed findings of fact and conclusions of law based on admitted evidence and testimony provided at trial, and on controlling or persuasive legal precedent.

**PROPOSED FINDINGS OF FACT**

I.   **WHAT IS PINTRIPS?**

1.   Pintrips is a travel planning service that enables users to research flights and to book their travel.  With Pintrips, users may easily compare route and price options, effortlessly monitor price changes, and seamlessly co-ordinate flights from travel sites with fellow travelers.  (Trial Tr. Vol. 1, 138:6-8; 172:1-24; Vol. 2, 233:8 – 234:10; 314:17 – 315:6; 315:17 – 319:8; 337:13-19; Vol. 3, 452:4-16; 464:1 – 479:21; TX85; TX206D; TX240; TX241; TX245; TX1141 at p.4.).

2.   Using the Pintrips' service and software, users can shop for flights at their favorite providers' sites (*e.g.*, united.com), pin the flights they care about to a personalized travel pinboard and then compare options side-by-side with other pinned flights and get real-time price updates.  (*Id.*; Trial Tr. Vol. 3, 534:15 – 535:2).

3.   A user's trip information (*i.e.*, itinerary and flight information) is private and accessible by the user's specific invitation only.  The information is shared only when a user expressly permits it, and then, it is shared only with the individuals that the user specifically invites.  There is no automatic sharing of information with all Pintrips users, or any subset of Pintrips users.  (Trial Tr. Vol. 2, 344:3-8; Vol. 3, 476:1 – 478:15; 536:2-11; Vol. 4, 661:10-23).

4.   Pintrips does not have any social media function.  (Trial Tr. Vol. 1, 173:2 – 174:13; Vol. 2, 242:25 – 243:12; Vol. 3, 531:10-12; Vol. 4, 670:20 – 671:17).

II.   **HISTORY OF PINTRIPS**

5.   Co-Founder Stephen Gotlieb came up with the concept of Pintrips' service starting in 2010 and created initial mockups for the service as a class project for his MBA program in January 2011.  The result of that frustration was the motivation to create a travel planning

KENYON & KENYON
LLP
PALO ALTO

PROPOSED POST-TRIAL FINDINGS OF
FACT AND CONCLUSIONS OF LAW

- 1 -

3:13-CV-4608-HSG

service that could facilitate easy comparison of flight information among various airlines. (Trial Tr. Vol. 3, 451:21 – 456:14; TX1216).

6.  The goal of his MBA program was to create a viable startup company.  Therefore, on March 21, 2011, Mr. Gotlieb incorporated the entity Flightrax, Inc. that would later come to offer the Pintrips service first conceptualized in the MBA class under the Pintrips trade name.  (*Id.*; Vol. 3, 457:10 – 462:12; TX1216).

7.  During a meeting that occurred June 8-10, 2011, Mr. Gotlieb met with, *inter alia*, co-founder Timothy O'Neil-Dunne and software developer Ashley Raiteri and Paul Addy to discuss the concept of Pintrips and to further develop a viable business model. (Trial Tr. Vol. 3, 458:21 – 460:11; Vol. 4, 642:9 – 645:19; TX1172).

8.  Out of that meeting, the founders came up with two complementary businesses.  The first became known as Pintrips and would provide travel planning services.  The second business was discussed as being called Goodr (although that name was never finalized) and would be a data mining business that would provide a soup-to-nuts automated booking service.  (*Id.* at 460:12 – 463:1).

9.  During that meeting, the name Pintrips was proposed as it suggested the purpose of the service, namely for users to pin their trip information.  (*Id.*; Vol. 4, 645:20 – 650:10; 651:11 – 655:10; 655:23 – 657:12; 659:5 – 661:2; TX1106; TX1117).

10.  Five days after the meeting, on June 15, 2011, Mr. Raiteri registered the domain names <pintrips.com>, <pintrips.net> and <pintrips.org> on behalf of Pintrips.  (Trial Tr. Vol. 1, 145:4 – 22; Vol. 3, 483:1-4; Vol. 4, 655:11-22; 657:19 – 658:15; TX1107).

11.  As early as September 2011, Pintrips had a functional service operating on the pintrips.com website.  Pintrips continued to test the service with members of the public in 2011, had a beta launch in 2012, and went out of beta in 2013.  Since 2011, Pintrips had a website publicly available that advertised its service using the PINTRIPS mark.  (Trial Tr. Vol. 1, 142:6-14; 156:16-22; 170:17-20; Vol. 2, 222:21 – 224:12, 299:8-13; 343:13 – 344:1; Vol. 3, 495:5-21; 506:20-25; 504:9 – 505:18; Vol. 4, 669:8 – 670:19).

12.     Prior to creating the PINTRIPS mark, the group choosing the name Pintrips had never heard of Pinterest.  (Trial Tr. Vol. 3, 456:15-17; 481:2 - 486:6; TX1117).

### III.     WHAT IS PINTEREST?

13.     Pinterest is an online scrapbooking and social media service.  (TX180A at pp. 2-4; Trial Tr. 2, 284:17 – 285:21).

14.     Pinterest has described itself as a virtual pinboard akin to the cork pinboards of old where people would pin their photos and other items.  (TX180 at p.3).

15.     Part of the Pinterest service is that it functions as a social media forum for users to search other users' pinboards and share their pinboards publicly with other users.  (Trial Tr. Vol. 1, 61:17 – 62:3).

16.     Pinterest has become a haven for scrapbookers collecting images and articles of assorted things from crafts and baked goods to cute pictures of puppies. (Trial Tr. Vol. 1, 53:2-11; 55:9-13; 130:14-18; TX176).

17.     Pinterest does not offer any travel services.  The most that Pinterest does is offer ad space for a variety of advertisers (including clothiers as well as travel providers) through its promoted pin feature.  Similar to Google Adwords, promoted pin companies can pay to have their pinboards appear prominently in the Pinterest search results.   However, Pinterest is not actually offering any travel services and merely acts as a billboard (or pinboard) for a variety of advertisers.  (Trial Tr. Vol. 1, 66:3-67:5; 87:17 – 88:15; Vol. 2, 266:11 – 267:2; 277:7 – 281:12; Vol. 3, 495:5 – 503:21; Vol. 4, 672:2-5; 699:15 – 700:2; 728:12 – 729:3; TX1141; TX1142).

18.     In addition, the fact that users of Pinterest may use the service to pin their vacation photographs (or cute puppy or cupcake photographs) to their pinboards, does not mean Pinterest is offering travel services (or dog breeding or baking services).   Pinterest believes that anything its users post on its site puts it in that business space (Trial Tr. Vol. 1, 127:7 – 129:23; 132:12 – 133:13).

## IV.     THE PUBLIC UNDERSTANDS PIN OR PINNING TO MEAN THE FUNCTION OF AFFIXING ONE VIRTUAL OBJECT TO ANOTHER

19.    Follow.  Like.  Pin.  Search.  Select.  These are just some of the words that make up the language of the Internet.  Each word denotes a particular function—when put on a clickable website "button" it tells the user what the button does—and no company can monopolize it for that common, ordinary purpose.  Software designers traditionally use "real-world metaphors"— *e.g.*, "folders," "files," "desktops," "bulletin boards"— when naming technological functions.  (Trial Tr. Vol. 3, 542:24 – 545:21).

20.    A "pin" or "pinning" is a common functional term frequently used by software providers (including in the travel industry), customers, analysts, users, and the media to describe shared features of operating systems, websites, map applications, graphic user interfaces, applications and other software programs.  (Trial Tr. Vol. 2, 230:1-6; 321:22 – 322:8; 342:4 – 343:5; Vol. 3, 456:18-21; 486:7-11; 487:12-15; 489:11 – 491:9; 492:2 – 493:22; Vol. 4, 612:19 – 613:5; 650:10 – 651:10; 661:24 – 662:13; TX1069).

21.    The first electronic "bulletin boards" appeared in 1978 and were designed to replicate the cork bulletin boards often found in grocery stores, offices, schools, and clubs, onto which notices were "pinned."   Many people referred to leaving messages on an electronic bulletin board as "pinning" the messages there.  (Trial Tr. Vol. 3, 545:22 – 547:19; 552:5 – 556:5; 556:17 – 557:9; Vol. 4, 650:23 – 651:10; TX1037; TX1039; TX1040; TX1041).

22.    Once the graphical World Wide Web became popular in the mid-1990s, however, people began using "pin" and "pinning" as metaphors for attaching virtual objects to electronic bulletin boards:

    "Pinning Hopes on Computer Bulletin Boards." (TX1039) (1994).

    "There are two kinds of [message] system[s]: 'person to person', and 'computer conferencing'. ... The point of the conference system is that messages are sent to a bulletin board and left 'pinned up' for future reference."  (TX1040) (1994).

    "Learners and instructors …post[] an e-mail message to a bulletin board in much the same way that they would pin a note on a cork board. "  (TX0141) (1997)

(Trial Tr. Vol. 4, 552:5-17, 555:18-557:9, TX1039-TX1041).

23.     An illustrative example of this real-world metaphorical use was The Internet Pinboard, a virtual pinboard that was available online two years *before* Pinterest was even founded, and which arguably is one of the conceptual predecessors of Pinterest itself.  Users of The Internet Pinboard could "pin" almost any virtual object—*e.g.*, photos, notes, artwork, website links, music, videos—to a graphical user interface that looked like a giant cork pinboard, and that pinned user content was then referred to as "pins." (Trial Tr. Vol. 4, 595:5-8; 596:15 - 597:11; 598:21 – 599:2; TX1341).

24.     Beginning with the launch of the Windows XP operating system in August 2001, and for all subsequent versions of the ubiquitous computer operating system, Microsoft has allowed computer users to pin items (such as programs, folders, and files) to their desktop environment by selecting either "Pin to Start" or "Pin to Taskbar."  Microsoft also incorporated pinning functionality into its other product offerings such as Internet Explorer, Microsoft Office, and Windows Phones.  (Trial Tr. Vol. 3, 490:14-22, 492:2 - 493:20; 557:10 – 570:10; 599:11 – 600:5; 603:15-17; 605:2-12; 608:14 – 609:3; TX1053; TX1055; TX1056; TX1057; TX1058; TX1059; TX1076; TX1334; TX1335; TX1348).

