1   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Diane M. Doolittle (Bar No. 142046)
2       dianedoolittle@quinnemanuel.com
    Rachel Herrick Kassabian (Bar No. 191060)
3       rachelkassabian@quinnemanuel.com
    Margret M. Caruso (Bar No. 243473)
4       margretcaruso@quinnemanuel.com
    Carolyn Homer Thomas (Bar No. 286441)
5       carolynthomas@quinnemanuel.com
    555 Twin Dolphin Drive, 5th Floor
6   Redwood Shores, CA 94065
    Tel.: 650-801-5000
7   Fax.: 650-801-5100

8   QUINN EMANUEL URQUHART & SULLIVAN, LLP
    Meagan K. Bellshaw (Bar No. 257875)
9       meaganbellshaw@quinnemanuel.com
    50 California Street, 22nd Floor
10  San Francisco, CA 94111
    Tel.: 415-875-6600
11  Fax.: 415-875-6700

12  (additional counsel listed on next page)

13  *Attorneys for Plaintiff*
    *Pinterest, Inc.*

14

15              **UNITED STATES DISTRICT COURT**

16              **NORTHERN DISTRICT OF CALIFORNIA**

17              **SAN FRANCISCO DIVISION**

18  PINTEREST, INC.,                     Case No. 13-CV-04608 (HSG)
    a Delaware corporation,
19                                        **PINTEREST'S AMENDED PROPOSED**
                Plaintiff,                **FINDINGS OF FACT AND**
20                                        **CONCLUSIONS OF LAW**
            v.
21
    PINTRIPS, INC.,
22  a Delaware corporation,

23              Defendant.

24  AND RELATED COUNTERCLAIMS

25

26

27

28

Additional Counsel:

HARVEY SISKIND LLP
Lawrence J. Siskind (Bar No. 85628)
    siskind@harveysiskind.com
Donald A. Thompson (Bar No. 260076)
    dthompson@harveysiskind.com
Jane A. Levich (Bar No. 293299)
    jlevich@harveysiskind.com
Four Embarcadero Center, 39th Floor
San Francisco, CA 94111
Tel.: 415-354-0100
Fax.: 415-391-7124

*Attorneys for Plaintiff*
*Pinterest, Inc.*

# **TABLE OF CONTENTS**

Page

I.   PINTRIPS HAS INFRINGED PINTEREST'S TRADEMARKS .............................................1

A.   Pinterest Has Protectable Ownership Interests In Its Trademarks ..............................1

1.   Pinterest's Features And Services ...........................................1

2.   Pinterest's Trademarks In PINTEREST, PIN, And PIN IT ............................3

3.   Pinterest's Travel-Planning Uses .........................................3

4.   The Astronomical Growth Of Pinterest's User Base ................................5

5.   Pinterest's Extensive And Increasing Coverage By The Media ....................6

6.   The Wide Recognition of Pinterest's Marks In The United States ................7

7.   Pinterest's Specific, Non-Standard Use For PIN And PIN IT ......................8

(a)   PIN as a Noun .........................................................8

(b)   PIN as a Verb .........................................................9

(c)   PIN IT as a Phrase on a Button ...........................................10

8.   Pinterest's Substantially Exclusive Use Of The PIN Mark.........................11

B.   Pintrips' Use Of "Pintrips" And "Pin" Is Likely To Cause Confusion.....................12

1.   Pintrips' Features And Services ....................................................12

2.   "Pintrips" and "Pin" Are Similar In Sight, Sound, And Meaning To
     PINTEREST, PIN And PIN IT. .................................................13

(a)   Pintrips Intended to Take Advantage of Pinterest's Brand
      Recognition ..................................................................13

(b)   Pintrips' Uses of "Pintrips" and "Pin" Cause Actual Confusion .......16

C.   PINTEREST And PIN Were Famous Marks Before Pintrips Began Using
     "Pintrips" and "Pin" In Commerce. ..................................................18

II.  DEFENDANT DID NOT PROVE ANY COUNTERCLAIMS OR AFFIRMATIVE
     DEFENSES ..................................................................................19

A.   Pinterest's PIN Mark Is Not Generic ...........................................19

B.   "Pin" Is Not Functional ..................................................................20

C.   Dr. Robertson's Survey Shows Neither Functionality Nor Genericness .................21

D.   Pintrips Did Not Prove Fair Use .........................................................23

1      E.     Pinterest Does Not Engage In Naked Licensing .......................................23

2  III.     PINTEREST IS ENTITLED TO A PERMANENT INJUNCTION ...................23

3  CONCLUSIONS OF LAW ....................................................................................24

4  I.      PINTRIPS HAS INFRINGED PINTEREST'S TRADEMARKS........................24

5      A.     Pinterest Owns The PINTEREST, PIN, And PIN IT Marks ....................25

6      B.     Pintrips' Actions Create A "Likelihood of Confusion" Under *Sleekcraft* .................25

7          1.     Pinterest's Marks Are Strong ....................................................26

8          2.     Pinterest's And Pintrips' Products Are Related. ............................28

9          3.     Pinterest's And Pintrips' Marks Are Similar. .................................29

10         4.     Actual Consumer Confusion Exists .............................................30

11         5.     Pinterest And Pintrips Use Overlapping Marketing Channels.....................30

12         6.     Consumers Exercise Limited Care With Free Services ................31

13         *7.*     Pintrips Intended To Derive Benefit From Pinterest's Reputation ...............31

14         8.     Pinterest's And Pintrips' Businesses Will Continue To Converge ...............32

15  II.      PINTRIPS IS LIKELY TO DILUTE PINTEREST'S MARKS ........................32

16  III.     PINTRIPS' AFFIRMATIVE DEFENSES AND COUNTERCLAIMS FAIL.....................34

17      A.     PIN Is Not Generic .................................................................34

18      B.     PIN And PIN IT Are Not Functional ...........................................36

19      C.     Pintrips Did Not Prove Fair Use .................................................37

20      D.     Pinterest Has Not Engaged In Naked Licensing ...........................37

21  IV.     PINTEREST IS ENTITLED TO A PERMANENT INJUNCTION ...................38

22

23

24

25

26

27

28

# FINDINGS OF FACT

## I.  PINTRIPS HAS INFRINGED PINTEREST'S TRADEMARKS

### A.  Pinterest Has Protectable Ownership Interests In Its Trademarks

#### 1.  Pinterest's Features And Services

1.  Pinterest, Inc. ("Pinterest") is a Delaware corporation.  TX23.  The Pinterest website launched in March 2010.  Bhaskaran, Tr. at 253:6-10; TX175.

2.  Pinterest is a free service used by approximately 80 million people per month in the United States.  Yamartino, Tr. at 90:25-91:7; Bhaskaran, Tr. at 253:14-17.

3.  Pinterest employs close to 600 people.  Yamartino, Tr. at 48:3-4.

4.  Pinterest employees Michael Yamartino and Vikram Bhaskaran testified at trial, and the Court finds their testimony persuasive.

5.  Mr. Yamartino is a product manager, and has been with Pinterest since April 2012.  Yamartino, Tr. at 47:16-22.  Mr. Yamartino leads teams to build new technology and features for the Pinterest service.  Yamartino, Tr. at 49:13-18.  He is familiar with many areas of Pinterest's business, including the engineering, data science, design, finance, marketing, sales, public relations, and the executive leadership teams.  Yamartino, Tr. at 50:19-51:15.  He evinced a deep familiarity with Pinterest's business and products, and the Court found him to be a credible witness.

6.  Vikram Bhaskaran is a partner manager at Pinterest.  As a partner manager, he works with companies and brands to make them more successful on Pinterest.  Bhaskaran, Tr. at 250:19-25.  Mr. Bhaskaran has been familiar with Pinterest since its founding; CEO Ben Silbermann is Mr. Bhaskaran's long-time friend and brother-in-law.  Mr. Bhaskaran was the fifteenth user to sign up for a Pinterest account.  Bhaskaran, Tr. at 250:13-252:15.  Mr. Bhaskaran demonstrated great familiarity with Pinterest's corporate history and products, including its partnerships with businesses in the travel industry.  The Court found him to be a credible witness.

7.  People use Pinterest to view, post, and organize content they are interested in.  Some of the most popular subject areas of interest are recipes, fashion, home decor and travel.  Yamartino, Tr. at 51:17-25, 131:6-132:6.  Users seek inspiration on Pinterest for shopping, party planning, cooking, travelling, and other activities.  TX1179 at PIN00016611; TX180 at PIN00012497;

PINTEREST'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Yamartino, Tr. at 103:19-104:5; Bhaskaran, Tr. at 253:24-254:4. Pinterest "is a discovery tool that helps people save and take action on things that they find." Yamartino, Tr. at 51:16-51:18, 76:12-20, 100:7-18; TX1179 at PIN00016618; TX161 at PIN00024168. Pinterest is a tool to help people do things in the real world. Yamartino, Tr. at 119:24-120:22; TX133 at PIN00017203.

8.      User surveys have shown that people love Pinterest because it is both visual and a useful tool, including for aspirational and planning purposes like travel. TX133 at PIN00017201.

9.      Pinterest uses its PIN mark to refer to a piece of digital content that has been saved onto a Pinterest board. Yamartino, Tr. at 123:5-15; Kent, Tr. at 621:5-11. A Pin is shaped like a vertical rectangular box, and contains a photo, a caption, and various action buttons; it is the core object on Pinterest. Yamartino, Tr. at 55:21-57:6; *see also* TX 238 at 6. Pinterest users create "boards" on their profile pages where they thematically group their Pins in categories such as recipes, fashion, or travel ideas. *See* TX143.

10.     To create a Pin, users can either go to another website and transfer content from that website by clicking on a "Pin It" action button, or they can browse content others have already Pinned on Pinterest, and "re-Pin" it to their Pinterest board. Yamartino, Tr. at 59:11-61:8.

11.     Some Pins, called "Rich Pins," contain extra information from the original third-party website and dynamically update that information in real time. For example, if a user has Pinned a pair of sandals from the Famous Footwear website, a Rich Pin of that sandal will automatically show the current price of the sandal and whether it is in stock. Yamartino, Tr. at 64:3-65:21. Clicking on that Pin will take the user to the website where the item can be found, so the user can then take action, such as making a purchase. Bhaskaran, Tr. at 269:18-271:22.

12.     By default, boards and Pins on Pinterest are public. Users can choose to create "secret" boards, however, which are boards that only the user and their specifically invited friends can see. Yamartino, Tr. 61:3-63:22. On either secret or public boards, users who can see those boards can comment on each other's Pins. Yamartino, Tr. at 63:13-22.

13.     Pinterest partners with a variety of companies that promote their products and services on Pinterest. Yamartino, Tr. at 125:18-126:13, 128:8-129:23. More than 1 million brands have Pinterest boards. TX162 at PIN00024305; TX1179 at PIN00016620; TX180 at PIN00012505.

### 2. Pinterest's Trademarks In PINTEREST, PIN, And PIN IT

14. Pinterest owns two federal trademark registrations for the word mark PINTEREST — Reg. Nos. 4,145,087 and 4,704,153. TX23; TX24. One covers international classes 42 and 45, and one covers international classes 9, 35, 38, 42, and 45.

15. Pinterest owns two federal trademark registrations for the word mark PIN — Reg. Nos. 4,553,185 and 4,653,305. TX25; TX26. One covers international classes 9 and 42, and one covers international class 45.

16. Pinterest's registrations for PINTEREST and PIN are not "Section 2(f) registrations," which would be required for descriptive words that have acquired distinctiveness through use under 15 U.S.C. §1052(f), but instead are registrations under 15 U.S.C. §1051(a). TX1086 at 6, 32, 47 (identifying the current basis for registration as "1(a)").

17. Pinterest uses the phrase PIN IT in commerce to indicate the action of saving content to Pinterest. Yamartino, Tr. at 115:11-116:10.

18. Pinterest began using the PINTEREST, PIN, and PIN IT marks in commerce in March 2010. Yamartino, Tr. at 122:5-10; TX23; TX24; TX25; TX26; Bhaskaran, Tr. at 253:6-13; TX175.