25.     The Internet giant Google also lets its hundreds of millions of users pin things.  For example, Google has a toolbar to which users can pin buttons using the "Pin button" command.  Google's Android mobile phone operating system lets you "Screen Pin" (which "pins the screen to a particular app"), and its Play Music app can pin music to a device.  (Trial Tr. Vol. 3, 487:12-15, 493:7-22; 570:20 – 577:6; TX1060; TX1069; TX1070; TX1071; TX1072).

26.     Millions of users of Facebook also pin.  Posts can be pinned to the top of a group's page by clicking "Pin Post" (and removed by selecting "Unpin Post"), or to the top of a timeline by choosing "Pin to Top."  Facebook users can also "pin" their postings to the top of their personal timelines, and are told how "pinning" differs from "highlighting. (Trial

Tr. Vol. 4, 490:6-13; 589:18 – 592:3; 599:3-10; 608:2-13; 638:19-23; TX1065; TX1068; TX1333)

27.    Blackberry users are told that To pin a file, tap 📎 and To unpin a file, tap 📎. "When you pin a file it is saved to your BlackBerry device … If a file is not pinned, it is not available when you're offline." (Trial Tr. Vol. 4, 600:6-22; TX1336).

28.    Kayak patrons could once click on a "pin" button and "pin [travel] itineraries" to another location, much like Pintrips' customers can do today. (Trial Tr., Vol. 4, 489:11-25). And Twitter users can pin tweets to a Twitter feed. (Trial Tr. Vol. 4, 637:6-10).

29.    There are numerous other software programs and Internet services that likewise use the terms pin and pinning to refer to the function of affixing one virtual object to another. (Trial Tr. Vol. 4, 592:6 – 595:4; 601:6 – 602:5; 637:11-16; TX1048; TX1049; TX1337; TX1338; TX1339).

30.    The media has likewise long recognized the functional nature of the terms "pin" and "pinning" and has frequently used them to denote attaching one virtual object to another long before Pinterest was even founded. (Trial Tr. Vol. 4, 601:20-610:2; TX1339; TX1340; TX1342; TX1343; TX1344; TX1345; TX1346; TX1347; TX1348); (*accord* TX205F, p. 2 (defining "pin" when used as a verb to mean "[t]o attach … with or *as with* a pin").

31.    The U.S. Patent and Trademark Office ("USPTO") in rejecting one of Pinterest's specimens showing how it used "pin" on its "Pin It" button, specifically stated that, "[i]n such presentation, the term PIN does not identify the source of any particular service, but is a shorthand term for the action performed by applicant's customers." (TX1086 at p. 169 (4/11/2014 Office Action)); TX1087 at p.89 (4/11/2014 Office Action).

32.    Pinterest itself also uses "pin" and "pinning" as functional terms and embraces the metaphorical reference to real-life pinboards. For example, and like users of The Internet Pinboard before, Pinterest users are told that "pins" are the items that have been pinned to their "boards" through a process called "pinning." There is no evidence that the public perceives Pinterest's use of "pin" as anything other than its ordinary meaning. (Vol. 2,

261:2-10; Vol. 5, 862:17-23; 864:10 – 867:5; TX133 at PIN00017203, #9 (Referring to the site, *inter alia*, as a pinboard and finding "The metaphors that people find most compelling are the ones that are closest to the name and design of your site."); TX180 at PIN12496; TX263; TX1081 [Resp. to Rog. 7]); *see also* TX127 (reporting that Plaintiff's co-founder came up with the idea for PINTEREST based on his experiences as a child when he would collect insects and "pin them to a piece of cardboard").

33.   On behalf of Defendant, Dr. Brian Robertson conducted a survey testing how consumers perceived the purpose of a button in an online computer environment.   The survey determined that although the label on some buttons act as source identifiers (Tumblr – 92%, Tweet – 87%) a majority of those surveyed found the word "pin" on a button indicated only a function and not a brand (62%).   (Trial Tr. Vol. 5, 753:19 – 790:24 [ultimate conclusion at 786:18 – 787:1]; TX1082; TX1083).

34.   Had the context provided by the Pintrips site also been considered—including placement of the button alongside the information meant to be "pinned" and next to explanatory text that informed consumers that they could use the button to "pin the [flights] you want to save into a personal trip board" the percentage of consumers who thought the button "only tells me what the button does" would have been even higher.   (Trial Tr. Vol. 5, 814:21-815:11, 823:2-824:8; TX240).

35.   Both the inherent meaning conveyed by the word "pin" when it appears on a button and the specific context in which consumers encounter the Pintrips button (alongside text that tells them they can use the button to "shop around for flights and pin the ones [they] want to save into a personal trip board") tell consumers what the Pintrips "pin" button *does*— namely, that it "pins" flight information.   (*Id.;* TX240) (emphasis added).

36.   Pintrips' use of "pin" for its common, ordinary meaning was intentional.   There is no subtlety or hidden meaning here—the website clearly informs users that they can use the "Pin" button to "Pin any flight from any site," and that "[w]ith the Pintrips Pin Button" they can "shop around for flights and pin the ones [they] want to save into a personal trip board"   (Trial Tr., Vol. 4, 526:14-528:5; TX240; TX241).

37. Pintrips' founders picked the PINTRIPS name because it was informative—that is, it told consumers the website was all about "pinning trips." (Trial Tr. Vol. 3, 460:4-25; Vol. 4, 645:20-647:10; 648:25-652:22).

## V. THE LACK OF CONFUSION BETWEEN THE PARTIES' TRADEMARKS AND PIN BUTTONS

38. In this case, the parties' respective marks are not the same, nor highly similar. Plaintiff's alleged three syllable mashup trademark "PINTEREST" does not sound or look similar to Defendant's two word, two syllable combination PINTRIPS trademark. (Trial Tr. Vol. 1, 167:25 – 168:13; Vol. 2, 291:9 – 292:13; Vol. 3, 482:1-7; Vol. 4, 699:13-14).

39. Both marks suggest a course of action for the parties' respective and disparate services, namely to either pin your interests (Pinterest) or to pin your trips (Pintrips). (Trial Tr. Vol. 3, 482:8-25).

40. The only similarity between the respective marks is the usage of the word "p" with "interest" to form the word "pin" (Pinterest) and the word "Pin" (Pintrips) to connote the action to be taken in the respective services. (Trial Tr. Vol. 2, 346:13-18).

41. This understanding of pin as meaning to affix one virtual object to another is established among the consuming public and is used repeatedly by the media and third party software and Internet service providers.

42. In addition, Pintrips is not using pin as a trademark. Rather it only appears on a button on Pintrips' software interface to indicate a function. (Trial Tr. Vol. 2, 245:19 – 246:5).

43. Other than on Defendant's website www.pintrips.com, the only time a consumer will encounter Defendant's mark is when he or she specifically installs Defendant's software downloaded from the Pintrips site and creates an account with Pintrips. Only when the software is installed, will a consumer see the PINTRIPS mark while navigating to certain flight providers' websites, such as united.com. (Trial Tr. Vol. 3, 464:2 – 479:21).

44. Pintrips provides its functionality by means of a browser extension, at present solely on the Google Chrome® web browser. The only way a user would ever see the Pintrips' pin button and be able to use it is if he or she:

i. visits www.pintrips.com using the Chrome® browser,

ii. creates an account with Pintrips,

iii. installs a browser extension locally on his/her computer,

iv. logs in to the browser extension using his/her Pintrips' account credentials,

v. identifies trip parameters in which the user is interested,

vi. visits a participating provider's Web site (e.g., united.com) on the same computer on which the user installed the browser extension, and

vii. identifies an itinerary in which the user is interested.

(Trial Tr. Vol. 2, 235:18 – 236:11; Vol. 3, 464:2 – 479:21; Kleiman Depo. 41:21 – 42:7).

45.     As a result of the user performing step vi. (on the United Web site, as an example) after performing steps i. – v., the user's local computer Google Chrome® browser will go to the United Web site, where United will search for flights for the identified trip parameters. The United Web site will be framed with the Pintrips logo and toolbar at the top of the United Web site. The banner invites the user to "[s]ave flights using [the Pintrips pin button]". The Google Chrome® browser extension will place the Pintrips pin button underneath prices for different flights. When the user clicks on the Pintrips pin button for a particular flight, that flight, and its corresponding fare, can be pinned to the Pintrips' pinboard in that user's account. *Id.*

46.     In this context, Pintrips' pin button *never* appears in the marketplace outside the usage of the Pintrips' browser extension software.  As a result of that software, the Pintrips' pin button is *only* displayed in conjunction with the PINTRIPS trademark and stylized logo. The presence of the house brand dispels any possible confusion. *Id.*

47.     Moreover, the Pintrips' PINTRIPS trademark and its functional pin button only ever appear for a user if that user had previously logged into their Pintrips account that they created on the www.pintrips.com website, and visited the travel site (like united.com) through the Pintrips account. *Id.*

48.   The Pintrips pin button never appears on a website next to any social media website badges or buttons.  (Trial Tr. Vol. 2, 242:18 – 243:12; 245:19 – 246:5; Vol. 4, 670:20 – 671:17).

49.   In its approval of the PINTRIPS mark for publication, the USPTO did not cite Plaintiff's application for "PIN" or Plaintiff's registration for "PINTEREST" as potentially confusing, nor did the USPTO otherwise suggest any issue was created by any of Plaintiff's alleged marks.  The PINTRIPS mark was approved by the USPTO Examining Attorney even though that Examining Attorney had located and had before her the Pinterest applications and registrations relied on by plaintiff in this case.  The USPTO did not find that Pintrips' PINTRIPS mark was confusingly similar to Plaintiff's application for "PIN" or its registration for "PINTEREST."  (Trial Tr. Vol. 4, 708:13 – 730:23; TX24; TX1080 at pp. 3, 15).

50.   Based on USPTO trademark application examination procedure, the Examining Attorney conducted a search for confusingly similar marks when examining the PINTRIPS application.  That search disclosed the Pinterest trademark applications and registrations.  In determining whether a likelihood of confusion exists, the Examining Attorney at the USPTO will consider the similarity of the marks and the similarity of the recited goods and services in the respective applications/registrations and the mark applied for.  The identified Pinterest applications and registration described goods and services which overlapped with the goods and services covered by the PINTRIPS trademark application.  Since the Examining Attorney likely did not find a likelihood of confusion between PINTRIPS and PINTEREST despite the similarity of the claimed goods and services, the necessary conclusion is that the Examining Attorney did not view the marks as being sufficiently similar to cause confusion.  (*Id.*).