### 3. Pinterest's Travel-Planning Uses

19. Pinterest has been active in the travel space since the website launched in 2010. Travel has been one of the top categories on Pinterest since at least November 2010, and it remains one of the top categories on Pinterest today. TX176; Yamartino, Tr. at 51:19-25, 70:19-71:22; TX162 at PIN00024291; Bhaskaran, Tr. at 265:17-24. Because travel planning is one of Pinterest's most common uses, it has grown proportionately with the Pinterest site. Bhaskaran, Tr. at 269:6-17.

20. Users use Pinterest to seek inspiration and plan vacations, honeymoons, trips, and specific travel itineraries. They can find travel deals and travel tips on Pinterest, and communicate with others about their finds. Pinterest has become the default trip planning tool on the internet. Yamartino, Tr. at 71:24-72:23; Bhaskaran, Tr. at 274:14-23; TX162 at PIN00024294-96.

21. Pinterest has developed "Place Boards" for use in connection with its travel services. Users create "Place Pins" on their Place Boards. Place Pins allow users to add a specific location to

a Pin, and can also include other Rich Pin data such as contact information about the specific place. Place Boards mark all Place Pin location data on a map, using indicators called "map markers." Yamartino, Tr. at 57:7-59:10, 60:19-61:8, 79:14-80:15 (referencing TX161 at PIN00024172), 81:14-83:10 (referencing TX142 at PIN00021931). Pinterest launched Place Pins and Place Boards in November 2013. TX161 at PIN00024168-69.

22. As of February 2014, Pinterest users had created more than 750 million travel Pins, and 2 million Place Boards, and were Pinning 1.5 million places each day. Yamartino, Tr. at 77:15-79:2; TX161 at PIN0024169. As of May 2015, Pinterest users had created around 8 million Place Boards and had placed "well over a billion" travel-related Pins on Pinterest. Yamartino, Tr. at 79:3-13; TX162 at PIN00024291. There are also over 177 million travel-themed boards on Pinterest. TX162 at PIN00024291; Bhaskaran, Tr. at 272:5-274:3. Users create five million Place Pins every single day. TX162 at PIN00024291; Bhaskaran, Tr. at 272:5-274:3.

23. Pinterest markets itself as "a visual planning tool to map out the places you want to go, from weekend trips, to dream vacations on the other side of the world." Yamartino, Tr. at 77:1-77:5; TX161 at PIN00024168. Pinterest's marketing, partnerships, and public relations teams work with business partners and the press to show how Pinterest may be used for travel. Yamartino, Tr. at 72:24-73:12. Pinterest partners with travel-related companies, including airlines, booking aggregators, and travel agencies and publications, to promote the use of Pinterest in the travel sector. Yamartino, Tr. at 80:16-81:8; Bhaskaran, Tr. at 265:25-267:9.

24. Travel companies advertise through Pinterest, paying Pinterest to promote travel-specific Pins to users who have signaled their interest in travel. Bhaskaran, Tr. at 266:11-18. Travel companies also create their own Pins, boards, and content to attract users. Bhaskaran, Tr. at 268:17-25; TX137. Pinterest's travel partners include Expedia, Booking.com, Kayak, JetBlue, United, Delta, Southwest, American Airlines, Virgin America, Skyscanner, FareCompare, StudentUniverse, Travel & Leisure magazine, Conde Nast Traveler, Trump Hotels, Airbnb, and Four Seasons. Bhaskaran, Tr. at 267:10-268:13; TX162 at PIN00024306-13.

25.     Pinterest currently serves as a portal to websites where users can book travel. Bhaskaran, Tr. at 269:6-271:4; TX239.  Pinterest is also a tool to help users remember travel destinations and options they might be interested in.  Bhaskaran, Tr. at 279:8-22.

26.     Pinterest is working to expand the services it offers in the travel area.  Bhaskaran, Tr. at 269:6-17.  Pinterest has as an underlying philosophy the goal of making it possible to take action in the real world on all Pins.  To make travel Pins more actionable and useful, it is highly likely that Pinterest will incorporate date, price, availability, and other booking information into travel Pins in the future.  Bhaskaran, Tr. at 279:24-280:21.  For instance, Pinterest's Rich Pin technology could be used to dynamically update travel-related Pins, such as bookings for hotels, cruises, and flights. Yamartino, Tr. at 66:3-67:5.  Pinterest has had planning discussions about expanding its travel sector services, including its Rich Pin offerings related to travel.  Yamartino, Tr. at 87:17-88:15.

### 4.     The Astronomical Growth Of Pinterest's User Base

27.     Unique monthly active users ("MAU") is a common metric used to measure the popularity of a website, and Pinterest monitors it daily.  Yamartino, Tr. at 89:3-90:2.  Pinterest also monitors the metrics of comScore, a third-party analytics firm that tracks website traffic.  Pinterest compares comScore metrics to its own internal metrics, and considers comScore's metrics to be accurate.  Yamartino, Tr. at 90:3-90:24.  According to comScore, Pinterest had 1 million MAUs in August 2011; 10 million MAUs in January 2012; between 13 and 14 million MAUs in April 2012; 25 million MAUs in September or October 2012; 45 million MAUs in September or October 2013; and approximately 80 million MAUs in May 2015.  Yamartino, Tr. at 90:25-91:7, 92:1-14, 98:2-11; TX1179 at PIN00016615.  Between October 2011 and March 2012, Pinterest's MAUs increased by 35% every single month.  Yamartino, Tr. at 106:19-107:1; TX180 at PIN00012501.

28.     Pinterest's user base grew from 50,000 to 17 million MAUs in nine months. Facebook took 16 months to achieve the same MAU activity.  TX180 at PIN00012499; Yamartino, Tr. at 104:6-25.  Pinterest's user base grew to 25 million MAUs after only 30 months of operations. At the same point in their existence, Facebook had just 10 million MAUs, and Twitter had just 5 million MAUs.  Yamartino, Tr. at 99:9-100:3; TX1179 at PIN00016616.

**5. Pinterest's Extensive And Increasing Coverage By The Media**

29. Starting in 2010, the press frequently and favorably covered Pinterest, including its travel uses. Yamartino, Tr. at 84:24-86:6; Bhaskaran, Tr. at 259:4-7. Press coverage dramatically increased in 2011, and again in 2012. Bhaskaran, Tr. at 256:10-258:4.

30. In 2010, *TechCrunch*, a leading technology publication, reported that Myspace, a popular social network at that time, had copied Pinterest's design. Bhaskaran, Tr. at 255:10-256:9.

31. Between 2011 and 2012, the *New York Times*, *Fortune*, *CNN*, the *Los Angeles Times*, *TechCrunch*, the *Wall Street Journal, Fast Company*, and every other major business and news publication was writing about Pinterest. Bhaskaran, Tr. at 257:15-258:4. In referring to "Pinterest" and "pin," these articles refer specifically to Pinterest and its proprietary services. *See, e.g.,* TX10, TX44, TX127, TX150, TX151, TX160, TX168, TX169, TX170, TX173, TX174.

32. As examples of media articles, in November 2011, *TechCrunch* published an article titled "How to Make Your Startup Go Viral the Pinterest Way." TX151. In December 2011, *Mashable*, a digital culture publication, published an article titled "Pinterest: A Beginner's Guide to the Hot New Social Network." The sister-in-law of Pintrips CEO Stephen Gotlieb forwarded him this article. TX116; Gotlieb, Tr. at 165:19-167:1. On December 22, 2011, *TechCrunch* published an article titled "Hitwise: Pinterest Grows Nearly 40-Fold Past Six Months." TX150. On December 22, 2011, *CNET*, a consumer technology media website, published an article titled "Pinterest: Crazy growth lands it as top 10 social site." TX160.

33. Pinterest won the annual *TechCrunch* "Crunchies" award for the Hottest Startup of the Year at the beginning of 2012. Major companies, CEOs, and journalists were in the audience. Bhaskaran, Tr. at 258:5-259:3. *TechCrunch* published an article on February 1, 2012 entitled "And The Crunchie Goes To … Pinterest, Best New Startup Of 2011." TX10.

34. In February 2012, travel news website *Tnooz* published the article "Google Travel, Facebook, Apple and … Pinterest?" about how Pinterest was becoming an "emerging force" in the travel planning space. TX44. Pintrips CEO Stephen Gotlieb forwarded this article to employees with the subject line "Interesting conversation to have." TX237; Gotlieb, Tr. at 177:1-180:17.

35. On February 7, 2012, *CNN* published an article titled "Why Pinterest is 2012's hottest website." TX168. On February 15, 2012, the *New York Times* published an article about Pinterest titled "A Scrapbook on the Web Catches Fire." TX174. On March 22, 2012, *Fortune* Magazine published an article titled "Is Pinterest the next Facebook?" TX169. On May 17, 2012, *The Wall Street Journal* published an article titled "Pinterest Raises $100 Million With $1.5 Billion Valuation." TX173. On June 15, 2012, the *Los Angeles Times* published an article titled "Pinterest grew more than 4,000% in one year, report says." TX170. In its October 2012 issue, the magazine *Fast Company* published a story on Pinterest, with founder Ben Silbermann on the cover. TX127.

**6. The Wide Recognition of Pinterest's Marks In The United States**

36. In July 2012, a consulting service conducted a survey regarding public attitudes towards Pinterest. The results of that survey showed that more than 75% of the United States general public recognized the name Pinterest. The study also showed that 96% of all mentions of Pinterest on social media were positive. TX133 at PIN00017218; Yamartino, Tr. at 116:11-117:4, 118:15-119:16.

37. Pinterest is one of the fastest-growing websites of all time as a result of positive word-of-mouth referrals. TX180 at PIN00012499; Yamartino, Tr. at 104:6-105:10. The consumer reaction to Pinterest is "almost universally positive." Yamartino, Tr. at 113:20-115:10.

38. When Pinterest is mentioned on social media, 96% of the mentions are positive — which is 30 percentage points higher than Twitter or Myspace, and 80 percentage points higher than Facebook. TX1179 at PIN00016612; Yamartino, Tr. at 96:10-97:12.

39. In 2012, Pinterest was the fifteenth most visited website in the United States, accounting for more than 2% of all Internet traffic. More people visited Pinterest in 2012 than CNN, AOL, Tumblr, or Netflix. Yamartino, Tr. at 98:12-99:8, 105:11-106:9; TX180 at PIN00012500; TX1179 at PIN00016615; TX180 at PIN00012500; TX1179 at PIN00016615.

40. In spring 2012, more people ran Google searches for Pinterest than they did for President Barack Obama. TX180 at PIN00012506; Yamartino, Tr. at 107:8-108:1.

41. In 2012, 65 of the top 100 United States retailers had a Pinterest presence, including Neiman Marcus and Etsy. TX1179 at PIN00016620.

42.     In July 2012, Pintrips' expert Peter Kent published "Search Engine Optimization for Dummies." Kent wrote in his book that Pinterest was one of the "biggies in North America" in the field of social networking services. Kent, Tr. at 616:17-619:6.

43.     Pinterest has experienced such staggering growth that it has become a "household name." Very few people "don't already know about Pinterest." Yamartino, Tr. at 114:4-15.

### 7.     Pinterest's Specific, Non-Standard Use For PIN And PIN IT

44.     Pinterest's expert Dr. Geoffrey Nunberg holds a Ph.D in linguistics and is a professor at the University of California at Berkeley. Dr. Nunberg has worked in the fields of linguistics and lexicology for more than 40 years, including spending 20 years as the chair of the usage panel for the American Heritage Dictionary. He is an expert on the meaning and use of words. Nunberg, Tr. at 826:18-831:10. Dr. Nunberg provided an analysis of the syntactical context of the use of the word "pin" on the Internet, in rebuttal to Pintrips' expert Mr. Kent. In his expert opinion, which the Court finds authoritative, persuasive and entitled to great weight, the definition of "Pin" and its grammatical use by Pinterest does not fall within dictionary definitions or other standard uses. *E.g.* Nunberg, Tr. at 835:9-836:6; 840:9-15.

### (a)     PIN as a Noun

45.     Pinterest uses Pin as a noun to refer to an entire piece of content that a user has created by importing content, editing it, captioning it, and choosing to place it on a specific board on Pinterest. Yamartino, Tr. at 123:5-15; Nunberg, Tr. at 833:11-834:1. Pinterest's use of the word Pin as a noun is specific and restricted to content on Pinterest. Nunberg, Tr. at 845:7-24.