51.   The marketplace experience supports that determination that confusion is not likely.  The parties have coexisted for over 3 years without actual confusion.  (Trial Tr. Vol. 2, 321:17-21; Vol. 4, 672:6-8).

52. Pinterest claims to have over 100 million users.  If Plaintiff actually were in the same commercial space with Pintrips, it might be expected that there would be significant evidence of actual confusion.  Pinterest has presented no admissible evidence of actual confusion of the public.

53. The only evidence Plaintiff presented was a hearsay statement in email from a Pintrips' user that knew she was contacting Pintrips, and had trouble logging onto her Pintrips' account.  There is no evidence as to why the out-of-court declarant wrote the word "Pinterest" and could have been, for example, a machine function, such as predictive typing.  The face of the email makes clear she intended to contact Pintrips, and did so. (Trial Tr. Vol. 2, 335:6-12; 336:2-9; 341:3-13; TX87).

54. Plaintiff also relies on a hearsay statement made by Ms. Hadar Gotlieb concerning a statement allegedly made by her mother-in-law.  However, there is nothing that suggests Ms. Gotlieb's mother-in-law was actually confused in a trademark sense.  She was not a target consumer for Defendant's product and hence not a relevant consumer.  Further, her hearsay statements are even more questionable given that English was not her native language nor was it even her second language.  In addition, Ms. Gotlieb herself could not recall the full context of her mother's statements or what precisely was said.  (Vol. 8, 1069:2 – 1070:5; Hadar Gotlieb Depo. 47:3-19).

55. Pinterest has presented no admissible evidence in the form of a properly conducted consumer survey that use of Pintrips would be likely to cause confusion with any marks of Plaintiff.

56. On behalf of the Plaintiff, Deborah Jay conducted an Internet-based study that purported to measure whether Pintrips' users would be confused if it were to create a pin button using an application programming interface ("API") technology, and then employ that button as a social media badge on third party websites.  Dr. Jay's study, however, failed to replicate marketplace conditions as Pintrips does not and has never used a pin button as a social media badge or button.  The test stimulus, therefore, created an artificial use that is completely different from how Pintrips displays its functional button.  In addition, Dr. Jay

improperly counted people as confused that clearly appear to be guessing, based on their verbatim responses. Finally, Dr. Jay asked leading questions that assumed the word pin to be source identifying and also invited guessing. (Trial Tr. Vol. 1, 173:2 – 174:13; Vol. 2, 242:25 – 243:12; 244:14 – 245:7; 248:18 – 249:3; 385:21-25; Vol. 3, 404:16 – 409:12; 414:6-25; 416:10-18; 423:3 – 428:14; 439:5-8; 502:2-10; 531:10-12; Vol. 6, 992:4 – 993:6; Vol. 7, 1022:9 – 1028:10; 1028:11 – 1032:13; 1032:15 – 1034:10; 1034:20 – 1035:8; TX207B at p. D-7; TX207D).

57. On behalf of the Plaintiff, Jacob Jacoby conducted an Internet-based study that purported to measure confusion based on the Pintrips' home page. Dr. Jacoby's study however, failed to account for, *inter alia*, marketplace conditions, failed to sample a representative universe of respondents, failed to control for use of pin functionally; encouraged guessing, used biasing questions, and improperly tabulated the results to include guesses. (Trial Tr. Vol. 6, 932:19 – 934:16; 936:13 – 937:3; 938:5-7; 939:19 – 942:1; 943:8 – 945:2; 956:10 – 957:3; 961:3 – 967:20; 970:12 – 973:25; 978:7-22; 992:4 – 993:6; 994:4-13; 995:17 – 997:23; 998:5 – 999:6; 99:10 – 1000:7; 1000:8 – 1004:6; 1004:11 – 1009:21; 1009:22 – 1017:11; 1017:14 – 1022:1; Vol. 7, 1079:15 – 1083:4; 1084:1-12; 1086:3 – 1087:15; TX206D; TX206E; TX206F2).

58. Plaintiff provided no evidence to support a finding that Pinterest will be expanding its services beyond advertising, to actually provide travel services to consumers. (Trial Tr. Vol. 1, 66:3-67:5; 87:17 – 88:15; Vol. 2, 280:15-21).

59. Defendant did not adopt its PINTRIPS mark with intent to tread on Plaintiff's goodwill. None of Defendant's co-founders had even heard of Pinterest at the time of creation of the PINTRIPS mark. (Trial Tr. Vol. 1, 168:25 – 169:15; Vol. 2, 225:1-12; Vol. 3, 456:15-17; 481:2-8; 482:1-4; Vol. 4, 664:9-24; 665:13 – 668:14).

60. Mr. Gotlieb, Defendant's CEO, conducted his own trademark search through a third party vendor and believed that his company name and mark, PINTRIPS, was available. (*Id.*)

1    **PROPOSED CONCLUSIONS OF LAW**

2    **I.    PLAINTIFF'S CLAIMS FOR RELIEF**

3    61.    Plaintiff asserts five (5) claims for relief in its Second Amended Complaint, namely:

4    (i) infringement of a federally-registered trademark under 15 U.S.C. § 1114; (ii) federal

5    false designation of origin under 15 U.S.C. § 1125(a); (iii) federal trademark dilution

6    under § 1125(c); (iv) unfair competition under Cal. Bus. & Prof. Code § 17200; and (v)

7    trademark dilution under Cal. Bus. & Prof. Code § 14247.

8    **A.    Claims I, II, and IV – Trademark Infringement & Unfair Competition**

9    62.    The Lanham Act prohibits infringement of either a registered mark (Section 32, 15 U.S.C.

10    § 1114) or an unregistered, common law mark (Section 43(a), 15 USC § 1125(a).  Section

11    32 imposes civil liability for "use in commerce [of] any ... copy, or colorable imitation of

12    a registered mark ... which … use is likely to cause confusion, or to cause mistake, or to

13    deceive." 15 USC § 1114(1)(a).  Similarly, the relevant inquiry in a federal claim of unfair

14    competition under Section 43(a) is whether Defendant "… on or in connection with any

15    goods…or any container for goods, uses in commerce any …symbol, or device, …

16    which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the

17    affiliation, connection, or association … with another person, or as to the origin,

18    sponsorship, or approval of his or her goods … or commercial activities by another

19    person, …." 15 U.S.C. § 1125(a)(1)(A).

20    63.    Cal. Bus. & Prof. Code § 17200 provides that "unfair competition shall mean and include

21    any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or

22    misleading advertising and any act prohibited by Chapter 1 (commencing with Section

23    17500) of Part 3 of Division 7 of the Business and Professions Code."

24    64.    Plaintiff's claims under §§ 1114 and 1125(a) of the Lanham Act are identical save the

25    latter claim "does not require that the mark be registered." *Celebrity Chefs Tour, LLC v.*

26    *Macy's Inc.*, 16 F. Supp. 3d 1159, 1166 (S.D. Cal. 2014) referencing *Brookfield*

27    *Commc'ns, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 n. 6, 8 (9th Cir.

28    1999).

1    65.    The Ninth Circuit has '"consistently held ... actions pursuant to California Business and

2           Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham

3           Act. *Yelp Inc. v. Catron*, 2014 WL 966706, *10 (N.D. Cal., Oct. 1, 2014) *quoting Cleary*

4           *v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir.1994).   Accordingly, "the Court [may

5           properly] analyze[] these claims [I, II, and IV] jointly." *Celebrity Chefs Tour*, 16 F. Supp.

6           3d at 1166.

7                         1.    ***Plaintiff Cannot Establish Ownership Rights In Pin It or Pin as a***

8                               ***Trademark***

9    66.    To prevail on Claims I, II, and IV, Plaintiff "must establish ownership of a trademark and

10          a likelihood of consumer confusion."   *La Quinta Worldwide LLC v. Q.R.T.M., S.A. de*

11          *.C.V.*, 762 F.3d 867, 874 (9th Cir. 2014) referencing *AMF, Inc. v. Sleekcraft Boats*, 599

12          F.2d. 341, 348-49 (9th Cir. 1979).

13   67.    A mark is valid and entitled to protection if it is (i) non-functional and (ii) distinctive. *See*

14          *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992); *accord Kendall-Jackson*

15          *Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 (9th Cir. 1998).

16   68.    The burden of proving or disproving validity turns on whether the Plaintiff's mark-at-

17          issue is registered with the United States Patent and Trademark Office.  "If the plaintiff

18          establishes that a mark has been properly registered, the burden shifts to the defendant to

19          show by a preponderance of the evidence that the mark is not protectable." *Zobmondo*

20          *Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010); *see also*

21          *Talking Rain Beverage Co. Inc. v. South Beach Beverage Co.*, 349 F.3d 601, 603 (9th Cir.

22          2003) ("Talking Rain's trademark is presumptively valid because it has been registered.").

23          However, if the plaintiff's mark-at-issue is unregistered, then the plaintiff has the burden

24          of proving validity. *See Yellow Cab Co. of Sacramento v. Yellow Cab of Elk Grove*, 419

25          F.3d 925, 928 (9th Cir. 2005).

26   69.    Further, Plaintiff may only rely on statutory presumptions to the extent their claimed use

27          is covered by their registrations. *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352,

28          1354 (9th Cir. 1985).  Plaintiffs' registrations here do not cover either "the act of saving

digital content from a third-party website" onto Pinterest, or the "digital content" itself. (TX25, TX26; *cf.* Trial Tr. Vol. 1, 15:2-25, 25:2-9).  Thus, Plaintiff may not rely on any statutory presumptions to the extent they are seeking to enforce alleged rights outside the scope of the registration.

70.   Plaintiff has presented no evidence to suggest its alleged unregistered "PIN IT" mark is valid.   To the contrary, the prosecution history from Plaintiff's own trademark applications for "PIN" suggest that its "PIN IT" button connotes a function and does not function as a brand identifier.  (TX1086 at p. 169 (4/11/2014 Office Action)); TX1087 at p.89 (4/11/2014 Office Action).