46.     The Oxford English Dictionary never defines "pin" as a piece of digital content that is transferred from one location to another, nor is that a standard use of the word. TX205F; Nunberg, Tr. at 844:7-22.

47.     Pintrips' expert Mr. Kent relied on articles that specifically reference Pinterest (as opposed to the category of products or services in which Pinterest exists) when they use the word "pin" as a noun. Both Mr. Kent and the media he relied upon indicate through quotation marks and clarifying definitions that "pin" has a non-standard definition restricted to Pinterest's use. Nunberg, Tr. at 835:16-836:8, 836:25-840:23.

48.     Mr. Kent's opinion that the term "pin" was commonly used "as a noun, to describe something that has been pinned to something else," is empirically incorrect and not entitled to any weight.  "Pin" is not normally used "as a noun, to describe something that has been pinned to something else," and that meaning does not appear in any dictionary.  Mr. Kent's examples on direct examination did not use the word "pin" as a noun at all.  As Dr. Nunberg testified, "One doesn't say [']I was reading an interesting pin on the bulletin board the other day.[']"  TX205F; Nunberg, Tr. at 842:4-20, 843:23-844:6.

49.     Mr. Kent admitted that when consumers refer to "their favorite pin" or "an interesting pin," there's a good chance they are specifically referring to content on Pinterest.  Kent, Tr. at 636:6-10.

### (b)     PIN as a Verb

50.     Pinterest uses the word "pin" as a verb to refer to the "action of taking a piece of content from another website and saving it to Pinterest"— i.e. the process of creating a Pin. Yamartino, Tr. at 123:5-15; Kent, Tr. at 621:20-622:5.  Pinterest's use of Pin as a verb also refers to the activity of using Pinterest generally.  Yamartino, Tr. at 123:5-15; Nunberg, Tr. at 834:16-23.

51.     The Oxford English Dictionary does not define "pin" as a verb to mean the act of creating a piece of digital content, nor is it a standard use of the word.  Nunberg, Tr. at 845:1-6.

52.     Pinterest's use of Pin as a verb is specific and restricted to creating content on Pinterest.  Nunberg, Tr. at 845:7-24, 856:3-860:2.  The overwhelming use of the word "pin" as a verb, in ordinary English, is followed by a prepositional phrase — people pin objects *to a specific place*.  Pinterest's use of "pin," by contrast, does not need to contain a prepositional phrase. Nunberg, Tr. at 849:7-852:12.  Either consumers are referring to the activity of using Pinterest generally, or they do not need to designate a location because they are referring to the act of creating a Pin on Pinterest.  *See* Nunberg, Tr. at 849:24-850:18, 852:3-12.

53.     Pinterest's use of Pin as a verb is distinct from the sense of locking something into place.  As Mr. Kent conceded, Pinterest does not use "pin" when used as a verb to mean attach, affix, or lock in place.  Kent, Tr. at 627:22-628:14.  In fact, Pinterest Pins do not stay in place, but dynamically update and move around as more content is added.  Kent, Tr. at 629:19-630:11.

54.     The examples Pintrips' expert Mr. Kent testified about regarding other uses of the word "pin" on the Internet are all distinguishable.  In each instance, the word "pin" was used as a synonym for attach or affix, meaning to "take one computer interface element and [] attach it to another one."  Kent, Tr. at 576:19-577:6, *see also id.* 589:17-592:3; *see, e.g.* TX1053, TX1056, TX1058, TX1338, TX1055, TX1334, TX1076 (Microsoft uses of "pin"); TX1060, TX1069, TX1070 (Google uses of "pin"); TX1065; TX1068; TX1333 (Facebook uses of "pin").  The "pinning" functionality on these platforms gives users the option to have an interface component become fixed rather than remain dynamic or "floating," such as email that gets pushed down the queue as new emails are received.  In contrast, to Pin on Pinterest involves creating new content on a board, where the resulting Pins will "float," or dynamically update their positions as more Pins are added.  Kent, Tr. at 629:16-630:11.

55.     Mr. Kent's testimony regarding other uses of the word "pin" on the Internet is not persuasive.  Mr. Kent never explained his method for collecting his examples of uses of the word "pin."  He did not address differences in how the word "pin" is used in different contexts, or compare these uses of the word "pin" to dictionary definitions.  Mr. Kent is not an expert in linguistics or lexicography and does not have the expertise necessary to opine regarding how consumers use or interpret the meaning of words.  Kent, Tr. at 611:8-19; Nunberg, Tr. at 831:13-833:10.  Mr. Kent never surveyed or tested whether consumers associate the word "pin" with any sources, or how often consumers actually encounter or use "pin" in any particular product category.  Mr. Kent did not study the use of the word "pin" with respect to social media websites; he looked instead at "computing in general."  Kent, Tr. at 611:25-613:5, 615:23-616:16, 631:17-20.

### (c)     PIN IT as a Phrase on a Button

56.     Pinterest uses the phrase "Pin It" on an action button that appears both on Pinterest and on third-party websites.  It is created by a single line of Javascript code that a third-party website can choose to add to its site.  When clicked on, the "Pin It" button will add content from the third-party website to Pinterest as a Pin.  Yamartino, Tr. at 115:11-21; Bhaskaran, Tr. at 261:2-21.

57.     Third-party brands, publishers, and partners like using the official Pinterest "Pin It" button because consumers recognize that button.  Bhaskaran, Tr. at 286:3-20.  Pinterest has

1    determined through internal testing that the "Pin It" phrase "is the best way to describe to a user that

2    they're about to save some content to Pinterest."  Yamartino, Tr. at 124:1-6.

3          58.     Pintrips' CEO recognizes that a red-and-white "Pin It" Button on the Internet is

4    associated with Pinterest.  TX233; Gotlieb, Tr. at 184:1-185:23.

5                **8.**      **Pinterest's Substantially Exclusive Use Of The PIN Mark**

6          59.     Dr. Nunberg conducted a study of Google search results to evaluate how the word

7    "pin" is used as a noun on the Internet.  95 percent of the results referred to pieces of digital content

8    on Pinterest, showing that Pinterest's use of Pin as a noun referencing digital content is almost

9    exclusive to Pinterest.  Nunberg, Tr. at 845:25-848:23.

10         60.     Dr. Nunberg also conducted a study of Google search results to evaluate how the

11    word "pin" is used as a verb on the Internet.  86 percent of those results referred to Pinterest.

12    Nunberg, Tr. at 852:13-855:4.

13         61.     No other United States based social media website, which is not an unauthorized

14    clone or copycat of Pinterest, uses the term "pin" to describe the unit of content that users add to the

15    site.  Nunberg, Tr. at 860:3-861:4.  Pintrips did not offer any evidence of any U.S. social media

16    website using "pin" in that way, except for Pinterest and Pintrips themselves.

17         62.     Pinterest's survey expert, Dr. Debra Jay, conducted a confusion survey that confirms

18    the strength of consumers' association of the word "pin" exclusively with Pinterest.  Dr. Jay is an

19    experienced and qualified expert in survey design, trademark surveys, and data analytics.  Jay, Tr. at

20    353:18-359:4.  Dr. Jay showed likely Pintrips users a United Airlines webpage that contained either

21    the actual Pintrips "Pin" button or a fictitious "Clip" button, and then measured through open-ended

22    questions what company, if any, the users identified with each button.  Jay, Tr. at 365:22-370:17.

23    The survey followed standard methodology and was reliable.  Jay, Tr. at 360:5-363:10, 387:3-10.

24    The Court credits Dr. Jay's testimony as authoritative and persuasive.

25         63.     Forty-four percent of respondents in Dr. Jay's survey thought the Pintrips "Pin"

26    button was associated with Pinterest, and another 5% at least mentioned Pinterest in connection

27    with Pintrips' "Pin" button.  Jay, Tr. at  376:25-377:11, 388:11-21; TX207C at Table 1.  Many of

28    the survey respondents said that Pinterest was the *only* website they knew of that "Pins" things.

05001-00003/6945709.1

*See. e.g.,* TX207D at User IDs 000740, 000763, 000850, 001119, 001434, 001547, 001741, 001937, 002381, 002618, 002812, 003080, 003208.  Because such a large number of respondents associated the use of the word "Pin" with Pinterest as a singular source, Dr. Jay's survey demonstrated the strength of the association between Pinterest and Pin, even though the respondents saw a "Pin" button with a different color and font than Pinterest uses.  Jay, Tr. at 386:17-387:1, 401:19-402:1.

**B.** **Pintrips' Use Of "Pintrips" And "Pin" Is Likely To Cause Confusion**

### 1. Pintrips' Features And Services

64.    Pintrips is a Web-based personalized travel-planning tool that allows users to create and share content with other Pintrips users.  Gotlieb, Tr. at 138:2-8, 172:20-173:5.

65.    Pintrips works by allowing users to collect flight information from third-party websites and to save that information on "tripboards" located on Pintrips' website.  TX85; Gotlieb, Tr. at 172:2-24; Mirkin, Tr. at 337:13-19; Raiteri, Tr. at 661:24-662:1.

66.    Pintrips uses a "pin" button to allow users to save content from third-party websites to their Pintrips boards.  Gotlieb, Tr. at 465:20-466:1, 471:23-472:23; TX1360.

67.    Pintrips markets itself as a tool that helps its customers collaborate on trip planning.  Mirkin, Tr. at 337:20-23.  The collaborative nature of its services is highlighted on the Pintrips website.  TX241; Gotlieb, Tr. at 529:23-531:9, 533:14-16.  Once a user saves content to his or her Pintrips tripboard, the user can choose to share that board with others, who can view the board and add content.  Gotlieb, Tr. at 174:10-13; Mirkin Tr. at 338:2-13.  Pintrips encourages users to invite friends, family and co-workers to view their trips.  Gotlieb, Tr. at 172:25-173:5, 174:2-5; TX85.

68.    Pintrips offers a chat feature, whereby users can communicate or chat with other users who are invited to collaborate on the same tripboard.  Mirkin, Tr. at 338:17-21.

69.    Pintrips does not enable users to purchase flights directly from the Pintrips site; to complete the booking process, the user is required to return to the original website where the flight was found.  Bijoor, Tr. at 289:14-24, 306:12-20.

70.    The product demonstration provided by Mr. Gotlieb confirmed that a user can sign up for Pintrips for free.  Gotlieb, Tr. at 464:1-479:21; TX1360.

71.    After receiving an email from a customer complaining about Pintrips' website, in which the customer wrote, "your website looks horrible…like web1.0 design style…if you want to compete with pinterest your site needs to be in [sic] par with them…" Sheila Bijoor admitted: "But overall [the customer] is right – we have a long way to go to look on par!" TX 51.

### 2.    "Pintrips" and "Pin" Are Similar In Sight, Sound, And Meaning To PINTEREST, PIN And PIN IT.

#### (a)    Pintrips Intended to Take Advantage of Pinterest's Brand Recognition

72.    Stephen Gotlieb is the CEO, founder and sole employee of Pintrips; Pintrips also has three officers. Gotlieb, Tr. at 135:22-137:2. Gotlieb initially incorporated his company in March 2011 under the name Flightrax. Gotlieb, Tr. at 138:11-19. In June 2011, Mr. Gotlieb met with three consultants, Timothy O'Neil-Dunne, Ashley Raiteri, and Paul Addy, to discuss ideas related to the Flightrax business, and alternative names for Flightrax. Gotlieb, Tr. at 138:24-139:10, 139:21-140:1; TX69. At the time, Flightrax did not have a commercially-available product. Gotlieb, Tr. at 139:18-20.

73.    Mr. Gotlieb was aware of Pinterest as of June 10, 2011. Gotlieb, Tr. at 142:19-25, 164:11-20; TX69 at PINTRIPS00006890. On June 10, 2011, Mr. Raiteri forwarded an email to Mr. Gotlieb and others directing them to "Take a look at Pinterest.com in relation to our alpha[.]" TX69 at PINTRIPS00006890. Mr. Gotlieb responded "[t]he concept is cool." TX69 at PINTRIPS00006890; Gotlieb, Tr. at 142:19-25.