71.   In addition, Plaintiff has presented no evidence of secondary meaning or any consumer recognition of its alleged "PIN IT" mark that might suggest the alleged mark functions as a brand identifier and not merely as an indicator of function.

72.   Plaintiff has presented no evidence that its alleged PIN mark actually functions as a source identifier for the services at issue in this case, and not a mere indicator of function.  This is especially true in view of the overwhelming evidence that the public understands the term "pin" to mean a particular function.  *See* discussion *supra*.

## 2.   *The Term Pin Is Merely Descriptive or Generic*

73.   The distinctiveness requirement is derived from 15 U.S.C. § 1052, which provides, in pertinent part, that "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it […] (e) consists of a mark which (1) when used on or in connection with the goods of the applicant is merely descriptive or deceptively misdescriptive of them."

74.   A "descriptive" trademark "define[s] qualities or characteristics of a product in a straightforward way that requires no exercise of the imagination to be understood." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141-42 (9th Cir. 2002).  A descriptive mark is only protectable if it acquires distinctiveness through secondary meaning.

1    *Zobmondo Entmt., LLC*, 602 F.3d at 1113; *see also Comedy III Productions, Inc. v. New*

2    *Line Cinema*, 200 F.3d 593, 595 (9th Cir. 2000) (*en banc*) (*accord*).

3    75.   A "generic" trademark "refer[s] to 'the genus of which the particular product or service is

4    a species,' i.e., the name of the product or service itself." *Advertise.com, Inc. v. AOL*

5    *Adver., Inc.*, 616 F.3d 974, 977 (9th Cir. 2010) *quoting Filipino Yellow Pages, Inc. v.*

6    *Asian Journal Publ'ns Inc.*, 198 F.3d 1143, 1146 (9th Cir.1999))."

7    76.   Unlike inherently distinctive marks or marks that have acquired distinctiveness, generic

8    marks are not eligible for trademark protection, even if they acquire "de facto" secondary

9    meaning. *See KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596,

10   602 (9th Cir. 2005) ("Generic marks are not capable of receiving protection because they

11   identify the product, rather than the product's source."); *see also* 2 J. Thomas McCarthy,

12   *McCarthy on Trademarks*, § 12:47 ("A showing of 'secondary meaning,' no matter how

13   strong, can never earn trademark status for a generic word or phrase. It is this fact that has

14   led to the coining of the phrase 'de facto secondary meaning.'").

15   77.   The Ninth Circuit uses the "who-are-you/what-are-you" test to determine whether a mark

16   is generic, *i.e.*: Who are you?  Where do you come from?  What do you do?  *See e.g.,*

17   *Advertise.com, Inc.,* 616 F.3d at 978 quoting *Filipino Yellow Pages,* 198 F.3d at 1147.  In

18   other words, courts "look to whether consumers understand the word to refer only to a

19   particular producer's goods or whether the consumer understands the word to refer to the

20   goods themselves." *Yellow Cab*, 419 F.3d at 929.

21   78.   Evidence of genericness can include the following: (1) generic use by competitors of the

22   mark that has not been contested by the owner of the mark; (2) generic use of the

23   trademark by the proponent of the trademark; (3) dictionary definitions to determine

24   public usage; (4) generic usage in the media of the trademark, such as in trade journals

25   and newspapers; (5) testimony of persons in the trade; and (6) consumer surveys. *See*

26   *McCarthy on* Trademarks *and Unfair Competition* § 12:13; see also *Filipino Yellow*

27   *Pages,* 198 F.3d at 1150–51.

28

79. In this case, there is overwhelming evidence that consumers, the media, third party software and Internet products all use the terms "pin" and "pinning" functionally to describe the action of affixing one virtual object to another. In addition, Plaintiff itself has described its service using "pin" generically. The USPTO itself viewed certain uses by Plaintiff of the word "pin" to connote a function of the service and not act as a brand identifier. Finally, a majority of potential consumers surveyed found the word "pin" on a button indicated only a function and not a brand (62%). *See* Findings of Fact Section IV *supra*.

80. Based on the overwhelming usage of the terms pin and pinning to describe a function carried out by a number of computer and Internet services, pin and pinning are generic terms used to describe the function of affixing one virtual object to another.

81. Plaintiff suggests that because it operates the largest and best-known website that uses the term "pin," other companies should be enjoined from using the term, including on a website "button" that allows users to "pin" things. (Doc. No. 134, ¶¶ 9, 22-23; *see also id.*, pp. 12-13; Trial Tr., Vol. 1, 194:17-18). Plaintiff, though, is merely attempting to claim rights based on "*de facto* secondary meaning," an argument that has been rejected by courts time and again. *See, e.g., America Online, Inc. v. AT & T Corp.*, 243 F.3d 812, 822 (4th Cir. 2001) ("evidence of association may establish what is called 'de facto secondary meaning,' but such secondary meaning does not entitle [a plaintiff] to exclude others from a functional use of the words"); *Eastern Air Lines, Inc. v. New York Air Lines, Inc.*, 559 F. Supp. 1270, 1275 (D.C.N.Y. 1983) (that survey respondents mentioned "Eastern" when they heard the word "shuttle" did not prove that "shuttle" was a protectable trademark; it merely showed "that a likely response to any generic word is the name of the best known producer or manufacturer of that product"); *McCarthy on Trademarks*, § 7:66.

82. According to Plaintiff, it uses "pin" as a verb with its online scrapbooking service to denote the act of "taking … digital content … from a third-party website" and saving it to a user's "board." (Trial Tr. Vol. 1, 15:17-25; 25:2-9). What Plaintiff describes, however,

is merely a common use of "pin."  Technology companies have been using "pin" to refer to the act of taking a virtual object from one digital location and attaching it somewhere else since long before Plaintiff even entered the field.  (*See, e.g., Id.,* Vol. 1, 121:2-10, Vol. 2, 253:5-13, Vol. 3, 557:10-558:24, 570:18-573:6, Vol. 4, 596:15-597:11; TX1339-TX1341, TX1053, TX1060; Doc. No. 134, ¶ 10 (Plaintiff launched in March 2010)).  Thus, Plaintiff's ability to control "pin" is no greater than that of any other company.

83.   Plaintiff has <u>no evidence</u> that anyone outside of its trial team identifies Plaintiff as the source of "PIN-branded digital content" (assuming such a thing can even exist).  Plaintiff did not offer a survey testing whether consumers supposedly consider it the sole source of "PIN" content, (*accord* Trial Tr. Vol. 6, 991:17-993:22, Vol. 7, 1084:21-1085:8), and although Plaintiff did introduce a handful of media articles, those merely describe Plaintiff as using "pin" in the same way that everyone else has for more than a decade—namely, as a verb to denote the action of attaching one virtual object to another.  (*See* TX44; TX151; TX168; TX169; TX173; TX174).  <u>None</u> of the articles—including a "puff piece" Plaintiff facilitated (*see* TX127) —claim that Plaintiff's use of "pin" was novel or distinctive (or that Plaintiff "pioneered" the idea of "pinning"), (Trial Tr. Vol. 1, 15:2-3, 25:2-9), and in those articles where "pin" was used as a noun, no special attention was called to that form of use.  (*See* TX10; TX127; TX151).

### 3.   *Likelihood of Confusion Analysis Under Sleekcraft*

84.   A likelihood of consumer confusion is "the 'core element of trademark infringement.'"  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.*, 618 F.3d 1025, 1030 (9th Cir. 2010) *quoting Brookfield Commc'ns Inc.,* 174 F.3d at 1053.

85.   Ninth Circuit courts are guided in their likelihood of consumer confusion analysis by the *Sleekcraft* factors, namely: (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be

1    exercised by purchasers of the defendant's product.  *Sleekcraft*, 599 F.2d at 348-4; *see also*

2    *La Quinta Worldwide LLC*, 762 F.3d at 874 (*accord*).

3    86.    The eight (8) *Sleekcraft* factors are not exhaustive of the court's likelihood of confusion

4          analysis; rather, they "are intended to act as 'guideposts' […] and are adaptable to specific

5          cases."  *La Quinta Worldwide LLC*, 762 F.3d. at 874 referencing *Fortune Dynamic, Inc.*,

6          618 F.3d at 1030 ("The *Sleekcraft* factors are not a scorecard, a bean-counter, or a

7          checklist.").

8                              a.    **Similarity of the Marks**

9    87.    Under the first *Sleekcraft* factor, a court "compare[s] the two marks in terms of sight,

10         sound, and meaning, considering the marks 'as a whole, as [they] appear in the

11         marketplace.'"  *La Quinta Worldwide LLC*, 762 F.3d. at 875 *quoting M2 Software, Inc. v.*

12         *Madacy Entm't*, 421 F.3d 1073, 1082 (9th Cir. 2005).

13   88.    However, any alleged similarity between the marks-at-issue is afforded less weight under

14         the court's likelihood of confusion analysis when the parties' goods and/or services "are

15         unrelated and the parties operate in distinct markets with no overlap in customers."  *Sand*

16         *Hill Advisors, LLC v. Sand Hill Advisors, LLC*, 680 F. Supp. 2d 1107, 1120 (N.D. Cal.

17         2010); *see also Brookfield Commc'ns, Inc.*, 174 F.3d 1036 at 1054 ("Even where there is

18         precise identity of a complainant's and an alleged infringer's mark, there may be no

19         consumer confusion—and thus no trademark infringement—if the alleged infringer is in a

20         different geographic area or in a wholly different industry.").

21   89.    In this case, the parties' respective marks are not identical, nor are they confusingly

22         similar.  Plaintiff's alleged trademark "PINTEREST" does not sound or look similar to

23         Defendant's PINTRIPS trademark.  Both marks suggest a course of action for the parties'

24         respective and disparate services, namely to either pin your interests or to pin your trips

25         (respectively).

26   90.    The only similarity between the respective marks is the appearance of the word "pin" to

27         connote the action to be taken in the respective services.  However, the overlap of the

28

1   word "pin" is not enough to create a similarity between the marks.  The marks must be

2   compared as a whole.  *See La Quinta Worldwide LLC*, 762 F.3d at 875.