74.    Prior to June 15, 2011, Flightrax/Pintrips did not own the pintrips.com, pintrips.net or pintrips.org domain names. Gotlieb, Tr. at 145:18-22; TX30. Mr. Gotlieb continued to consider other names for his company. Gotlieb, Tr. at 141:4-9; O'Neil-Dunne Clip Report, 30:17-20.

75.    As of June 15, 2011, the name "Goodr [was] still the primary target." TX30 at ADDY00000190. Mr. Gotlieb instructed Mr. Raiteri that "I wouldn't even bother getting pintrip unless we can get it for cheap." TX30 at ADDY00000190. On July 3, 2011, Timothy O'Neil-Dunne recommended that Mr. Gotlieb consider registering all Goodr sub-domains. TX125.

76.    On August 25, 2011, Flightrax launched a demo product "the new Goodr trip pinner" for alpha access. TX122 at PINTRIPS00007903; Gotlieb, Tr. at 148:9-149:7. This alpha version of

the Goodr trip pinner was only available for access to a limited number of select people. Gotlieb, Tr. at 149:8-150:9. The product could not be accessed by the general public and was only available to those who had the username and password. Gotlieb, Tr. at 150:14-21. At the time, the Company planned to include a Goodr button as part of its product. TX122 at PINTRIPS00007903.

77.     As of September 23, 2011, the company continued to represent itself as "Goodr" to outside investors. TX120; Gotlieb, Tr. at 155:2-157:1. On September 29, 2011, Mr. O'Neil-Dunne wrote: "ATP-Pintrips/Goodr*  when these boys make up their mind!!!" TX253 at TOD0000970. Goodr remained a possible name for the company until December 2011. Schwartzman Clip Report, 31:08-16.

78.     Although at trial Pintrips tried to portray Goodr as a data mining company that Pintrips would only be a part of, Pintrips did not introduce any documentary evidence supporting that Pintrips was always intended to be a subsidiary or sister company of Goodr, and the testimony by Pintrips was unpersuasive on that point, particularly in view of the documentary evidence.

79.     By November 2011, Mr. Raiteri was aware that Pinterest had gone viral and was becoming wildly popular on the internet. Raiteri, Tr. at 677:24-678:6. Flightrax was reincorporated as Pintrips on April 16, 2012. Gotlieb, Tr. at 138:20-22. Pintrips launched its beta product in November 2012. Gotlieb, Tr. at 170:17-20, 506:20-507:3, 507:16-24, 508:1-509:4; Levy Clip Report, 133:14-16; TX6; TX33. Before its November 2012 beta launch, only a limited number of people were allowed access to Pintrips' website. Gotlieb, Tr. at 510:2-11.

80.     Pintrips has no registered trademark in "Pintrips." Krugman, Tr. at 733:17-21.

81.     As Pintrips' witnesses conceded, Pinterest and Pintrips "sound similar." Mirkin, Tr. at 329:21-330:3; Kleiman Depo. Tr. 36:21-37:7.

82.     In June 2011, Pintrips consultant Ashley Raiteri explained to his wife the concept behind Pintrips and mentioned the Pintrips name. Raiteri, Tr. at 674:17-675:1. Mr. Raiteri's wife's immediate reaction was, "Oh, you mean like Pinterest?" Raiteri, Tr. at 674:17-675:1.

83.     On December 28, 2011, Mr. Gotlieb's sister-in-law forwarded him a link to an article "Pinterest: A Beginner's Guide to the Hot New Social Network." TX116; Gotlieb, Tr. at 165:22-

166:18. She wrote: "Check out the article on a company named pinterest. When you say it out loud, it sounds like pintrips…" TX116.

84. In August 2012, Eugene Mirkin informed Mr. Gotlieb that Pintrips was "kind of reminiscent of Pinterest." Mirkin, Tr. at 329:15-23. Mr. Gotlieb's response was "[I]t's a useful coincidence. But it might play to our hand." Mirkin, Tr. at 330:22-334:3.

85. In response to a consumer complaint that "if [Pintrips] want[s] to compete with pinterest your [sic] site needs to be in [sic] par with them…" Ms. Bijoor wrote: "overall he is right – we have a long way to go to look on par!" Bijoor, Tr. at 311:5-15; TX51 at PIN00006876.

86. Pintrips executives, including Mr. Gotlieb, Pintrips' Chief Product Officer Sheila Bijoor, and Pintrips' Chief Operating Officer Guy Levy, were aware that Pinterest offered travel-related features and services. Gotlieb, Tr. at 136:1-10; Bijoor, Tr. at 288:18-21; TX187; TX237.

87. Pintrips' executives considered Pinterest a competitor. TX40 at PINTRIPS00006791. For example, in 2012, in response to a question posed by a media consultant for Pintrips, Mr. Gotlieb identified Pinterest as a direct competitor. Gotlieb, Tr. at 181:18-20; TX40 at PINTRIPS00006791 ("One more competitor would actually be Pinterest.").

88. Ms. Bijoor said that Pintrips "sound[s] like a cheap knock-off of Pinterest." TX235 at PINTRIPS00006931.

89. Mr. Gotlieb believes Pintrips would benefit if consumers associated it with Pinterest, and Pintrips markets itself accordingly. Gotlieb, Tr. at 195:17-21; Kleiman Depo Tr. 118:1-15; TX50 at PINTRIPS0000611. Mr. Gotlieb characterized Pintrips' service as "a travel-planning tool (similar to … pinterest)." Gotlieb, Tr. at 176:2-12; TX50 at PINTRIPS000611. Mr. Gotlieb publicized and directed others to publicize articles referencing Pinterest and Pintrips together. Gotlieb, Tr. 196:7-197:15, 198:5-199:5; Kleiman Depo. Tr. 120:1-122:25; TX41; TX93; TX92.

90. Pintrips markets itself on social media, including Facebook and Twitter, and through word-of-mouth. Gotlieb, Tr. at 199:6-12; Kleiman Depo Tr. 20:24-23:6; TX92.

91. Pinterest sent Pintrips a cease-and-desist email on May 23, 2013. Gotlieb, Tr. 193:7-194:6; TX82. A few weeks earlier, Pintrips considered developing a "pin it" button that could be displayed directly on third-party websites without a user first being required to log-in to Pintrips or

PINTEREST'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

install Pintrips' browser extension. Gotlieb, Tr. at 183:12-187:10; Levy Clip Report, 77:21-22, 77:24-25; TX39; TX233; TX234. In May of 2013, Pintrips' CEO reviewed designs for a new Pintrips "pin it" button. Gotlieb, Tr. at 188:14-193:6. While until that time Pintrips' button had always contained only the word "Pin," the new design mock-ups were for a "pin it" button—the same phrase that Pinterest uses for its buttons. Gotlieb, Tr. at 188:14-193:6.

92.     Pintrips continued to use "Pintrips" and "pin" following receipt of Pinterest's cease-and-desist letter. Gotlieb, Tr. at 194:7-18.

**(b)     Pintrips' Uses of "Pintrips" and "Pin" Cause Actual Confusion**

93.     Actual consumer confusion exists between Pintrips and Pinterest. Gotlieb, Tr. at 199:13-16; Mirkin, Tr. at 336:16-337:12. Pintrips' former Chief Technology Officer Eugene Mirkin testified that he received an email from a customer who confused Pintrips and Pinterest. TX87; Mirkin, Tr. at 336:16-337:12. Mr. Gotlieb's mother-in-law saw the name Pinterest and mistakenly believed that it was Mr. Gotlieb's company, Pintrips. H. Gotlieb Depo. Tr. 47:3-17.

94.     A consumer survey showed that almost 20% of likely Pintrips users shown Pintrips' landing page thought that it either came from the same source or was affiliated with Pinterest, or that Pinterest had authorized Pintrips to use "Pintrips" and/or "pin." Jacoby, Tr. at 899:16-900:7. The *Eveready*-format survey was performed by Dr. Jacob Jacoby, who has more than 50 years of experience in his field, is a professor at New York University in the Graduate School of Business, and is the president of Jacob Jacoby Research, Inc. Dr. Jacoby has conducted more than 1,000 trademark litigation surveys and testified in federal court more than 150 times. At the request of the American Bar Association's Section on Intellectual Property Law, Dr. Jacoby authored the comprehensive reference book "Trademark Surveys." Jacoby, Tr. at 897:3-15, 889:22-896:23. The study performed by Dr. Jacoby and his testimony about it is credited.

95.     Another consumer survey showed that almost 45% of likely Pintrips users shown a screenshot of the United.com website displaying an actual Pintrips "pin" button in a similar manner to the way that Pinterest's button appears on third-party websites mistakenly believed that Pinterest was the source of the "pin" button. Jay, Tr. at 359:19-23, 371:4-9; TX207C. This survey was conducted by Dr. Deborah Jay, who has more than 20 years of experience in trademark surveys.

Dr. Jay holds a Ph.D. from the University of California at Berkeley and is the president and chief executive officer of Field Research Corporation. Dr. Jay has been qualified as a survey expert in court 22 times, and has conducted nearly 300 trademark litigation surveys. She is qualified as an expert in survey design, trademark surveys, and data analytics. Dr. Jay's study is credited as showing that actual confusion is likely to occur if Pintrips succeeds in having third parties, such as United, place a Pintrips "pin" button directly on their websites without requiring a user to download the Pintrips browser extension on their own. This is relevant because Pintrips' documents show it planned to do this and it did not disavow those plans at trial. Gotlieb, Tr. at 183:12-187:10, 188:14-193:6; Levy Clip Report, 77:21-22, 77:24-25; TX39; TX233; TX234.

96.   Pintrips offered Dr. Susan McDonald as a rebuttal expert to the surveys of Dr. Jay and Dr. Jacoby. Neither she, nor any other of Pintrips' experts, conducted a rebuttal confusion survey. McDonald, Tr. at 1077:11-1078:8. Although Pintrips proffered Dr. Robertson's survey as rebuttal to Dr. Jacoby's survey, it was not a confusion survey. TX1082, 1083.

97.   Dr. McDonald offered only unfounded speculation about what the effect of any corrections to the purported flaws in the other surveys would have been. Her criticisms were both factually unsupported and internally contradictory. For example, Dr. McDonald criticized Dr. Jay and Dr. Jacoby for not allowing their survey respondents to take the survey on a cell phone, tablet, or other mobile device, McDonald, Tr. at 998:5-999:6, 1034:20-1035:8, which she said was necessary because "there are many tablet-only users for whom Pintrips would be accessible even now." McDonald, Tr. at 1075:15-1076:2. But Dr. McDonald had never actually used the Pintrips product on a mobile device, had not investigated whether using Pintrips on a tablet was even possible, and had never seen the Pintrips error message stating that Pintrips is not available on tablets. McDonald, Tr. at 1076:3-18. Although Dr. McDonald opined on the importance of having studies with "approximate real-world market conditions," she testified that the actual market conditions for use of the Pintrips website did not affect her analysis. McDonald, Tr. at 1024:18-1025:5, 1076:19-1077:10.

98.   Dr. McDonald also criticized Dr. Jacoby for using Pintrips' complete homepage as a stimulus, but not requiring respondents to get to that page by typing "pintrips" into a search or

1  direct URL link.  McDonald, Tr. at 1000:8-1002:5.  McDonald claimed this additional piece of

2  context would be important to users because "it's all but impossible to reach the home page without

3  knowing the Pintrips name."  McDonald, Tr. at 1037:9-1039:4.  McDonald admitted that it was

4  possible for users to reach the Pintrips website by clicking on paid advertising, but she had just

5  assumed that no such advertising existed without any factual investigation.  McDonald, Tr. at

6  1040:1-5, 1040:24-1041:17.  McDonald claimed "pinning" was "ubiquitous" on the Internet,

7  McDonald, Tr. at 1033:20-1034:10, but admitted that no other website uses "pinning" to refer to

8  transferring content from one website to another.  McDonald, Tr. at 1060:6-1061:1.

9  99.    McDonald criticized Dr. Jay for creating a stimulus of the United Airlines homepage

10  where she placed the Pintrips "pin" button next to other social media buttons, because it was

11  "impossible, or implausible" that Pintrips' "pin" button would ever appear next to other social

12  media buttons.  McDonald, Tr. at 1024:18-1025:5, 1027:4-1028:10.  But McDonald admitted that

13  she had no knowledge about where Pintrips might plan to place a button in the future, and that even

14  if Pintrips planned to add its "pin" button next to other social media buttons, that would not change

15  her opinion that Dr. Jay's stimulus was improper.  McDonald, Tr. at 1049:19-1051:3.