3   91.   In addition, because the term pin has a generic meaning, particularly in the computer and

4         Internet industries, it is proper to focus the similarity prong on the dominant non-generic

5         portions of the mark.  *See* MCCARTHY § 23:49 ("As a preliminary to comparing marks in

6         their entireties, it is proper to discount the similarity of generic parts of conflicting

7         marks.");  *Keebler Co. v. Murray Bakery Products*, 866 F.2d 1386, 9 U.S.P.Q.2d 1736

8         (Fed. Cir. 1989) (holding that generic "pecan" portion of mark be given less weight in

9         comparing PECAN SANDIES to PECAN SHORTEES);  *Builders Square, Inc. v. Wickes*

10        *Companies, Inc.*, 1985 WL 5469, *4 (C.D. Cal. 1985) ("Where a common term to two

11        marks is generic, the inquiry as to similarity must focus not only on the confusing

12        similarity of the overall marks, but on the similarity of the nongeneric terms.").  "If the

13        common element of conflicting marks is a word that is 'weak' then this reduces the

14        likelihood of confusion.  A portion of a mark may be 'weak' in the sense that such portion

15        is descriptive, highly suggestive, or is in common use by many other sellers in the

16        market."  MCCARTHY § 23:48; *accord Time, Inc. v. T.I.M.E. Inc.*, 123 F. Supp. 446, 456

17        (S.D. Cal. 1954).

18   92.   The USPTO concluded that the mark PINTRIPS as used by defendant is not confusingly

19        similar to PINTEREST, when it approved the PINTRIPS trademark application despite

20        having the Pinterest trademark applications before it while examining the PINTRIPS

21        application.

22   93.   Similarly, neither the "PIN IT" nor "PIN" alleged marks asserted by Plaintiff is similar to

23        the PINTRIP's mark as it appears in the marketplace.

24   94.   In this context, Pintrips' pin button *never* appears in the marketplace outside the usage of

25        the Pintrips' browser extension software.  As a result of that software, the Pintrips' pin

26        button is *only* displayed in conjunction with the PINTRIPS trademark and stylized logo.

27        The presence of such house brand dispels any possible confusion.  *Walter v. Mattel, Inc.*,

28        31 F.Supp.2d 751, 760 (C.D. Cal. 1998) ("Otherwise similar marks are not likely to be

1     confused where used in conjunction with the clearly displayed name and/or logo of the

2     manufacturer"); *see also Cohn v. Petsmart, Inc.*, 281 F.3d 837, 842 (9th Cir. 2002) ("The

3     emphasis on these housemarks has the potential to reduce or eliminate likelihood of

4     confusion").

5  95.    This factor weighs in Defendant's favor.

6                b.     **The Strength of the Mark**

7  96.    "The strength of a mark determines the level of trademark protection it is given." *La*

8     *Quinta Worldwide LLC*, 762 F.3d. at 874. To determine a mark's strength, courts

9     consider two (2) factors, namely: "[i] conceptual strength—that is, where it falls in the

10     spectrum of marks—and [ii] the strength of the mark within the marketplace." *Id.* at 874-

11     75.

12               (1)     **Conceptual Strength**

13  97.    As discussed *supra*, "Pin" is a generic term when used to describe the function of a

14     computer service of affixing one virtual object to another.

15  98.    The term "PIN IT" similarly is generic. The USPTO already rejected a specimen

16     submitted by Pinterest using a "Pin it" button finding that "[i]n such presentation, the term

17     PIN does not identify the source of any particular service, but is a shorthand term for the

18     action performed by applicant's customers."

19  99.    Even if Pinterest could establish that PIN IT is descriptive rather than generic, it has

20     produced no evidence of secondary meaning that consumers recognize PIN IT as a mark.

21     *Zobmondo Ent'mt, LLC*, 602 F.3d at 1113 (A "descriptive mark can become protectable if

22     it has acquired distinctiveness as used on or in connection with the applicant's goods in

23     commerce. This acquired distinctiveness is referred to as 'secondary meaning.'")

24     (internal citations omitted).

25  100.   The term PINTEREST is at best suggestive of Plaintiff's services as it generally describes

26     what you do with Plaintiff's service.

27

28

(2)   **Commercial Strength**

101.   A trademark's "[c]ommercial strength is based on 'actual marketplace recognition' […]." *Network Automation, Inc. v. Advanced Systems Concepts, Inc.*, 638 F.3d 1137, 1149 (9th Cir. 2011) *quoting Brookfield*, 174 F.3d at 1058.  "Advertising, length of time in business, and public recognition are factors taken into account when classifying the commercial strength of marks." *Stark v. Diageo Chateau & Estates Wines Co.*, 907 F. Supp.2d  1042, 1061 (N.D. Cal. 2012).

102.   Given that "Pin" is generic for the functions for which the parties use it, Pinterest cannot as a matter of law change it to a non-generic term by trying to offer evidence to establish secondary meaning in that term. *See e.g., America Online,* 243 F.3d at 820-23  ("evidence of association may establish what is called 'de facto secondary meaning,' but such secondary meaning does not entitle [a plaintiff] to exclude others from a functional use of the words").  As such the term "pin" or "pin it" by itself would be unprotectable, and a combination mark relying on those words would, at best, be commercially weak.

103.   As to its alleged PINTEREST mark, Pinterest did not present any evidence at trial regarding advertising expenditures for its marks-in-suit.   Nor did Pinterest present competent evidence regarding actual marketplace recognition of its marks.  Other than presenting generalized claims as to the size of its user base (without any context to establish consumer recognition of its alleged brand, whether the users are discrete or their geographic location), Plaintiff presents only the self-serving testimony of its employees.  However, such *ipse dixit*, self-serving testimony is insufficient to establish Pinterest's marks' alleged commercial strength.

> Trademark law is skeptical of the ability of an associate of a trademark holder to transcend personal biases to give an impartial account of the value of the holder's mark.  Attestations from person in close association and intimate contact with  (the trademark claimant's) business do not reflect the views of the purchasing public.

*Self-Realization Fellowship Church v. Ananda Church of Self-Realization*, 59 F.3d 902, 910 (9th Cir. 1995).

104. For example, the only alleged evidence of consumer recognition was a brand study that Pinterest claims reported that more than 75% of respondents were familiar with the Pinterest website.  This study notably was not qualified by the person conducting the study and would not, for a variety of reasons, be admissible as a scientifically verifiable study.  Notably, the study inquired as to the website and not recognition of the PINTEREST brand.  (TX133 at p. PIN00017218).  Moreover, the study was limited to respondents who used the Pinterest website at least once a week and spent at least a minimum number of hours per week on the Internet. This is akin to asking only the customers of a particular store, if they are familiar with that store.  It is telling, in light of that bias, therefore, that a quarter of actual, existing Pinterest users are not even familiar at all with Pinterest's website.  (*See Id*. at PIN00017217, Q10).

105. Further, Plaintiff's employees testified as to supposed widespread media coverage, but only introduced a handful of articles that fall short of establishing consumer recognition.  Uncorroborated testimony is insufficient to establish Pinterest's marks' alleged commercial strength.  *See Planet Coffee Roasters, Inc. v. Hung Dam*, 2010 WL 625343, *4 (C.D. Cal., Feb. 18, 2010) ("Plaintiff has not presented substantial evidence establishing the wide-spread recognition of its mark.").

106. Moreover, Plaintiff has not even tried to present evidence to support that either PIN or PIN IT is commercially strong.  Nor has Pinterest presented any survey evidence to support consumer recognition of either mark as a brand, relying instead on a presumption without support that it functions as a brand.  In contrast, Dr. Robertson's survey indicates that consumers view the term "PIN" to connote a function rather that act as a source identifier.  (Trial Tr. Vol. 5, 753:19 – 790:24 [ultimate conclusion at 786:18 – 787:1]; TX1082; TX1083).

107. This factor weighs in Defendant's favor.

c.     **The Proximity or Relatedness of the Goods or Services**

108. The proximity or relatedness of the goods or services-at-issue is determined by whether the goods or services are: "'(1) complementary; (2) sold to the same class of purchasers;

and (3) similar in use and function."' *La Quinta Worldwide LLC*, 762 F.3d. at 875 *quoting Network Automation,* 638 F.3d at 1151.  "Goods or services that are closely related are generally more likely than unrelated goods or services to confuse the public as to their sources." *La Quinta Worldwide LLC*, 762 F.3d. at 875.

109.    The core functionality of the parties' respective goods or services must be examined to determine whether they are related.  *Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, *12 (N.D. Cal., Aug. 13, 2007) (the parties' goods "are both freely downloadable software, are both offered over the Internet, and both have some video capability.  However, these similarities are superficial and are far overshadowed by significant and fundamental differences in functionality"); *see also Hanginout, Inc. v. Google, Inc.*, 2014 WL 5113601, *10 (S.D. Cal., May 13, 2014) ("Although the Court finds Google and Hanginout offer similar products under the HANGOUTS and HANGINOUT marks, the Court finds the products have distinct differences that change the functionality of the products.").

110.    While both parties operate on the Internet, they offer completely different services. Plaintiff provides online scrapbooking and social media services while Defendant provides online collaborative travel planning and booking services.  Defendant's service lacks any social media component and Plaintiff's service lacks any travel planning or booking component.  (Trial Tr. Vol. 1, 66:3-67:5; 87:17 – 88:15; 173:2 – 174:13; Vol. 2, 242:25 – 243:12; Vol. 2, 266:11 – 267:2; 277:7 – 281:12; Vol. 3, 495:5 – 503:21; 531:10-12; Vol. 4, 670:20 – 671:17; 672:2-5; 699:15 – 700:2; 728:12 – 729:3; TX1141; TX1142).

111.    The prospective customers of the respective services are different.  While there is some potential general overlap of individuals in that the services are available to the general public, that overlap is no different than the overlap that exists with respect to any services offered to the general public (*e.g.*, Pinterest users might conceivably utilize automotive purchasing services, medical information services, sports arena services, insurance services, and like, but defined as customers for a particular good or service, they do not overlap.).

112.   Travel planning and booking services are no more a natural area of expansion, or a natural extension of Plaintiff's business than automotive sales because it has a category to pin pictures of cars, or interior design services because it has a category to pin pictures of houses, or bakery services because it permits users to pin pictures of cupcakes to its site. (Trial Tr. Vol. 1, 127:7 – 129:23; 132:12 – 133:13).