16  100.   Dr. McDonald was a combative witness who avoided answering direct questions

17  from counsel, took positions that were contrary to the relevant facts and internally inconsistent, and

18  expressed disdain for the conventions of trademark litigation surveys.  McDonald, Tr. 1035:14-

19  1061:1; 1074:4-1078:8; 1088:3-21.  The Court finds Dr. McDonald's criticisms of Dr. Jay and Dr.

20  Jacoby to be unpersuasive, and her testimony is not credited.

21  **C.**    **PINTEREST And PIN Were Famous Marks Before Pintrips Began Using**
         **"Pintrips" and "Pin" In Commerce.**

22

23  101.   Pintrips first offered its service to the public in November 2012.  *Supra* ¶ 79.

24  102.   Before November 2012, the PINTEREST and PIN marks had received frequent,

25  extensive, and nationwide publicity, including by major media outlets and corporate partners.
    *Supra* ¶¶ 29-43.

26

27  103.   Pinterest had 10 million monthly active users in the United States in January 2012.
    *Supra* ¶ 27.  At that time, Pintrips' expert Peter Kent wrote that Pinterest was one of the social

28

networking "biggies" in America. *Supra* ¶ 42. By October 2012, 25 million U.S. consumers used the PINTEREST and PIN marks in conjunction with Pinterest's services. *Supra* ¶ 27.

104. By July 2012, more than 75% of U.S. consumers recognized the PINTEREST mark. *Supra* ¶ 36. 96% of social media mentions about Pinterest were positive. *Supra* ¶ 38. Pinterest was the fifteenth most visited website in the U.S. in 2012, *supra* ¶ 39, and grew more rapidly in its first 30 months (March 2010 – September 2012) than either Facebook or Twitter. *Supra* ¶ 28.

105. PINTEREST became a registered trademark in May 2012. TX23. *Supra* ¶ 14.

## II. DEFENDANT DID NOT PROVE ANY COUNTERCLAIMS OR AFFIRMATIVE DEFENSES

### A. Pinterest's PIN Mark Is Not Generic

106. Pinterest operates in the social media space. Yamartino, Tr. at 96:10-97:11, 120:15-17; Gotleib, Tr. at 246:18-247:2. Pintrips did not conduct a consumer survey on what PIN means or signifies to relevant consumers in that space. Kent, Tr. at 603:23-604:5; 611:25:-612:13.

107. Pintrips did not present any evidence regarding the use of the word pin as a noun on social media websites, or even in the broader context of computing generally. Pintrips' expert Peter Kent testified that that when consumers refer to "their favorite pin" or "an interesting pin," there's a good chance they are specifically referring to content on Pinterest. *Supra* ¶ 49. Pinterest uses PIN as a noun to refer to piece of social media content on Pinterest. This is a non-standard use that does not track the dictionary definition of pin. Dr. Nunberg's study of the top 50 search results for uses of Pin as a noun showed results that overwhelmingly referred to Pinterest. *Supra* ¶ 59.

108. Pintrips offered no evidence of any other U.S. based social media website which uses PIN as a verb to describe the creation of content on that social media website. Pintrips presented examples of the word pin being used as a verb in the context of computing generally, according to its common dictionary definition of "affix," "attach," or "lock in place." *Supra* ¶ 54. The only example Mr. Kent presented from the social media context was a screenshot from Facebook, in which Facebook also used the work "pin" consistently with the standard dictionary definition of lock in place. *Supra* ¶ 54. Mr. Kent acknowledged that that Pinterest does not use PIN as a verb to mean affix, attach, or lock in place, but rather, uses PIN as a verb to mean the act of creating a Pin.

1    *Supra* ¶ 53.  This is a non-standard use that does not track the dictionary definition of pin.  Dr.

2    Nunberg's study of the top 50 search results for a uses of Pin as a verb showed results that

3    overwhelmingly referred to Pinterest.  *Supra* ¶ 60.

4          109.    Mr. Kent is not an expert in social media, linguistics or lexicography; he collected

5    examples of the word pin being used on the Internet and computing in general.  Mr. Kent did not

6    examine the use of pin in the context of social media specifically, disclose his methodology, or

7    provide information as to whether any consumers actually viewed the websites which contained his

8    pin examples, nor how any such consumers perceived the meaning of the term pin.  Kent, Tr. at

9    611:13-613:5, 615:23-616:16; *supra* ¶ 55.

10         110.    In Dr. Jay's survey, *supra* ¶¶ 62-63, many respondents explained that they believed

11   Pinterest was the source of the Pintrips "pin" button because they associated "pin" so strongly with

12   Pinterest.  Jay, Tr. at 374:9-15, 375:12-377:11; TX207C; TX207D.

13         **B.    "Pin" Is Not Functional**

14         111.    The words "pin" or "pin it" are not necessary for an action button to perform a

15   content creation function.  Pinterest's PIN IT button would functionally work the same way, as a

16   line of Javascript code, even if the words appearing on the button were different—for example if the

17   word on the button was "save" or "post."  Yamartino, Tr. at 115:11-116:17.  The words on a button

18   do not create or interfere with the button's functionality.

19         112.    Pintrips' CEO testified that when Pintrips was creating its own "pin" button, that

20   button "could be labeled anything.  The technology function is separate from the name that's on it."

21   Gotlieb, Tr. at 151:1-19.  Pintrips' former consultant Ashley Raiteri testified that Pintrips could

22   have chosen a different word than "pin" to fulfill the same function.  Raiteri, Tr. at 652:7-10.

23         113.    Luvocracy is a former Pinterest competitor.  Luvocracy used the word "luv" the

24   same way that Pinterest uses PIN.  Having a different word did not matter to the function of taking

25   digital content from one website and saving it to another.  Mirkin, Tr. at 338:25-340:7.

26         114.    Other social media websites use words other than "pin" to describe content on their

27   sites.  For example, www.delicious.com uses "link,"  www.scoop.it uses "scoop,"

28   www.slashdot.org uses "tag," www.stumbleupon.com uses "stumble," Twitter uses "tweet," and

Facebook uses "post." Kent, Tr. at 631:21-636:23, 638:9-18. No other U.S.-based social media website (excluding clones or copycats of Pinterest), uses the term "pin" to describe the unit of content that users add to the site. Nunberg, Tr. at 860:3-861:4.

### C. Dr. Robertson's Survey Shows Neither Functionality Nor Genericness

115. The testimony by Pintrips' expert Dr. Robertson, is not credited for any purpose. Dr. Robertson has never qualified as an expert in either trademark surveys or trademark survey design. Dr. Robertson never previously served an expert in any court case. Robertson, Tr. 791:21-792:5. He has performed only one other trademark survey, and it concerned the construction industry, not the Internet. No court evaluated that survey. Robertson, Tr. at 793:23-794:22. Dr. Robertson lacked basic knowledge about the nature, use, and design of trademark surveys, and was not able to respond directly and unequivocally to questions. Robertson, Tr. at 794:19-796:22, 798:13-800:14; 806:11-811:23; 814:3-818:11. The Court finds Dr. Robertson neither persuasive nor credible.

116. Dr. Robertson claimed to perform a "modified" *Teflon* survey. Robertson, Tr. at 796:10-12. A *Teflon* survey asks consumers whether they associate a series of words with a single corporate source, or with a class of goods or services and is designed to test a *plaintiff*'s trademark in the *plaintiff*'s market to determine if the public primarily views the plaintiff's mark as generic. Robertson, Tr. at 798:13-21, 796:10-12. Dr. Robertson did not do any of those things. Robertson, Tr. at 796:17-797:16. Instead, Dr. Robertson tested perception of consumers in Pintrips' airline travel planning market to see whether they associate Pintrips' use of the word "pin" on a button as a corporate name/brand or as a function. Robertson, Tr. at 796:17-22, 797:17-798:12, 798:22-800:9. Because Dr. Robertson did not test Pinterest's marks or the single source/class of goods dichotomy, his survey is entitled to no weight in the genericness or functionality analysis.

117. Dr. Robertson's survey is also entitled to no weight because it has fundamental methodological flaws. These include the following:

- The survey gave consumers an improper binary choice, asking consumers whether a button "[o]nly tells me what the button does" or "[a]cts as a brand and tells me whose button it is." Robertson, Tr. at 766:15-768:4; TX1083 at 32. This "forced-choice comparison" did not give consumers the option of answering that a button both acted as a brand *and* performed a function,

which Dr. Robertson admitted could occur. Robertson, Tr. at 781:20-782:5, 798:22-25. Dr. Robertson did not inquire as to what function respondents thought the Pintrips "pin" button served, Robertson, Tr. at 799:14-800:12, even though such a question might have yielded answers such as "pin content to Pinterest." Robertson admitted that the 31% of respondents who thought the button "tells me whose button it is" could have associated it with Pinterest. Robertson, Tr. at 807:5-808:12.

- Dr. Robertson acknowledged that consumer perception of a button, and the word "pin," may differ depending on the context in which it is presented. Robertson, Tr. at 808:18-813:5, 815:14-17. But his survey did not show the Pintrips "pin" button in the context in which it appears in the marketplace, including its proximity to the Pintrips name. Robertson, Tr. at 808:14-17, 809:20-25, 814:3-20, 816:3-818:11.

- Dr. Robertson's controls were leading and not appropriate. He chose famous marks and stylized fanciful words as the "brand/company" marks against which he asked survey respondents to evaluate Pintrips' "pin" button. TX1083. Robertson, Tr. at 801:18-804:18. For example, he used Google's stylized "g+" icon, Twitter's stylized "Tweet" icon with a bird, and he used "Stumble!" with an exclamation point, "Digg"'s unique spelling, and Tumblr's "tumblr+" distinctive font and spelling. TX1083. These brand buttons were then contrasted with "pin," a word that, like "call," "print," "follow" and "share," can all be found in the dictionary. TX1083; Robertson, Tr. at 804:22-24. As "brand" stimuli, he also almost exclusively chose company names—which are what are commonly associated with the word "brands"—such as Google, Tumbler, and Digg, rather than product feature names, such as PIN, using only one uniquely named product feature—"tweet"—as a "brand" control. TX1083.

118. Dr. Robertson's survey analysis also failed to net out the "noise" demonstrated by incorrect answers to the control question, which is proper survey methodology. Jay, Tr. at 433:18-25; McDonald, Tr. at 1015:16-1016:3; Robertson, Tr. at 786:18-790:7; TX1082 at 18. For example, Dr. Robertson did not subtract the 16% of respondents who incorrectly identified the "tweet" control button as functional, TX1082 at 14, from the 61% of respondents who identified Pintrips' "pin" button as functional, TX1082 at 18.

119.     Even with all the contextual clues in Dr. Robertson's survey suggesting the "pin" button was "functional," 33% of respondents nonetheless identified "pin" as acting as a brand—substantially more than for the controls of "print" (7%), "submit" (7%), "share" (11%), and "follow" (14%).  TX1082 at 16-17.  This does not make a finding of genericness or functionality any more likely.

### D.     Pintrips Did Not Prove Fair Use

120.     Pintrips' use of Pinterest's PIN mark is not fair use.  Pintrips does not use the word "pin" as a synonym for attach.  Pintrips uses the word "pin" in the same manner as Pinterest to mean the acting creating pieces of digital content to be saved on a website or digital platform. Gotlieb, Tr. at 465:20-466:1, 471:23-472:23; TX1360.

121.     In selecting and using the word "pin," Pintrips acted in bad faith.  As established in Section I-B-2, *supra*, Pintrips selected the word "pin" with the intention of confusing consumers and benefiting from Pinterest's reputation and goodwill.

### E.     Pinterest Does Not Engage In Naked Licensing

122.     Pintrips presented no evidence that Pinterest fails to exercise quality control over PINTEREST, PIN, and PIN IT.