113.   This factor weighs strongly in Defendant's favor.

### d.   **Evidence of Actual Confusion**

114.   The failure to prove instances of actual confusion weighs heavily against a finding of a likelihood of confusion when "the particular circumstances indicate such evidence should have been available." *La Quinta Worldwide LLC*, 762 F.3d. at 875 *quoting Sleekcraft*, 599 F.2d at 352.

115.   Plaintiff has failed to present any evidence of actual confusion despite at least three years of co-existence and an alleged 100 million annual users of Plaintiff's service.

116.   As discussed, Pinterest itself produced not a single instance of alleged actual confusion, and only introduced two hearsay statements; one in an email from an individual that, on the face of the email, intended to contact Pintrips and was clearly referencing Pintrip's service and not Plaintiff's; and a hearsay statement made by Pintrips' CEO's wife about a statement allegedly made to her by her mother, who was not a potential consumer and was not a native English speaker.  Neither the author of the email nor the person about whom Mrs. Gotlieb testified, was called at trial. (Trial Tr. Vol. 2, 335:6-12; 336:2-9; 341:3-13; Vol. 8, 1069:2 – 1070:5; Hadar Gotlieb Depo. 47:3-19).

117.   Even if the two instances of hearsay were admissible to evidence some form of confusion, it would not be enough to support a finding of likelihood of confusion.  The Lanham Act does not protect against such general confusion; rather, it protects *consumers* from being confused about a good or service's source when making purchasing decisions. *See Bosley Medical Institute, Inc. v. Kremer*, 403 F.3d 672, 677 (9th Cir. 2005) (the Ninth Circuit holding that "'[t]he Lanham Act seeks to prevent consumer confusion that enables a seller to pass off his goods as the goods of another.... [T]rademark infringement protects only

against mistaken *purchasing decisions* and not against confusion generally"') *quoting Lang. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 582-83 (2d Cir. 1991) (emphasis in original); *see also Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1148 (C.D. Cal. 1998) ("The fact that a plaintiff can point to some evidence of confusion in the abstract does not automatically mean that such confusion affects actual purchasing decisions.").

118.   The absence of instances of actual confusion, given the ease of communication over the Internet and the alleged size of Plaintiff's user base, would weigh in favor of Defendant. If Plaintiff and Defendant operated in the same space, then one would expect out of Plaintiff's more than 100 million annual users over three years that Plaintiff would have experienced at least some number of examples of actual confusion.  The dearth of such evidence suggests there is no likelihood of confusion.  *La Quinta Worldwide LLC*, 762 F.3d. at 875.

119.   Because Plaintiff could present no evidence of actual confusion, it commissioned two surveys to attempt to provide surrogate evidence of confusion.  However, as detailed above in the *Proposed Findings of Fact* Section V, the surveys of Drs. Jay and Jacoby offered by Plaintiff are so flawed that they simply cannot be relied upon to support the conclusion that there is a substantial likelihood of confusion.  *The Learning Network, Inc. v. Discovery Communications, Inc.*, 153 F.Supp.2d 785, 790 (D. Md. 2001) (excluding survey as "severely defective" where the test stimulus used did not include the browser title bar or address bar and where the stimulus was removed from respondents' view before they were asked key question about the source of the website); Jacob Jacoby, *Trademark Surveys*, Vol. 1, pp. 487-88, 515-516 (2013).

120.   Even if one considered the surveys, Dr. Jacoby's survey *proves* no confusion is likely. Specifically, Dr. Jacoby's data reveals that *at most* six respondents (or roughly 2.7% of the test total) provided answers that suggest that confusion could possibly arise because of the use of the PINTRIPS name, (*see* TX206F2 (Resp. Nos. 10459, 10533, 10629, 10717, 10984, and 11263)), and two of those were clearly just guesses. (*See id.* (Resp. Nos.

10533 and 10629)).  As Dr. Jacoby teaches in his treatise, it is not proper to count survey respondents as "confused" if their alleged "confusion" was influenced by or attributable to elements a party cannot control (such as here the use of the term "Pin" for its descriptive purpose or the offering of pinning functionality).  (*See* Trial Tr. Vol. 6, 957:4-962:8, 965:13-22; Jacoby, *Trademark Surveys*, pp. 514-16).  Thus respondents who, for example, explained that their answer of "Pinterest" was because of use of the root word "pin" (Resp. Nos. 11217, 13455) or the offering "pinning" functionality  (Resp. Nos. 13063, 13335), or who gave non-trademark reasons in addition to referring to the name (Resp. Nos. 12224 ["they mentioned trip boards"], 13300 ["the way it works"]),  cannot properly be counted as having been confused solely for trademark-related reasons.  (*See* Trial Tr. Vol. 6, 972:6-973:25, 1014:15-1016:3, TX206F2).

121.  Thus, a confusion rate of 2.7% represents the *maximum* potential for confusion and regardless falls well below the level of confusion considered actionable by courts.  *Cf.* Trial Tr. 359:24-360:4 (courts credit "anything over 10 percent as evidence of the likelihood of confusion"), 900:13-901:1 (Dr. Jacoby) ("most [c]ourts have found … 10 to 20 percent confusion to be actionable"); *see also, e.g., Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1040 (C.D. Cal. 1998) ("[S]urvey evidence clearly favors the defendant when it demonstrates a level of confusion much below ten percent."); *Visa Int'l Service Ass'n v. Eastern Financial Credit Union*, 1992 WL 138231 (9th Cir. 1992) (6.7% confusion between marks insufficient to show actual confusion for purposes of preliminary injunction).

122.  This factor is neutral since the Parties are not in the same line of commerce.  Were they in the same line of commerce, it would weigh in Defendant's favor given the dearth of evidence.  *La Quinta Worldwide LLC*, 762 F.3d. at 875.

e.  **Marketing Channels Used**

123.  Under the fifth *Sleekcraft* factor, courts examine "where the goods or services are sold, the sales and marketing methods employed, and the class of purchasers exposed to the marketing efforts."  *La Quinta Worldwide LLC*, 762 F.3d. at 877.

124.   In this case, although both parties have an Internet presence, that is not determinative. "Where both parties utilize the Internet to market the products at issue, the Ninth Circuit has found this factor carries little weight in the likelihood of confusion calculation." *Hanginout,* 2014 WL 5113601 at *11 referencing *Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir.2004) ("Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight."). What really is probative is how consumers will encounter the marks in the marketplace.

125.   Importantly, consumers will never encounter Defendant's mark in the same marketing channels as Plaintiff. Other than on Defendant's website www.pintrips.com, the only time a consumer will encounter Defendant's mark is when they specifically install Defendant's software downloaded from its site and create an account with Pintrips. When the software is installed, then consumers will see the PINTRIPS mark while navigating to certain flight providers' websites such as united.com, through the Pintrips functionality. (Trial Tr. Vol. 2, 235:18 – 236:11; Vol. 3, 464:2 – 479:21; Kleiman Depo. 41:21 – 42:7).

126.   Consumers will never encounter Defendant's mark where Plaintiff's mark appears such as when listing social media sites to link to on a website. (Trial Tr. Vol. 2, 242:18 – 243:12; 245:19 – 246:5; Vol. 4, 670:20 – 671:17).

127.   This factor favors Defendant.

### f.   Types of Services and Degree of Care

128.   Under the sixth *Sleekcraft* factor, courts examine "the type of good or service offered and the degree of care one would expect from 'the average buyer exercising ordinary caution.'" *La Quinta Worldwide LLC*, 762 F.3d. at 877 *quoting Sleekcraft*, 599 F.2d at 353. "The likelihood of consumer confusion decreases where the consumer is sophisticated and exercises a high degree of care." *Sand Hill Advisors, LLC*, 680 F. Supp. 2d at 1120.

129.   "Likelihood of confusion is determined on the basis of a reasonably prudent consumer. What is expected of this reasonably prudent consumer depends on the circumstances."

*Brookfield Commc'ns , Inc.*, 174 F.3d at 1060. (internal citations omitted); *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125, 1131 (C.D. Cal. 2001) ("Moreover, "a realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine ... what a reasonable purchaser in market conditions would do.") (internal citations omitted).

130.   Reasonably prudent consumers exercise a "heightened degree of care" when purchasing goods and services offered via the Internet.  *See Hanginout, Inc.*, 2014 WL 5113601 at *14 ("[W]hen examining consumer confusion in the context of products offered over the Internet, the 'relevant marketplace is the online marketplace, and the relevant consumer is a reasonably prudent consumer accustomed to shopping online .... Unreasonable, imprudent and inexperienced web-shoppers are not relevant'") *quoting Toyota Motor Sales, U.S.A., Inc. v. Tabari,* 610 F.3d 1171, 1176 (9th Cir. 2010).

131.   In this case, Defendant is currently offering travel planning services and the ability to book airfare.  By the inherent nature of Defendant's service, described above, consumers have to make the conscious decision to use Defendant's service.  In order to even be exposed to Defendant's mark in the marketplace, consumers have to affirmatively go to the source www.pintrips.com, download the software, create an account with Defendant and install and login to the software.  As a result, consumers – whatever their level of absolute "sophistication" - have to exercise a fairly high level of attention and care.  A consumer cannot accidently or mistakenly run into Defendant's marks, but must knowingly seek them.

132.   In addition, as the users of Defendant's service are by nature discerning consumers looking to carefully shop for the best price of airfare, which itself tends to be expensive and consequently captures the attention of a purchaser, consumers are more likely to exercise a high degree of care when selecting and using Defendant's services.  (Trial Tr. Vol. 2, 315:25 – 318:5 (service is designed for comparison shopping and saves inquiries for further scrutinization by consumer); Vol. 4, 651:11-652:6 (facilitates comparison

shopping); 653:1-18 (airline fares can be expensive); 653:23 – 654:13 (consumers on average spend hours researching flights visiting on average 8-15 sites before booking)).