123.     Pinterest publishes guidelines about how the "Pin It" button should appear and operate when the button is placed on third party websites.  Bhaskaran, Tr. at 264:15-265:15. Pinterest urges brands, publishers, partners, and other third-party websites to adopt the official "Pin It" button because millions of Pinterest users recognize it.  Bhaskaran, Tr. at 286:3-287:13.

124.     Pinterest vigorously enforces its trademarks.  Pinterest surveys software offerings, the Internet, and the press to make sure that its PIN mark is being used correctly.  When Pinterest becomes aware of other websites who are using similar names, Pinterest sends cease and desist letters or pursues other legal action.  Yamartino, Tr. at 122:14-124:6.  Pinterest does not tolerate abuse or misuse of its marks or buttons.  Bhaskaran, Tr. at 287:14-17.

## III.     PINTEREST IS ENTITLED TO A PERMANENT INJUNCTION

125.     The facts set forth above demonstrate that Pinterest has achieved actual success on the merits.

126.    Pinterest is likely to be irreparably injured if injunctive relief is not granted. Pinterest's reputation is threatened by Pintrips' use of similar marks. As established above, Pintrips' use of "Pintrips" and "pin" was intended to confuse and has already confused consumers into believing there is an association between Pinterest and Pintrips. TX87; Mirkin, Tr. at 336:16-337:12; H. Gotlieb Depo. Tr. 47:3-17. While Pinterest vigorously polices its trademarks and does not tolerate infringing uses of it marks or buttons, Bhaskaran, Tr. at 287:14-17, Pinterest has no control over the quality of Pintrips' services. As acknowledged by Sheila Bijoor, Pintrips' website is not "on par" with Pinterest. TX51.

127.    This potential for damage to Pinterest's goodwill and reputation confers a hardship on Pinterest if Pintrips' actions are not enjoined. An injunction prohibiting Pintrips from continuing to use the similar marks does not present an undue hardship to Pintrips. Pintrips has never generated any revenue. Gotlieb, Tr. at 137:19-21. Pintrips' metrics (user numbers) are "modest." TX118 at PINTRIPS00007223; Bijoor, Tr. at 299:2-300:17. Pintrips has only 200 to 300 daily unique users. Gotlieb, Tr. at 171:9-19. Very few people have ever become aware of Pintrips. Raiteri, Tr. at 692:9-11. Users cannot "pin" flights without installing the Pintrips browser extension. Bijoor, Tr. at 300:12-24. As a result of its small size, few users, lack of revenue base and single employee, Pintrips will not suffer any great hardship by re-branding.

128.    An injunction against Pintrips' continued use of similar marks will advance the public interest. Pinterest's evidence of confusion (*see supra,* Section I(B)(2)) confirms that the public interest is not being served by Pintrips' conduct.

<u>**CONCLUSIONS OF LAW**</u>

**I.    PINTRIPS HAS INFRINGED PINTEREST'S TRADEMARKS**

129.    Pinterest's claims for trademark infringement, false designation of origin, and unfair competition are "substantially congruent." *See* 15 U.S.C. § 1114(1), 1125(a); Cal. Bus. & Prof. Code § 17200; *Cleary v. News Corp.*, 30 F.3d 1255, 1262-63 (9th Cir. 1994); J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1.50 (2015) ("*McCarthy*"). To prevail on these infringement claims, Pinterest must prove by a preponderance of the evidence that (a) Pinterest owns valid, protectable trademarks in PINTEREST, PIN, and PIN IT, and (b) that Pintrips

1  used the PINTEREST, PIN, and PIN IT in a manner that is likely to cause consumer confusion.

2  *Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1124 (9th Cir. 2014).

3  **A.  Pinterest Owns The PINTEREST, PIN, And PIN IT Marks**

4  130.  "Federal registration of a trademark endows it with a strong presumption of

5  validity."  *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 604 (9th Cir.

6  2005).  Pinterest's ownership of federally registered trademarks for PINTEREST and PIN (*see*

7  Findings of Fact ("FF") ¶¶ 14-15) establishes that Pinterest has a presumption of ownership under

8  the Lanham Act, which Pintrips can only "overcome … by a preponderance of the evidence."  *See*

9  *Sengoku Works Ltd. v. RMC Intern., Ltd.,* 96 F.3d 1217, 1219-20 (9th Cir. 1996).  Pintrips did not

10  rebut this presumption.

11  131.  Pinterest owns a common-law trademark in PIN IT.  FF ¶¶ 17-18.  "[C]ommon law

12  rights are acquired in a service mark by adopting and using the mark in connection with services

13  rendered."  *Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156 (9th Cir. 2001).

14  132.  Pinterest enjoys priority in the trademarks PINTEREST, PIN, and PIN IT because it

15  has used them for social bookmarking software and services since at least as early as March 2010,

16  more than two and a half years before Pintrips had its beta launch and began to be used in

17  commerce in November 2012.  FF ¶¶ 18, 79.

18  **B.  Pintrips' Actions Create A "Likelihood of Confusion" Under *Sleekcraft***

19  133.  Likelihood of consumer confusion will be found where a "reasonably prudent

20  consumer in the marketplace is likely to be confused as to the origin of [Pintrips's services] and to

21  associate [those services] with [Pinterest]."  *Pom Wonderful*, 775 F.3d at 1125.  Courts consider the

22  eight non-exclusive factors enumerated by the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats*, 599

23  F.2d 341, 348-49 (9th Cir. 1979), *abrogated on other grounds by Mattel, Inc. v. Walking Mountain*

24  *Prods*, 353 F.3d 792, 810 n. 19 (9th Cir. 2003): (1) strength of the mark; (2) proximity and

25  relatedness of the goods; (3) similarity of the marks; (4) evidence of actual consumer confusion; (5)

26  marketing channel convergence; (6) type of goods and the degree of consumer care; (7) defendant's

27  intent in selecting the allegedly infringing mark; and (8) likelihood of expansion of the product

28  lines.  *Id.*; *Pom Wonderful*, 775 F.3d at 1125.

**1.  Pinterest's Marks Are Strong**

134.    "The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).  Trademark strength encompasses conceptual strength, or "the placement of the mark on the spectrum of marks," and commercial strength, or "the marketplace recognition value of the mark." *McCarthy* § 23:40.50; *accord GoTo.com*, 202 F.3d at 1207.  "'Strong' marks are given 'strong' protection — protection over a wider range of related products and services and a greater spectrum of variations." *McCarthy* § 23:40.50

135.    Pinterest's marks have strong conceptual strength.  "Suggestive, arbitrary, and fanciful marks are considered 'inherently distinctive' and are automatically entitled to federal trademark protection because their intrinsic nature serves to identify a particular source of a product." *Zobmondo Entm't, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010) (citation omitted).  Fanciful marks consist of "coined word[s] . . . invented solely to function as a trademark." *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993).  Suggestive marks "subtly connote something about the product[]." *Sleekcraft Boats*, 599 F.2d at 349.  A mark is suggestive "[i]f a consumer must use imagination or any type of multistage reasoning to understand the mark's significance." *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998).  "A suggestive mark indirectly or metaphorically alludes to the nature of the product" by "employ[ing] terms which do not describe but merely suggest features of the product, requiring imagination, thought and perception to reach a conclusion as to the nature of the goods." *North Am. Graphics, Inc. v. North Am. Graphics of US, Inc.*, No. 97 CIV.3448(RWS), 1997 WL 316599, at *3 (S.D.N.Y. Jun. 10, 1997); *accord Visa Int'l. Service Ass'n v. JSL Corp.*, 610 F.3d 1088, 1089-90, 1092 (9th Cir. 2010) (VISA for credit cards considered metaphorical and inherently distinctive).

136.    PINTEREST is a strong, inherently distinctive mark.  As a whimsical portmanteau of the words "pin" and "interest," PINTEREST is a fanciful mark that was coined for the sole purpose of functioning as a name for a website.  *Goss*, 6 F.3d at 1385 ("A fanciful mark is a coined word or

phrase, such as Kodak, invented solely to function as a trademark"). Even if not a fanciful mark, it

is a strong, suggestive mark. *Coryn Grp. II, LLC v. O.C. Seacrets, Inc.*, 868 F. Supp. 2d 468, 485

(D. Md. 2012) (the combination of "two words to create something that sounds like an English

word, but is spelled differently and conjures favorable images of the product or service…is…a

strong, distinctive mark.") (internal quotations omitted) (quoting *Sara Lee Corp. v. Kayser-Roth*

*Corp.*, 81 F.3d 455, 465 (4th Cir. 1996) (as a combination of "leg" and "eggs," L'eggs was a strong

suggestive mark)).

137. PIN is a strong, inherently distinctive mark. It is a suggestive mark because it

"subtly connotes something about the product." *Sleekcraft*, 599 F.2d at 349. Pinterest's use of PIN

is not in conformance with its ordinary dictionary meaning. FF ¶¶ 45-46, 50-53. Instead, the PIN

mark as a noun refers to a graphical piece of content placed on Pinterest, and the PIN mark as a verb

means the act of creating a graphical piece of content on Pinterest, or more generally the act of

using Pinterest. FF ¶¶ 45, 50. It requires "imagination" and "multistage reasoning," *Zobmondo*,

602 F.3d at 1113, to grasp the particular use of the PIN mark in connection with the Pinterest

service. *Cf. Visa*, 610 F.3d at 1090 ("[T]he word visa wouldn't make people think of credit cards if

it weren't for the Visa brand."). Moreover, PIN's 1(a) rather than 2(f) registration, FF ¶ 16, reflects

the PTO's acceptance of PIN as not descriptive, but inherently distinctive. *Zobmondo*, 602 F.3d at

1113-14 ("Where the PTO issues a registration without requiring proof of secondary meaning, the

presumption is that the mark is inherently distinctive."); *cf.* 15 U.S.C. §1052(f) (showing of

secondary meaning required to register descriptive mark).

138. PIN IT is a strong, inherently distinctive mark. Because it does not use a dictionary

meaning of the verb "pin," but rather refers to the Pinterest-specific definition of creating content

for Pinterest, it is a suggestive mark. FF ¶¶ 50-52.

139. Pinterest's marks have strong commercial strength. Commercial strength is

evaluated by considering how "extensively advertised and readily identifiable a mark and dress are

in the relevant market." *CytoSport, Inc. v. Vital Pharm., Inc.,* 617 F. Supp. 2d 1051, 1070 (E.D.

Cal.), *aff'd*, 348 F. App'x 288 (9th Cir. 2009). Approximately 80 million people per month in the

United States, , FF ¶ 2, and more than 1 million third-party brands promote themselves using

Pinterest, FF ¶ 13.  Pinterest has used the PINTEREST, PIN and PIN IT mark continuously in commerce for more than five years.  FF ¶ 18.  Consumers view PINTEREST, PIN and PIN IT as indicating Pinterest.  FF ¶ 36, 43, 57, 59-63.  The media uses the PIN and PIN IT marks to refer to Pinterest.  FF ¶ 31.  As strong marks, PINTEREST, PIN and PIN IT must be "afforded the widest ambit of protection from infringing users."  *Sleekcraft*, 599 F. 2d at 349.  This factor weighs heavily in Pinterest's favor.

## 2. Pinterest's And Pintrips' Products Are Related.

140.  "Related goods (or services) are those which would be reasonably thought by the buying public to come from the same source if sold under the same mark."  *Pom Wonderful*, 775 F.3d at 1127 (internal quotations omitted).

141.  To assess whether the products offered by Pinterest and Pintrips are related, the inquiry is not limited to determining whether the parties directly compete in their principal line of business.  *Dreamwerks*, 142 F.3d at 1131 ("[T]he relatedness of each company's prime directive isn't relevant."); *Pom Wonderful*, 775 F.3d at 1127.  Products are considered related where the goods are complementary, the products are sold to the same class of purchasers, or they are similar in use and function.  *Sleekcraft*, 599 F. 2d at 350; *Brookfield*, 174 F.3d at 1056; *Pom Wonderful*, 775 F.3d at 1127.  The operative question is "whether the consuming public is likely somehow to associate" Pintrips' product with Pinterest.  *Brookfield*, 174 F.3d at 1056; *see also GoTo.com*, 202 F.3d at 1206-07 ("With respect to Internet services, even services that are not identical are capable of confusing the public.").