133.   Furthermore, the parties' respective services are not fungible.  Indeed, no step in the above-described process of obtaining Defendant's services suggests they include simply pinning a picture onto a virtual pinboard to share with friends and family (*i.e.*, Pinterest's services).  Thus, a consumer looking for a scrapbooking service would quickly learn Defendant cannot meet his or her needs, and, so would not use Defendant's travel planning services for that purpose.  *See e.g., Self-Insurance Institute of America, Inc. v. Software and Information Industry Ass'n.*, 208 F. Supp. 2d 1058, 1073 (C.D. Cal. 2000) (finding consumers to be highly discerning where goods were not fungible.  "In fact, it is unclear how Software could gain anything by misleading consumers as to its relationship with Self–Insurance.  Should consumers desire self-insurance related services or information, they will quickly learn that Software cannot meet their needs and will not purchase its services.").

134.   Based on the foregoing, this factor weighs against a likelihood of confusion and favors Defendant.

g.   **Defendant's Intent in Selecting the Mark**

135.   "[T]his factor generally focuses on whether the junior holder of the mark intended to 'palm off' its goods as those of the senior mark-holder […]."  *Stark*, 907 F. Supp. 2d at 1063.

136.   Defendant adopted its mark without any prior knowledge of Plaintiff or Plaintiff's alleged marks.  Defendant had selected the PINTRIPS mark as early as June 10, 2011 at the end of a three day initial meeting to plan out the PINTRIPS service.  After that meeting, Defendant registered the pintrips.com domain name and other variations of that domain name.  (Trial Tr. Vol. 3, 456:15-17; 481:2 - 486:6; TX1117).

137.   In short, Defendant did not adopt or use its PINTRIPS mark in bad faith or to palm-off its services as those of Pinterest's services (which, as discussed *supra*, are strikingly dissimilar from Defendant's services).

1    138.   This factor slightly favors Defendant, or is at most neutral.

2                    h.    **Likelihood of Expansion**

3    139.   To the extent '"a trademark owner is afforded greater protection against competing goods,

4           a 'strong possibility' that either party may expand his business to compete with the other

5           will weigh in favor of finding that the present use is infringing."' *SunEarth, Inc. v. Sun*

6           *Earth Solar Power Co., Ltd.*, 2013 WL 4528539, at *16 (N.D. Cal.  2013) *quoting*

7           *Sleekcraft,* 599 F.2d at 354.  However, "a senior user may not prevent use of a mark where

8           the junior user enters a product market outside of the senior user's natural zone of

9           expansion."  *Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1116 (N.D.

10          Cal. 2008) ("In the present case, the natural expansion of Tolkien's Hobbit mark did not

11          extend to travel services at the time Wozniak opened Hobbit Travel.").  "[T]he zone of

12          natural expansion is generally defined narrowly." *Credit One Corp. v. Credit One*

13          *Financial, Inc.*, 661 F. Supp. 2d 1134, 1138 (C.D. Cal. 2009).

14   140.   The plaintiff must offer more than mere speculation that the natural expansion of its

15          business includes the defendant's business.  *See Kern v. Mindsource, Inc.*, 225 F.3d 663,

16          *3 (9th Cir. 2000) ("Kern, ever hopeful, argued in the alternative that employment staffing

17          was an area of natural expansion for his business [...] Kern's evidence never reached

18          beyond speculation to show that this was in fact a natural area of expansion.  Therefore,

19          we find that Kern failed to produce sufficient evidence to show that its class of goods or

20          services was or would be the same as MSE's.").  "In determining possible expansion of a

21          product line, it is the ordinary customer's perception of possible expansion that counts,

22          whether that perception comports with the reality of the senior user's actual plans or not."

23          4 McCarthy on Trademarks and Unfair Competition, § 24:19 (2014).

24   141.   Plaintiff has presented no evidence of any business plans to expand into the travel

25          planning or booking business.  The only contemplated business plans are negotiations

26          with various travel providers to provide advertising opportunities for those travel

27          providers, in much the same way as Plaintiff makes advertising opportunities available to

28

1   the retail clothing business (*e.g.*, Saks) or automotive business (*e.g.*, Hyundai).  (Trial Tr.

2   Vol. 1, 66:3-67:5; 87:17 – 88:15; Vol. 2, 280:15-21).

142.   Moreover, the nature of Plaintiff's scrapbooking services do not suggest any natural

expansion to directly compete with Defendant's travel planning service any more than car

sales or pet store services would be a "natural" expansion.

143.   This factor favors Defendant.

i.   **The Balance of *Sleekcraft* Factors Favors Defendant**

144.   On balance, the *Sleekcraft* factors favor Defendant.   Accordingly, Plaintiff fails to

demonstrate a likelihood of confusion and, thus, it cannot prevail on Claims I, II, or IV.

4.   ***Defendant's Use of Pin Is Fair Use***

145.   In the alternative, Defendant is not infringing any rights by displaying its pin button

because it is not using pin as a mark in commerce.

146.   "In *Bosley,* the Ninth Circuit, interpreting the language of §§ 1114 and 1125(a), held that

trademark infringement claims under the Lanham Act 'are subject to a commercial use

requirement.'" *Petroliam Nasional Berhad v. GoDaddy.com, Inc.*, 2010 WL 3619780, *4

(N.D. Cal., Sept. 9, 2010) *quoting Bosley Med. Inst., Inc. v. Kremer,* 403 F.3d 672, 676

(9th Cir.2005).   Accordingly, it must be determined whether Defendant is making

"trademark use" of the terms-at-issue.  *See* 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a).

147.   The Lanham Act expressly provides for a defense where "the use of the … term …

charged to be an infringement is a use, otherwise than as a mark, … of a term … which is

descriptive of and used fairly and in good faith only to describe the … services of such

party …"   15 U.S.C. § 1115(b)(4); *see also   KP Permanent Make-Up, Inc. v. Lasting

Impression I, Inc.*, 543 U.S. 111, 121-22 (2004) (explaining that the Lanham Act's Section

33(b)(4) "fair use" defense applies even if the challenged use causes consumer confusion)

("If any confusion results, that is a risk the plaintiff accepted when it decided to identify

its product with a mark that uses a well[-]known descriptive phrase.") (quoted authority

omitted).

148.    Here, Defendant does not use the word "pin" as a trademark, *i.e.*, as an identifier of the source of goods or services in the marketplace.  Rather, Defendant displays its "pin" button in connection with its service to simply describe the nature of a function of its software, namely: pinning commercial flight information to a virtual interface.  (*See* Trial Tr. Vol. 3, 452:4-456:21, 487:12-15, 489:11-25, 490:16-22, 492:2-493:2, 493:7-22 (Pintrips' founder was aware of "pinning" and created a mock-up showing a pin button before he had even heard of Plaintiff); *see also id.*, 460:4-25, Vol. 4 645:20-647:10, 650:6-651:10,  648:25-652:22).  This constitutes "classic fair use."  *See Marketquest Group, Inc. v. BIC Corp.*, 2015 WL1757766, *4-5 (C.D. Cal., April 17, 2015) ("Because Norwood used 'all-in-one' for its descriptive, common meaning, it is used other than as a trademark.  As stated in Cairns, junior users are 'always entitled' to such use, if it is in good faith"); *Cairns*, 292 F.3d at 1151 ; *America Online, Inc.*, 243 F.3d at 820-23 (Internet company widely associated with use of the phrase "You Have Mail" to announce the arrival of email could not exclude others from also using that phrase for its functional meaning) ("evidence of association may establish what is called 'de facto secondary meaning,' but such secondary meaning does not entitle [a plaintiff] to exclude others from a functional use of the words").

## B.    Claims III and V - Dilution

149.    Plaintiff's third claim arises under 15 U.S.C. § 1125(c), which provides:

> "Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury."

150.    Plaintiff's fifth claim arises under CAL. BUS. & PROF. CODE § 14247, which provides, in pertinent part:

"Subject to the principles of equity, an owner of a mark that is famous and distinctive, whether inherently or through acquired distinctiveness, shall be entitled to an injunction against another person's commercial use of a mark or trade name, if such use begins after the mark has become famous and is likely to cause dilution of the famous mark, and to obtain such other relief as is provided in this section."

151.     The same analysis is applicable to Plaintiff's federal trademark dilution claim under 15 U.S.C. § 1125(c) and Plaintiff's trademark dilution claim under CAL. BUS. & PROF. CODE § 14247.  *See Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2007) ("Mattel brought dilution claims under both federal and California state law. The analysis under each is the same"); *see also Airwair Int'l. Ltd v. Vans, Inc.*, 2013 WL 3786309, *8 (N.D.Cal., July 17, 2013) ("the analysis for California dilution claims is the same as the analysis under the federal Trademark Dilution Revision Act […].").  Thus, the Court may properly analyze these claims jointly.

152.     To prove trademark dilution under 15 U.S.C. § 1125(c), Plaintiff must "prove that: (1) it owns a famous trademark; (2) the famous mark is distinctive; (3) the defendant is using or has used in commerce an identical or nearly identical trademark; (4) the defendant began using the mark after the mark became famous; and (5) the defendant's use of the mark is likely to cause dilution by blurring or tarnishment."  *United Tactical Systems, LLC v. Real Action Paintball, Inc.*, 2014 WL 6788310, *20 (N.D. Cal., Dec. 2, 2014).

1.       ***Plaintiff's PINTEREST Mark is Not "Famous"***

153.     Plaintiff only asserts a dilution claim with respect to its alleged PINTEREST mark and not the other alleged marks-in-suit.  (*Dkt.* 134 at ¶ 44).

154.     Pursuant to 15 U.S.C. § 1125(c)(2)(A), a mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."

155.     However, "[i]t is well-established that dilution fame is difficult to prove."  *United Tactical Systems, LLC*, 2014 WL 6788310 at *20 quoting *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1373 (Fed. Cir. 2012); *see also* 4 MCCARTHY ON TRADEMARKS AND

UNFAIR COMPETITION § 21:104 (4th ed. 2014) ("By definition, all 'trademarks' are 'distinctive'—very few are 'famous'"; "in addition to the basic level of "distinctiveness" needed to qualify as a trademark in the first instance, the mark must also surmount the demanding and difficult threshold of qualifying as "famous.").

156. That is "[b]ecause protection from dilution comes close to being a 'right in gross,' ... [so] the [Lanham Act] extends dilution protection only to those whose mark is a 'household name.' "*Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1011 (9th Cir. 2004). The Lanham Act "was revised in 2006 to deny protection to marks whose fame extends only to niche markets, specifically stating that 'a mark is famous if it is widely recognized by the general consuming public of the United States.'" *Urban Home, Inc. v. Cordillera Inv. Co., LLC*, 2012 WL 3704031, *6 (C.D. Cal., June 19, 2014) *citing* 15 U.S.C. § 1125(c)(2)(A); *Xen, Inc. v. Citrix Systems, Inc.*, 2012 WL 5289609, *6 (C.D. Cal., Oct. 25, 2012) ("Niche fame, however, will not suffice.").