142.  The services offered by Pinterest and Pintrips are closely related and significantly overlap.  FF ¶¶ 19-25; 64-69.  Both Pinterest and Pintrips provide web-based travel planning services by allowing users to "pin" travel content to their respective websites and save it for later reference.  FF ¶¶ 20-25, 64-66.  Both services include collaborative functions that allow users to share saved content with other users.  FF ¶¶ 12; 67-68.  Pintrips itself has acknowledged that Pinterest is a competitor.  FF ¶ 87.  Pinterest also is expanding its offerings in the travel sector, and working to make pins more useful to users; Pinterest's Rich Pin technology could soon be used to dynamically update travel-related Pins, such as bookings for hotels, cruises, and flights.  FF ¶ 26.

143. This relatedness of services weighs heavily in favor of a likelihood of confusion.

### 3. Pinterest's And Pintrips' Marks Are Similar.

144. As the similarities between the parties' marks increases, "so too does the likelihood of confusion." *Pom Wonderful*, 775 F.3d at 1127. The marks must be considered as a whole, rather than dissected into their component parts. *See, e.g. Sleekcraft*, 599 F. 2d at 351 (declining to disregard the common suffix "craft" when determining Sleekcraft and Slickcraft are similar marks). Thus, it would be inappropriate to eliminate the word "pin" from the words "Pinterest" and "Pintrips" when considering their similarity. That the word "pin" appears in both contributes to their similarity in appearance, sound and meaning.

145. Similarity is evaluated by comparing the appearance, sound and meaning of each mark. *Pom Wonderful*, 775 F.3d at 1128; *GoTo.com*, 202 F.3d at 1206 ("[S]imilarity is adjudged in terms of appearance, sound, and meaning."). Because "reputation is often conveyed word-of-mouth," sound is a very important element in determining whether two marks are similar. *Sleekcraft*, 599 F.2d at 351. To find likelihood of confusion, it is not necessary that the pronunciation of the two names be identical, only that they be similar. *Id.*; *Aqua Logic, Inc. v. Aquatic Logic, Inc.*, No. 09-CV-1791 H (BLM), 2009 WL 3628091, at *3 (S.D. Cal. Oct. 29, 2009) (finding potential for confusion where marks sounded similar and were differentiated by only one syllable); *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1174-75 (9th Cir. 2007) (finding similarity between Perfumebay and eBay).

146. Pinterest and Pintrips are highly similar marks. They are comprised of the same first four letters: P-I-N-T. Both pronounced as two-word syllables beginning with "Pin-tr": "Pin-trips" and "Pin-trest." Aurally, they differ only in the last half of the second syllable. While these two sounds can be distinguished, like the terms Slickcraft and Sleekcraft, "the difference is only in a small part of one syllable." *Sleekcraft*, 599 F.2d at 351 ("Slight differences in the sound of trademarks will not protect the infringer." (citation omitted)).

147. This factor weighs heavily in Pinterest's favor. *Brookfield*, 174 F.3d at 1055.

05001-00003/6945709.1

### 4. Actual Consumer Confusion Exists

148.    The absence of actual confusion generally does not weigh against a plaintiff, but "[e]vidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.  Where the defendant's use has not received significant consumer attention, but actual confusion nonetheless exists, it weighs heavily in plaintiff's favor.  *CSC Brands LP v. Herdez Corp.*, 191 F. Supp. 2d 1145, 1152 (E.D. Cal. 2001).

149.    Pintrips' actions have caused actual confusion among Pintrips' users.  FF ¶ 93.  *CSC Brands*, 191 F. Supp. at 1152.

150.    In addition to marketplace evidence of actual consumer confusion, surveys can provide surrogate evidence of actual confusion where the net rate of confusion meets or exceeds 15%.  *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002) ("Survey evidence may establish actual confusion."), *superseded by statute on other grounds*; *see also, e.g., Hansen Beverage Co. v. Cytosport, Inc.,* No. CV 09-0031-VBF(AGRX), 2009 WL 5104260, at *16 (C.D. Cal. Nov. 4, 2009) (finding infringement where survey showed 12.5% of respondents were confused); *CSC Brands,* 191 F. Supp. 2d at 1151-52 (finding infringement  where survey showing 15% of respondents were confused*); Exxon Corp. v. Texas Motor Exchange of Houston, Inc.*, 628 F.2d 500, 507 (5th Cir. 1980) (affirming finding of infringement where 15% of respondents were confused regarding the parties' marks and 23% were confused regarding the parties' products); *James Burrough, Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 277-79 (7th Cir. 1976) (affirming finding that survey showing 15% confusion rate was dispositive of likelihood of confusion). Pinterest has presented compelling survey evidence of consumer confusion that is likely to occur if Pintrips' use of "Pintrips" and "pin" are not enjoined.  FF ¶¶ 94-95.

151.    The evidence of actual marketplace confusion and survey evidence of likely confusion causes this factor to weigh heavily in Pinterest's favor.  *Sleekcraft*, 599 F.2d at 352.

### 5. Pinterest And Pintrips Use Overlapping Marketing Channels

152.    "Convergent marketing channels increase the likelihood of confusion." *Sleekcraft*, 599 F.2d at 353.  The marketing channels need not be identical; rather, courts look to marketing techniques and whether the class of consumers overlap.  *Id.*; *Pom Wonderful*, 775 F.3d at 1131.

153.    Pinterest and Pintrips use parallel marketing channels.  FF ¶¶ 37, 90.  This factor favors Pinterest.  *Lettuce Entertain You Enter., Inc. v. Leila Sophia AR, LLC*, 703 F. Supp. 2d 777, 787 (N.D. Ill. 2010) (same marketing channels found "because both rely on word of mouth.").

### 6.    Consumers Exercise Limited Care With Free Services

154.    "[P]urchasers of inexpensive goods are likely to exercise less care, thus making confusion more likely."  *Pom Wonderful*, 775 F.3d at 1126 (citation and internal quotations omitted).  Pintrips and Pinterest offer their travel planning services for free, FF ¶¶ 2, 70, so this factor weighs in Pinterest's favor.

### 7.    Pintrips Intended To Derive Benefit From Pinterest's Reputation

155.    It is uncontested that Stephen Gotlieb was aware of Pinterest's trademarks before he adopted the name Pintrips in commercial use.  FF ¶¶ 73-79.  "Adopting a designation with knowledge of its trademark status permits a presumption of intent to deceive."  *Interstellar Starship Servs., Ltd. v. Epix Inc.*, 184 F.3d 1107, 1111 (9th Cir. 1999).

156.    This factor not only weighs heavily in favor of Pinterest, it creates a presumption of confusion.  *Playboy Enter. Int'l, Inc. v. Muller*, 314 F. Supp. 2d 1037, 1042 (D. Nev. 2004) (citing *Sleekcraft*, 599 F.2d at 354 ("When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived.")).  By adopting and continuing to use the name Pintrips, Defendant intended to leverage similarities between the names and confuse consumers into believing that the two companies were related, thereby deriving benefit for Pintrips from Pinterest's reputation and consumer goodwill.  FF ¶¶ 73, 79, 81-89.  In such circumstances, "courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived."  *Sleekcraft*, 599 F.2d at 354.  Because copying of another's trademark reveals that the defendant's "intent must be to benefit from the goodwill of the competitor's customers by getting them to believe that the new product is either the same, or originates from the same source as the product whose trade dress was copied[,] [l]ogic requires . . . that from such intentional copying arises a presumption that the newcomer is successful and that there is a likelihood of confusion."  *Osem Food Indus. Ltd. v. Sherwood Foods, Inc.*, 917 F.2d 161, 165 (4th Cir. 1990) (adopting Ninth and Second Circuit's

presumption of infringement).  "It would be inconsistent not to require one who tries to deceive customers to prove they have not been deceived."  *Id.*

### 8. Pinterest's And Pintrips' Businesses Will Continue To Converge

157. "[A] 'strong' possibility that either party may expand his business to compete with the other will weigh in favor of finding that the present use is infringing."  *Sleekcraft*, 599 F.2d at 354.  Where, as here, the goods are already closely related, any expansion is likely to result in direct competition.  *Id.*  As discussed, *supra*, the services offered by Pinterest and Pintrips are closely related and both parties operate in the web-based travel planning space.  Pintrips considers Pinterest its competitor.  FF ¶ 87.

158. There is a strong likelihood that the parties' services will continue to converge. Pinterest is currently working to expand the services it offers in the travel area and Pintrips has discussed having a third-party "pin" button that is not downloaded by consumers—a plan that although it has not yet implemented, it has not disavowed as an option.  FF ¶¶ 21, 26, 91, 95.

159. Pintrips' use of "Pin" and "Pintrips" infringes Pinterest's PINTEREST, PIN, and PIN IT marks.

## II. PINTRIPS IS LIKELY TO DILUTE PINTEREST'S MARKS

160. To prevail on its dilution claims, Pinterest must show that (1) PINTEREST and PIN are distinctive and famous; (2) PINTEREST and PIN became distinctive and famous before Pintrips' use in commerce of diluting words began, and (3) Pintrips is likely to dilute PINTEREST and PIN by creating an association with those marks.  15 U.S.C. § 1125(c)(1), (2)(B); *Visa*, 610 F.3d at 1089-90.

161. Pinterest must establish its marks were famous before Pintrips' beta launch in November 2012.  FF ¶¶ 101-105.  *Chance*, 242 F.3d at 1158.

162. A mark is "famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).  The following factors are relevant to fame: "(i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the

owner or third parties. (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark. (iii) The extent of actual recognition of the mark. (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register." 15 U.S.C. § 1125(c)(2)(A).

163. Pinterest's PINTEREST and PIN trademarks are famous, and became so by the time Pintrips began commercial use of Pintrips in November 2012. The registration of PINTEREST on the principal federal trademark register, FF ¶ 105, favors a finding of fame. The wide recognition of the PINTEREST and PIN marks by the general population of the United States by November 2012, FF ¶¶ 103-104, favors a finding of fame. The pervasive use of Pinterest's PINTEREST and PIN marks throughout the entire United States since before November 2012, FF ¶¶ 103-104, favors a finding of fame. The recognition the PINTEREST and PIN marks received from major media outlets from Pinterest's founding through November 2012, FF ¶ 102, favors a finding of fame. Pinterest's partnering with other major United States brands regarding the PINTEREST and PIN marks before November 2012, FF ¶ 102, favors a finding of fame.

164. Dilution by blurring is an "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). Factors relevant to blurring are: (i) The degree of similarity between the mark or trade name and the famous mark; (ii) The degree of inherent or acquired distinctiveness of the famous mark; (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (iv) The degree of recognition of the famous mark; (v) Whether the user of the mark or trade name intended to create an association with the famous mark, and (vi) Any actual association between the mark or trade name and the famous mark. 15 U.S.C. § 1125(c)(2)(B).

165. Pintrips' use of "Pintrips" and "pin" is likely to dilute Pinterest's famous marks, PINTEREST and PIN. The term "Pintrips" is highly similar to PINTEREST, and Pintrips' use of "pin" is identical to PIN. FF ¶¶ 72-92, 120; Conclusions of Law ("CL") ¶¶ 144-147. The high degree of similarity favors a finding of dilution.

166.  PINTEREST and PIN are both strong, inherently distinctive marks.  CL ¶¶ 134-139. The strength of PINTEREST and PIN favors a finding of dilution.

167.  Pinterest engages in substantially exclusive use of the PINTEREST and PIN marks. FF ¶¶ 44-55, 59-62, 94-95, 107-109, 113-114.  This level of exclusivity favors a finding of dilution.

168.  PINTEREST and PIN are highly recognized by the general public as referring to Pinterest. FF ¶¶ 27-43.  This high degree of recognition favors a finding of dilution.

169.  Pintrips intended to create an association between Pintrips and PINTEREST, and Pintrips' "pin" button and PIN. CL ¶¶ 155-157.  Pintrips' intentionality favors a finding of dilution.

170.  The public has actually associated "Pintrips" with PINTEREST and Pintrips' "pin" button with PIN. CL ¶¶ 148-151.  This actual association favor a finding of dilution.