157. Accordingly, courts consider the following factors to determine whether a mark is famous, *i.e.*, a household name: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the mark; (2) [t]he amount, volume, and geographic extent of sales of goods or services offered under the mark; (3) [t]he extent of actual recognition of the mark; and (4) whether the mark is registered." 15 U.S.C. § 1125(c)(2)(A)(i)-(iv).

158. Here, Plaintiff's alleged PINTEREST mark is not famous. Although Pinterest's service may have exploded in popularity, it is far from a household name. Pinterest has only been in operation for a few years and has presented no evidence of any sales or advertising revenue or advertising expenditures for services offered under its alleged marks. Nor is there any evidence of the level of recognition by the general public of the alleged mark. Plaintiff has conducted no surveys to determine fame and has presented no marketing evidence of fame. *See discussion supra.*

159. Marks substantially more well-known have been determined not to be famous for purposes of the Trademark Dilution Revision Act. *See e.g., Board of Regents v. KST Electric, Ltd.*, 550 F. Supp. 2d 657, 679 (W.D. Tex. 2008) (holding the University of

1    Texas failed "to demonstrate the extremely high level of recognition necessary to show

2    'fame' under" the Lanham Act with respect to its otherwise well-known Texas Longhorn

3    Silhouette logo.)

4    160.   Regardless, Plaintiff failed to present evidence of fame in the relevant time period "at the

5    time the defendant begin using it[s mark]."   *United Tactical Systems, LLC*, 2014 WL

6    6788310 at *20 *referencing* 15 U.S.C. § 1125(c).  Any evidence Plaintiff presented its

7    irrelevant unless it predated Defendant's June 2011 commencement of use of its mark. *Id.*

8    For example, the only alleged evidence of consumer recognition that Plaintiff introduced

9    consisted of a marketing study conducted over a year after Defendant commenced use of

10   its mark. (TX133).

11   161.   Thus, given that Plaintiff has not carried its burden to prove that the PINTEREST mark is

12   a famous mark within the meaning of the statutes, it is irrelevant as to whether

13   PINTEREST is a distinctive mark, or whether Defendant's mark is identical or nearly

14   identical to the same. *United Tactical Systems, LLC*, 2014 WL 6788310 at *20.

15          2.   *No Likelihood of Dilution by Blurring*

16   162.   Assuming *arguendo* that PINTEREST were a famous mark, there is no evidence that

17   Defendant's mark is likely to dilute the same.

18   163.   Plaintiff alleges that Defendant's mark dilutes its mark by "blurring." (*Dkt.* 134 at ¶ 46).

19   Pursuant to 15 U.S.C. 1125(c)(2)(B), '"dilution by blurring"' is association arising from

20   the similarity between a mark or trade name and a famous mark that impairs the

21   distinctiveness of the famous mark."  Put another way, dilution by blurring "occurs when

22   a mark previously associated with one product also becomes associated with a second."

23   *Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.*, 633 F.3d 1158, 1169 (9th Cir.

24   2011).

25   164.   The result of dilution by blurring is that it "weakens the mark's ability to evoke the first

26   product in the minds of consumers." *Levi Strauss & Co.*, 633 F.3d at 1169.

27   165.   Pursuant to 15 U.S.C. 1125(c)(2)(B)(i)-(vi), courts examining whether dilution by blurring

28   exists may consider the following the following factors:

(i) The degree of similarity between the mark or trade name and the famous mark.
(ii) The degree of inherent or acquired distinctiveness of the famous mark.
(iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.
(iv) The degree of recognition of the famous mark.
(v) Whether the user of the mark or trade name intended to create an association with the famous mark.
(vi) Any actual association between the mark or trade name and the famous mark.

166.   Here, there is no evidence that Defendant's mark is likely to dilute the alleged distinctiveness of the PINTEREST mark by blurring.

167.   As discussed, the parties' respective marks are not similar, and certainly do not share the kind of similarity which may be affected by 'blurring'.   *See discussion supra* on similarity of marks in likelihood of confusion analysis.

168.   PINTRIPS as a whole does not resemble PINTEREST, and Plaintiff has asserted no claim to dilution of "Pin", nor could it given the fact that word is being used for its ordinary, functional meaning, it is used by many others in the Internet space, and has been incorporated into the names and marks of others.

169.   Plaintiff also failed to demonstrate that its alleged PINTEREST mark is widely recognized by the general consuming public – which is the test to be met.  To the extent that Plaintiff offered any evidence of consumer recognition (but see discussion *supra*), that was solely as to its own user base and not as to recognition among the general consuming public.

170.   As to intent, as discussed *supra*, Defendant created its PINTRIPS mark with no knowledge of Plaintiff or its PINTEREST mark and did not intend to cause an association with the Plaintiff or its mark.  Rather, Defendant selected its mark based on the fact that its mark suggests the nature of its services, namely pinning a user's trips to their pinboard. Plaintiff offered no evidence to the contrary.

171.   Plaintiff fails to demonstrate a likelihood of dilution and, thus, it cannot recover on either Claim III or V.

## II.   **DEFENDANT'S COUNTERCLAIMS FOR RELIEF**

172.   Defendant asserts six (6) counterclaims for relief in its Second Amended Counterclaims, namely: (i) a declaratory judgment under 28 U.S.C. § 2201(a) that Plaintiff's putative PIN

1    mark is generic and invalid; (ii) a declaratory judgment under 28 U.S.C. § 2201(a) that

2    Plaintiff's putative PIN IT mark is generic and invalid; (iii) a declaratory judgment under

3    28 U.S.C. § 2201(a) that Plaintiff's putative mark in the form of a graphic image of a pin

4    is generic and invalid; (iv) an Order directing the Commissioner of the PTO to cancel

5    Plaintiff's U.S. Trademark Registration No. 4,553,185 for the mark PIN under 15 U.S.C.

6    §§§ 1064, 1119, and 1127 on the grounds that such mark is a generic and/or functional

7    term; (v) an Order directing the Commissioner of the PTO to cancel Plaintiff's U.S.

8    Trademark Registration No. 4,653,305 for the mark PIN under 15 U.S.C. §§§ 1064, 1119,

9    and 1127 on the grounds that such mark is a generic and/or functional term; and (vi) a

10   declaratory judgment under 28 U.S.C. § 2201(a) that Defendant is entitled to use and

11   register its PINTRIPS mark in connection with travel services.

12   173.   Pursuant to 28 U.S.C. § 2201(a), "[i]n a case of actual controversy within its jurisdiction,

13   […] any court of the United States, upon the filing of an appropriate pleading, may

14   declare the rights and other legal relations of any interested party seeking such

15   declaration, whether or not further relief is or could be sought."

16   174.   Pursuant to 15 U.S.C. § 1119, "[i]n any action involving a registered mark the court may

17   determine the right to registration, order the cancelation of registrations, in whole or in

18   part, restore canceled registrations, and otherwise rectify the register with respect to the

19   registrations of any party to the action."

20   175.   Pursuant to 15 U.S.C. § 1064(3), a mark is subject to cancellation if it is or "becomes

21   the generic name for the goods or services, or a portion thereof, for which it is registered."

22   For purposes of § 1064(3), "[t]he primary significance of the registered mark to the

23   relevant public rather than purchaser motivation" is the test for determining whether the

24   registered mark is or has become the generic name of goods or services on or in

25   connection with which it has been used.  15 U.S.C. § 1064(3).

26   176.   As discussed repeatedly, the record evidence demonstrates that the primary significance to

27   the public of the terms "pin" and "pin it," and the graphic image of a pin, is the act of

28   pinning a virtual object on a user interface.  (*See e.g., supra*; D.I. 147-5, Expert Report of

1    Peter Kent).  Thus, the terms "pin" and "pin it," and the graphic image of a pin, are

2    functional and/or generic and cannot function as trademarks in connection with the

3    services offered by the Parties.

4    177.  Because Plaintiff maintains that the description of goods and services in its two federal

5    trademark registrations for "PIN" is supposedly broad enough to encompass Pintrips'

6    particular use of the term, (*see* D.I. 134, ¶ 17; Trial Tr. Vol. 1, 16:6-17:6, TX25, TX26), a

7    finding that Pintrips is using "pin" for a common, ordinary meaning also compels

8    cancellation of Plaintiffs' registrations as to those overbroad goods and services.  (*See* D.I.

9    136 (Counts IV, V); *cf., e.g.,* 15 U.S.C. §§ 1052(e) (a mark cannot be registered for any

10   goods or services for which it is merely descriptive), § 1064(1)).

11   178.  Accordingly, Defendant is entitled to the relief requested in Counts I-V of its Second

12   Amended Counterclaims.

13   179.  Furthermore, as discussed *supra*, there is no likelihood of confusion or dilution between

14   Plaintiff's and Defendant's marks as used by them in the market.  Thus, Plaintiff has no

15   basis to prevent Defendant from using or registering its PINTRIPS mark.  Accordingly,

16   Defendant is entitled to the relief requested in Count VI of its Second Amended

17   Counterclaims.

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,


Dated:  July 3, 2015          By:     /s/ Frank L. Bernstein
                                      Edward T. Colbert (Admitted to Practice)
                                      William M. Merone (*pro hac vice*)
                                      Erik C. Kane (*pro hac vice*)
                                      KENYON & KENYON LLP
                                      1500 K Street, NW
                                      Washington, D.C.  20005
                                      Telephone: (202) 220–4200
                                      Facsimile: (202) 220–4201
                                      Email: ecolbert@kenyon.com

                                      Frank L. Bernstein (SBN 189504)
                                      KENYON & KENYON LLP
                                      1801 Page Mill Road, Suite 210
                                      Palo Alto, California 94304
                                      Telephone: (650) 384-4700
                                      Facsimile: (650) 384-4701
                                      Email: fbernstein@kenyon.com

                                      *Attorneys for Defendant and
                                      Counter-Plaintiff Pintrips, Inc.*