171.  Pintrips' use of "Pintrips" and "pin" is likely to dilute Pinterest's famous marks, PINTEREST and PIN.

## III.  PINTRIPS' AFFIRMATIVE DEFENSES AND COUNTERCLAIMS FAIL

### A.  PIN Is Not Generic

172.  Once a plaintiff establishes a prima facie case that its marks are valid, the defendant bears the burden of proving genericness. *Filipino Yellow Pages, Inc. v. Asian Journal Publ'n, Inc.*, 198 F.3d 1143, 1146 (9th Cir. 1999). "The general presumption of validity resulting from federal registration includes the specific presumption that the trademark is not generic." *KP Permanent Make-Up*, 408 F.3d at 604; *accord* 15 U.S.C. § 1057(b).  Here, PIN is a registered trademark, which receives a presumption of validity.  FF ¶¶ 15-16; *KP Permanent Make-Up*, 408 F.3d at 604. Pinterest has also proven that PIN IT is a valid common-law trademark. FF ¶¶ 17-18.

173.  A mark is generic only if consumers understand it to refer to "all such goods or services, regardless of [source]." *KP Permanent Make-up*, 408 F.3d at 604.  The Ninth Circuit employs the "who-are-you/what-are-you" test: "A mark answers the buyer's questions 'Who are you?' 'Where do you come from?' 'Who vouches for you?' But the generic name of the product answers the question 'What are you?' Under this test, if the primary significance of the trademark is to describe the *type of product* rather than the *producer*, the trademark is a generic term and cannot

1  be a valid trademark." *Filipino Yellow Pages, Inc*, 198 F.3d at 1147 (emphasis within) (internal

2  citations and formatting omitted).

3        174.    The relevant public to test genericness is the class of consumers likely to purchase

4  the trademark owner's goods or services.  15 U.S.C. § 1064; *Magic Wand, Inc. v. RDB, Inc.*, 940

5  F.2d 638, 640-42 (Fed. Cir. 1991); *Intel Corp. v. Advanced Micro Devices, Inc.*, 756 F. Supp. 1292,

6  1296 (N.D. Cal. 1991).  The relevant public to test whether Pinterest's use of PIN is generic is

7  consumers of social media websites.  FF ¶ 106.  *See, e.g., Magic Wand*, 940 F.2d at 640-42; *Intel*

8  *Corp.*, 756 F. Supp. at 1296.

9        175.    Pintrips offered no survey evidence about what social media consumers understand

10  PIN to mean or what source PIN signifies.  FF ¶ 106, 109.  "A litigant who alleges [genericness]

11  and does not introduce a survey . . .  may be viewed as less than serious." *McCarthy* § 12:14;

12  *Magic Wand*, 940 F.2d at 639 (affirming non-genericness where the challenger presented trade

13  articles and advertisements using the word "touchless" generically, but "presented no consumer

14  surveys, consumer affidavits, or other evidence showing generic use or understanding by vehicle

15  owners who purchase [car] washing services.").

16        176.    Pinterest uses PIN as a noun in a non-standard way.  FF ¶¶ 44-49, 107.  Pintrips

17  offered no evidence of any other websites using PIN as a noun in the social media context.  FF ¶¶

18  48, 107.  Pintrips' expert Peter Kent admitted that when consumers refer to "their favorite pin" or

19  "an interesting pin," there's a good chance they are specifically referring to content on Pinterest.  FF

20  ¶¶ 49, 107.

21        177.    Pinterest uses PIN as a verb in a non-standard way.  FF ¶¶ 44, 50-53, 108.  Pintrips

22  offered no evidence of any other social media websites using PIN as a verb to indicate the process

23  of creating content.  FF ¶ 54, 108.

24        178.    Pintrips offered no evidence that relevant consumers understand PIN to refer to all

25  goods or services in Pinterest's product category regardless of source – i.e. all units of content on

26  social media sites, and the act of creating those units of content.  FF ¶ 55, 109.  Because Pintrips

27  offered no evidence sufficient to show the primary meaning and significance of PIN in the minds of

28  the relevant social media consumers, it has failed to meet its burden of showing that PIN is generic.

**B.** **PIN And PIN IT Are Not Functional**

179.     "A *product feature* is functional, and cannot serve as a trademark if it is essential to the use or purpose of the article or if it affects the cost or quality of the article." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32 (2001) (emphasis added) (citation and internal quotations omitted).  The functionality analysis is usually applied to determine whether the design features of physical goods, such as beverage bottles, are marketed as offering "utilitarian advantages," are "motivated by manufacturing efficiencies," and are comparable to other designs in the industry. *Talking Rain Beverage Co. Inc. v. S. Beach Beverage Co.*, 349 F.3d 601, 604-05 (9th Cir. 2003).  In contrast, "it is not apparent how a *word mark* could be essential to the use or purpose of an article or affect its cost or quality." *Autodesk, Inc. v. Dassault Sys. SolidWorks Corp.*, 685 F. Supp. 2d 1001, 1008 (N.D. Cal. 2009) (emphasis added).  A word mark cannot be essential to the use or purpose of an article, and cannot affect the cost or quality of the article, if the word mark is easily replaceable without impairing the use, purpose, cost or quality of the article.  *See Playboy Enters, Inc. v. Netscape Comm'ns. Corp.*, 354 F.3d 1020, 1030-31 (9th Cir. 2004) (word mark not functional); *see also McCarthy* § 7:77.  Consumer perception is not a factor in the legal determination of whether a word mark is functional.  *See Talking Rain*, 349 F.3d at 603 (functionality is a multi-factor consideration based on utilitarian advantages, method of manufacture, and availability of alternative designs).

180.     PIN and PIN IT are not functional because independent of their reference to Pinterest, they neither "improve[] the usefulness or appeal of the object [they] adorn[]." *See Vuitton et Fils S.A. v. J. Young Ent.*, *Inc.*, 644 F.2d 769, 774 (9th Cir. 1981).  The word "pin" does not need to appear on an internet action button in order for the button to function.  FF ¶¶ 111-112.  Nor do PIN or PIN IT "confe[r] a significant benefit that cannot practically be duplicated by the use of alternative designs." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 170 (1995) (citation omitted).  Other social media sites use different words to label their action buttons.  FF ¶¶ 113-114.  For example, Twitter uses "Tweet."  FF ¶ 114.  Because there are numerous alternatives to the word "pin" on action buttons, PIN and PIN IT are not functional.  Dr. Robertson's survey does not change this conclusion because it is irrelevant to functionality, was not properly disclosed as

affirmative evidence, and is methodologically unsound in its design and conclusions.  FF ¶¶ 117-118.  In addition, Dr. Robertson did not demonstrate sufficient experience or credibility to have his testimony credited.  FF ¶¶ 115-116.

### C.  <u>Pintrips Did Not Prove Fair Use</u>

181.  Pintrips has not established that its use of Pinterest's PIN mark is fair.  To do so, Pintrips must prove (1) its use of the term is not a trademark or service mark; (2) Pintrips uses the term fairly and in good faith; and (3) Pintrips uses the PIN mark only to describe its goods or services.  *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir. 2002).

182.  Pintrips did not carry its burden on the first two factors.  First, "the classic fair use defense … applies only to marks that possess both a primary meaning and a secondary meaning—and only when the mark is used in its primary descriptive sense rather than its secondary trademark sense."  *Brother Records, Inc. v. Jardine*, 318 F.3d 900, 905 (9th Cir. 2003), *abrogated on other grounds by Toyota Motor Sales, U.S.A, Inc. v. Tabari*, 610 F.3d 1171 (9th Cir. 2010).  Pintrips is using the word "pin" not as a synonym for attach, but in the trademarked meaning developed by Pintrest, i.e., the act of creating Pins, or pieces of digital content to be saved on a website or platform.  FF ¶ 120.

183.  Second, as established above, Pintrips acted with the intent to confuse consumers and to benefit from Pinterest's goodwill and reputation in the marketplace.  *See supra* I(B)(7).

184.  The only ostensible evidence offered by Pintrips regarding fair use was Dr. Robertson's survey.  Beyond the myriad of flaws with that survey, FF ¶¶ 115-119, it is irrelevant *ab initio*.  Fair use is only determined by reference to plain English meaning — not consumer research.  *See, e.g., Brother Records,* 318 F.3d at 905.  The defense of fair use fails.  *Id.* at 907.

### D.  <u>Pinterest Has Not Engaged In Naked Licensing</u>

A brand engages in naked licensing when the mark no longer indicates consistent quality or a single source.  *FreecycleSunnyvale v. Freecycle Network*, 626 F.3d 509, 515-16 (9th Cir. 2010).  Pintrips presented no evidence that Pinterest fails to exercise quality control over PINTEREST and PIN.  FF ¶ 122.  Pinterest presented evidence that it enforces brand guidelines for PINTEREST and PIN.  FF ¶ 123-124.  Pinterest has not engaged in naked licensing.

# IV. PINTEREST IS ENTITLED TO A PERMANENT INJUNCTION

185.    The Lanham Act "vests the district court with the power to grant injunctions according to principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the trademark owner." *Reno Air Racing Ass'n., Inc. v. McCord*, 452 F.3d 1126, 1137 (9th Cir. 2006) (citation and internal quotations omitted); *see also* 15 U.S.C §§1116(a), 1125(c)(1). "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement." *Wecosign, Inc. v. IFG Holdings, Inc.*, 845 F. Supp. 2d 1072, 1083-84 (C.D. Cal. 2012) (citing *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1998)).

186.    Pinterest has demonstrated: (1) actual success on the merits; (2) a likelihood of irreparable injury if injunctive relief is not granted; (3) a balance of hardships favoring Plaintiff; and (4) that an injunction will advance the public interest. *Winter v. Natural Res. Def. Counsel*, 555 U.S. 7, 20 (2008).

187.    First, Pinterest has achieved actual success on its trademark infringement and unfair competition claims.  Second, if an injunction were not granted, Pinterest would suffer irreparable injury from the ongoing damages to its goodwill and diversion of customers to Pintrips' infringing services. *Wecosign*, 845 F. Supp. 2d at 1084; FF ¶ 126.  Third, the balance of hardship favors Pinterest.  Pinterest is not seeking to end Pintrips as a going concern, only that it be rebranded under a non-infringing name.  The Pintrips website is not "on par" with Pinterest, and Pinterest has no control over the quality of Pintrips' product.  FF ¶ 126.  If Defendant is allowed to continue operating under the name Pintrips and using the word "pin" to refer to the act of creating a piece of digital content and saving it to Pintrips, Pinterest risks harm to its reputation and loss of goodwill, while an injunction will only proscribe Pintrips' infringing activities. *E & J Gallo Winery v. Grenade Beverage LLC*, No. 1:13-cv-0070-AWI-SAB, 2014 WL 4073241, at *14 (E.D. Cal. Aug. 15, 2014) ("Courts have recognized that, in trademark cases, the injury caused by the infringement manifests as the loss of control over a business' reputation, a loss of trade and loss of goodwill." (citing *CytoSport*, 617 F. Supp. 2d at 1080 ("Trademarks serve as the identity of their owners and in

PINTEREST'S AMENDED PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

them resides the reputation and goodwill of their owners. Thus, if another person infringes the marks, that person borrows the owner's reputation, whose quality no longer lies within the owner's control.")). Further, Pintrips is an emerging business that "[v]ery few people have ever become aware of," with only a modest user base, no employees and no revenue. FF ¶ 127. Using a different name, such as "Powrtrip" and a word other than "pin" to reflect adding content to a webpage, such as "Powr," would not unduly burden Pintrips. Finally, a permanent injunction against Pintrips' continuing infringement is in the public interest because "[t]he public has an interest in avoiding confusion between two companies' products." *Id.*; *Internet Specialties West, Inc. v. Milon-DiGiorgio Enters., Inc.*, 559 F.3d 985, 993 n. 5 (9th Cir. 2009).

188. Pinterest is entitled to a permanent injunction prohibiting Pintrips from using the name Pintrips and the use of "pin" to mean either a piece of digital content on Pintrips' website or the act of creating a piece of digital content and saving it to the Pintrips' website.

DATED: July 3, 2015                QUINN EMANUEL URQUHART & SULLIVAN, LLP


By  */s/ Diane Doolittle*
    Diane Doolittle
    Rachel Kassabian
    Margret Caruso

    *Attorneys for Plaintiff*
    *Pinterest, Inc.*