UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PINTEREST, INC.,

      Plaintiff and Counter-Defendant,

      v.

PINTRIPS, INC.,

      Defendant and Counter-Plaintiff.

Case No. 13-cv-04608-HSG

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.   INTRODUCTION

In this case, Plaintiff and Counter-Defendant Pinterest, Inc. ("Pinterest") alleges that its rights to its "Pinterest," "Pin," and "Pin It" word marks are infringed by the "Pintrips" and "Pin" word marks used by Defendant and Counter-Plaintiff Pintrips, Inc. ("Pintrips"). Pinterest asserts five causes of action: (1) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) false designation of origin under 15 U.S.C. § 1125(a); (3) trademark dilution under 15 U.S.C. § 1125(c); (4) unfair competition under Cal. Bus. & Prof. Code § 17200; and (5) trademark dilution under Cal. Bus. & Prof. Code § 14247. Pinterest asks the Court to permanently enjoin Pintrips from using the Pintrips and pin marks. For its part, Pintrips seeks a declaration from the Court that its use of the Pintrips and pin marks does not infringe, as well as an order cancelling Pinterest's pin registrations (at least in part) if those registrations are construed to prohibit the manner in which Pintrips uses the term.

This matter was tried to the Court, sitting without a jury, from May 18, 2015 to May 27, 2015. On July 3, 2015, the parties submitted post-trial briefs, *see* Dkt. Nos. 251 ("Pl. Br.") and 248 ("Def. Br."), and Proposed Findings of Fact and Conclusions of Law, *see* Dkt. Nos. 250 ("Pl. FFCL") and 249 ("Def. FFCL"). The parties filed reply briefs three weeks later. *See* Dkt. Nos. 254 ("Pl. Reply Br.") and 253 ("Def. Reply Br."). Closing arguments were heard August 28,

United States District Court
Northern District of California

2015.  The Court has carefully considered the evidence presented at trial, the exhibits admitted into evidence, the parties' briefs, and the arguments of counsel.  This memorandum opinion will constitute the Court's Findings of Fact and Conclusions of Law.

**II.     JURISDICTION**

The Court has original jurisdiction under 15 U.S.C. § 1121 (claims arising under the Lanham Act), as well as 28 U.S.C. §§ 1331, 1338, and 1367(a).  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because the parties reside in this judicial district and a substantial portion of the events giving rise to this action occurred here.

**III.    BACKGROUND**

**A.     Pinterest**

Launched in March of 2010, the Pinterest website permits its users to view, post, and organize content in which they are interested by creating pins on their virtual Pinterest "Pinboard."  Pins are pieces of digital content that are shaped like a vertical rectangular box, and contain a photo, caption, and various action buttons.  To create a pin, users can either go to a different website and transfer content by clicking on a "Pin It" action button, or browse content others have already pinned on Pinterest and "re-pin" that content to their Pinboard.  Some pins, called "rich pins," are associated with a particular product offered by one of Pinterest's partners.  For example, a rich pin of a pair of sandals from a shoe retailer's website will automatically show the current price of the sandal and whether it is in stock.

Pinterest permits its users to create multiple Pinboards with different subject matters.  Some of the most popular areas about which Pinterest users create pins on Pinterest are recipes, fashion, home décor, and travel.  Regardless of its subject matter, each Pinboard a Pinterest user creates is viewable by all other Pinterest users by default.  Pinterest users have the option to change the default by creating "secret" boards that only they and their specifically invited friends can see.  In November of 2013, Pinterest launched a particular type of Pinboard called a "Place Board," which allows Pinterest users to add location information to certain pins.  Many Pinterest users use these Place Boards as part of their vacation and travel-related research on Pinterest.

Pinterest owns two federal trademark registrations for the word mark "PINTEREST," *see*

2

Trial Exhibit ("TX") 23; TX24, and two federal trademark registrations for the word mark "PIN," *see* TX25; TX26.  It does not have a federal trademark registration for the word mark "PIN IT."  Pinterest has used each of the Pinterest, Pin, and Pin It word marks since March of 2010.

**B.     Pintrips**

Pintrips is a website-based travel planning service that enables users to monitor the price fluctuations of airline flights.  Co-founder and CEO Stephen Gotlieb came up with the concept of Pintrips (initially called Flightrax) in 2010 and created a mockup for the service as part of a class project for his MBA program in January of 2011.  In order to use the Pintrips service, users must create an account on the Pintrips website and download a Google Chrome browser extension.  Once installed, the Chrome browser extension inserts Pintrips' pin button next to airline itineraries when the user visits certain third-party travel websites.  When a Pintrips user clicks on the pin button next to an itinerary, that itinerary is automatically "pinned" to that user's "Tripboard" on the Pintrips website.  Once pinned, the price displayed next to the itinerary on the user's Tripboard will update to reflect the flight's real-time pricing and availability.  Pintrips users may return to the Tripboard at any time to see if their pinned flights have changed in price and to compare their pinned travel options side-by-side.  When a Pintrips user decides to purchase a flight, he or she may click on the pinned itinerary, which redirects the user to the website from which the flight was originally pinned.

Pintrips' default configuration permits only individual users to access and view the trip information stored on each Pintrips user's Tripboard.  Access to this information may be shared with other Pintrips users only when the Pintrips user grants authorization to an individual email address to view his or her Tripboard.  Email addresses may only be invited one at a time; Pintrips does not allow users to share their Tripboards with all other Pintrips users or any subset of Pintrips users.  Users can communicate with each other through a Pintrips chat feature once they are invited to collaborate on the same Tripboard.

Pintrips does not own any federal trademark registrations.  Its current application for registration of the "PINTRIPS" mark has been administratively stayed pending the outcome of this case.

United States District Court
Northern District of California

## IV.  DISCUSSION

The Court was presented with three primary questions at trial: (1) does Pintrips' use of the "Pintrips" mark infringe Pinterest's rights to its registered "Pinterest" mark; (2) does Pintrips' use of the term "Pin" infringe Pinterest's rights to its registered "Pin" and/or unregistered "Pin It" marks; and (3) was Pinterest sufficiently famous at the time Pintrips first used its marks in commerce to support a trademark dilution claim.  The Court resolves each question below.

### A.  "Pinterest" vs. "Pintrips"

The Lanham Act prohibits the "use[ ] in commerce [of] any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin" that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods." 15 U.S.C. § 1125(a)(1)(A).  To establish trademark infringement under the Lanham Act, a plaintiff must demonstrate that (1) it has a valid, protectable ownership interest in a mark, (2) its mark is the senior mark, and (3) the defendant's mark is likely to cause consumer confusion in the marketplace.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1202-03 (9th Cir. 2012); *see also Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1046-47 (9th Cir. 1999).

In this case, Pinterest asserts that Pintrips' name infringes its registered Pinterest word mark.  There is no dispute that Pinterest has a valid, protectable ownership interest in the Pinterest mark, and that the Pinterest mark is senior to the Pintrips mark.  Pinterest's trademark registration is prima facie evidence of the validity of its marks.  15 U.S.C. § 1057(b).  Accordingly, the resolution of this infringement claim turns on whether the Pintrips mark is likely to cause consumer confusion in the marketplace.  Specifically, the question is whether consumers are likely to mistakenly believe that Pintrips is "somehow affiliated with or sponsored by" Pinterest.  *Cohn v. Petsmart, Inc.*, 281 F.3d 837, 841 (9th Cir. 2002); *see also Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998) ("[T]he question here is whether a reasonable consumer attending a [convention sponsored by the plaintiff] might do so believing that it is a convention sponsored by [the defendant].").

United States District Court
Northern District of California

4

To answer this question, the Court applies the eight-factor test articulated by the Ninth Circuit in *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979). The "*Sleekcraft* factors" include: (1) the strength of the allegedly infringed mark; (2) the proximity of the parties' goods; (3) the similarity of the parties' marks; (4) the extent to which there is evidence of actual confusion; (5) the marketing channels used by the parties; (6) the degree of care likely to be exercised by the purchasers of the parties' products; (7) the alleged infringer's intent in selecting its marks; and (8) the likelihood of expansion of the parties' product lines. *Id*.

The courts' application of the eight *Sleekcraft* factors in determining the likelihood of confusion is supposed to be "pliant," and the Ninth Circuit has warned against "excessive rigidity" in their application. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 632 (9th Cir. 2008). Instead, "[t]he test is a fluid one and the plaintiff need not satisfy every factor, provided that strong showings are made with respect to some of them." *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005); *see also Dreamwerks*, 142 F.3d at 1129-32 (allowing case to proceed past summary judgment where the plaintiff overwhelmingly satisfied three *Sleekcraft* factors). Courts have extensive discretion in determining how much weight to accord each factor based on the circumstances of the case. *See Interstellar Starship Servs., Ltd. v. Epix, Inc.*, 304 F.3d 936, 941 (9th Cir. 2002).

As will be discussed in more detail below, after considering each *Sleekcraft* factor and balancing them as a whole, the Court finds that the factors considered in their totality weigh against a finding that consumer confusion is likely.

### 1. The "Pinterest" Mark is Suggestive

The purpose of examining the strength of the plaintiff's mark is to determine the scope of trademark protection to which the mark is entitled. *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1141 (9th Cir. 2002). The strength of the senior mark determines the scope of trademark protection which applies. *Surfvivor Media*, 406 F.3d at 631 n.3. The strength of the junior mark, while important in cases of reverse infringement, is not relevant to the Court's analysis outside of that context. *See La Quinta Worldwide LLC v. Q.R.T.M., S.A. de C.V.*, 762 F.3d 867, 875 (9th Cir. 2014) ("This is not a reverse infringement case, and the district court should not have considered

United States District Court
Northern District of California

1    the strength of [defendant's] mark in determining what level of trademark protection to extend to

2    [plaintiff's] mark.").

3          Trademarks are divided into five categories. The two strongest sets of marks are

4    "arbitrary" and "fanciful" marks, which trigger the highest degree of trademark protection.

5    *Entrepreneur Media*, 279 F.3d at 1141.  The third category, "suggestive" marks, do not "describe

6    the product's features, but suggest[] them."  *Kendall-Jackson Winery, Ltd. v. E. & J. Gallo*

7    *Winery*, 150 F.3d 1042, 1047 n.8 (9th Cir. 1998) (emphases omitted).  Examples include

8    "Slickcraft" boats, or "Air Care" for a service that maintains medical equipment for administering

9    oxygen.  *Id.*; *see also Sleekcraft*, 599 F.2d at 349.  The fourth category of marks is referred to as

10   "descriptive." *Kendall–Jackson Winery*, 150 F.3d at 1047.  An example of a descriptive mark is

11   "Honey Roast" for nuts roasted with honey.  *Id.* at 1047 n.8.  Because these marks merely describe

12   a characteristic of the product, they do not receive any trademark protection unless they acquire

13   sufficient "secondary meaning" to create an association between the mark and the product.  *Id.* at

14   1047.  The final category of marks consists of "generic" marks, which "describe the product in its

15   entirety, and which are not entitled to trademark protection.  Examples include 'Liquid controls'

16   for equipment that dispenses liquid, or 'Multistate Bar Examination' for a bar examination that

17   may be taken across multiple states." *Survivor Media*, 406 F.3d at 632 (citation omitted).

18         In this case, the parties agree that "Pinterest" is at least a suggestive mark, which entitles it

19   to trademark protection without a showing of secondary meaning.  *Sleekcraft*, 599 F.2d at 349

20   ("Although less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak

21   mark, a suggestive mark will be protected without proof of secondary meaning.").  While Pinterest

22   argues that the Pinterest mark may straddle the line between suggestive and arbitrary, Pl. Br. at 5,

23   the Court finds that Pinterest is clearly a suggestive mark.  Suggestive marks "subtly connote

24   something about the products." *Sleekcraft*, 599 F.2d at 349; *see also Zobmondo Entm't, LLC v.*

25   *Falls Media, LLC*, 602 F.3d 1108, 1114 (9th Cir. 2010) ("A suggestive mark is one for which 'a

26   consumer must use imagination or any type of multistage reasoning to understand the mark's

27   significance . . . the mark does not describe the product's features, but suggests them.'")

28   (emphases and citation omitted).  Here, the Pinterest mark is a combination of the words "pin" and

6

"interest" mashed together to create a new word.  Accordingly, while understanding the meaning of the "Pinterest" mark requires the public to employ the multistage reasoning that differentiates suggestive marks from those that are merely descriptive, the combination of "pin" and "interest" cannot reasonably be said to be arbitrary or fanciful.  The Pinterest mark is a textbook example of a suggestive mark that "subtly connote[s] something" about the company's services, *Sleekcraft*, 599 F.2d at 349, in that it conveys to users that the website allows them to pin their interests.

The Court's conclusion that Pinterest is a suggestive mark does not end the inquiry under this factor.  Identifying whether a mark is arbitrary, fanciful, suggestive, descriptive, or generic is only the first step.  The second step is to determine the strength of the mark in the marketplace, *i.e.*, the commercial strength of the mark.  *One Indus., LLC v. Jim O'Neal Distrib., Inc.*, 578 F.3d 1154, 1164 (9th Cir. 2009).  "When similar marks permeate the marketplace, the strength of the mark decreases.  In a crowded field of similar marks, each member of the crowd is relatively weak in its ability to prevent use by others in the crowd."  *Id.* (internal quotation marks omitted).  "The more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws."  *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000).

Pintrips offers little argument to dispute that "Pinterest" is a commercially strong mark. *See* Def. Br. at 18.  At the time of the bench trial, approximately one-quarter of the United States' population (*i.e.*, 80 million people) used the Pinterest website each month.  The Court was not presented with evidence that the marketplace is crowded with other similar names.  Although the Ninth Circuit has noted that suggestive marks are "comparatively weak," *Sleekcraft*, 599 F.2d at 349, the Pinterest mark should be afforded greater protection than most other suggestive marks given its commercial strength.  Accordingly, the Court finds that this *Sleekcraft* factor weighs slightly in favor of Pinterest.

### 2.  The Proximity of the Parties' Goods or Services

"Goods or services that are closely related are generally more likely than unrelated goods or services to confuse the public as to their sources."  *La Quinta*, 762 F.3d at 875 (citation omitted).  The proximity of the parties' products is relevant to the confusion analysis in that "[f]or

United States District Court
Northern District of California

7

related goods, the danger presented is that the public will mistakenly assume there is an

association between the producers of the related goods, though no such association exists.  The

more likely the public is to make such an association, the less similarity in the marks is requisite to

a finding of likelihood of confusion." *Sleekcraft*, 599 F.2d at 350 (citation omitted).  The public is

likely to make such an association "when the goods are complementary, the products are sold to

the same class of purchasers, or the goods are similar in use and function."  *Id*.; *see also*

*Brookfield Commc'ns*, 174 F.3d at 1056 ("[T]he relatedness of each company's prime directive

isn't relevant.  Instead, the focus is on whether the consuming public is likely somehow to

associate [the defendant's] products with [the plaintiff].") (citation omitted).

Pinterest argues that the Pinterest and Pintrips websites are related because both companies

offer "services related to the travel industry generally" and "collaborative products that allow

consumers to plan travel using the Internet."  Pl. Br. at 6-7.  Pinterest points to evidence

introduced at trial demonstrating that Pinterest users often use its website to research their travel

destinations and activities.  *See* Tr. at 72:4-7 ("So a lot of people will use Pinterest to plan dream

vacations, honeymoons, as we saw earlier.  I've used it to plan travel itineraries for people coming

to visit me in cities."); *id*. at 72:16-17 ("There are lots of pins that will provide ideas about how

you can save money or find the best -- best travel tips."); *id*. at 73:7-9 ("[W]e worked with *Travel*

*+ Leisure* Magazine to get some coverage for Place Pins at launch, then to explain how people use

Pinterest for travel.").  Pinterest also offered evidence that it allows users to create place pins on

their Place Boards, which adds specific location information to a pin.  *See* Tr. at 58:22-24 ("That's

a button that would allow the user to add some data to that pin using a partner that we have called

[F]oursquare so that they can identify the actual location of that pin.").  Certain pins can be

associated with indicators called "map markers," which show the user where, for example, a pin of

a hotel would be located on a map.  *See* Tr. at 60:22-61:6.

While the Court credits the testimony of the Pinterest witnesses who discussed how

Pinterest is used to research travel destinations, the Court disagrees that this use is similar to

Pintrips' service.  Pintrips is an online tool that tracks fluctuating airline prices by providing users

the ability to save flight itineraries from multiple airline websites to a single location.  *See* Tr. at

United States District Court
Northern District of California

United States District Court
Northern District of California

464:2-474:14.  After searching airline websites and pinning the itineraries they wish to track, Pintrips users may then return to the Pintrips website—without needing to duplicate the effort of their initial search—to see whether their selected flights have become more or less expensive.  *Id*. Pintrips does not provide users the opportunity to research their travel destinations, identify sights to see while traveling, or gather ideas for new travel destinations from other users, given that all Pintrips Tripboards are, by default, private.  *Id.* at 476:1-477:11.  The only arguable "social media" aspect of the Pintrips site is a function allowing users to individually invite other users (generally traveling companions or people making travel arrangements on the user's behalf) to access a particular trip so that those users can also view and pin itineraries for the primary user's trips.  *Id*.; *see also id*. at 661:10-23.

In contrast, Pinterest is a social media website where users can share photos, articles, and other information about their interests on personalized web-based Pinboards which are, by default, viewable by all of Pinterest's 80 million monthly users.  Tr. at 61:25-62:3.  Travel is just one of the dozens and dozens of exceptionally broad subject-matter categories about which Pinterest users choose to pin.  Tr. at 125:5-126:7.  While Pinterest users undoubtedly use the service to research their travel destinations (as well as hundreds of other subjects), that fact does not render Pinterest's social media service similar to Pintrips' airline itinerary-tracking tool.  Pinterest has no travel booking function; is not working on a travel booking function; and has no concrete plan to begin working on a travel booking function in the future.  *See* Tr. at 88:14-15 ("We've discussed [expanding Pinterest's products to facilitate booking travel], but we haven't specifically set a date when we would start working on something like that.").  That Pinterest may aspire to provide a tool similar to Pintrips' service at some unknown point in the future is too speculative and indefinite to weigh in favor of a finding of proximity under this factor.

In further support of its argument, Pinterest cites to a few emails in which Pintrips executives refer to Pinterest as a possible competitor.  *See, e.g.,* TX40; TX186.  Although the Court agrees that these statements are relevant to its analysis, the Court finds the comparison of the services actually performed by the Pinterest and Pintrips websites to be more persuasive than the representations made by Pintrips' executives to a public relations firm and in an investor pitch

9

deck.  For example, in Mr. Gotlieb's November 7, 2012 email to an employee at a public relations firm, he states that "[t]he main competitors Pintrips has are meta-sites. . . . The other competitors are either players that need to pivot and like our idea or newcomers."  TX40 at PINTRIPS_00006790.  In what appears to be almost an afterthought, Mr. Gotlieb states that "[o]ne more competitor would actually be Pinterest."  *Id*. at PINTRIPS_00006791.  The Court also does not find the "WHY INVEST NOW?" section of an investor pitch deck introduced at trial through Pintrips' Chief Product Officer, Sheila Bijoor, to override the Court's analysis of the parties' services.  *See* TX186 at PINTRIPS_00006824 ("[I]nvest in us NOW because we have the ingredients for success, and there is competition in the market from players like Pinterest  – so we have no time to waste!!") (capital lettering and exclamation points in original).  Both emails appear tailored to evoke a comparison to an already successful company, rather than serve as a reasoned analysis of Pintrips' realistic competitors.  The Court agrees with Ashley Raiteri, a travel industry consultant who was an integral player in the genesis of the Pintrips product (and who has substantially more experience working and consulting in the travel industry than Mr. Gotlieb or Ms. Bijoor, Tr. at 640:16-642:4), that Pinterest is not a competitor of Pintrips, Tr. at 672:2-5 (stating that he did not "consider Pinterest to be a competitor of [Pintrips] or its products").

Although this *Sleekcraft* factor does not weigh quite as overwhelmingly in favor of Pintrips as it would in the absence of the emails cited by Pinterest, the Court finds that this factor still strongly weighs against a likelihood of consumer confusion.

### 3.  Similarity of the Parties' Marks

"The similarity of the marks is 'a critical question in the likelihood-of-confusion analysis.'"  *La Quinta*, 762 F.3d at 875 (citation omitted).  To assess similarity, courts must "compare the two marks in terms of sight, sound, and meaning, considering the marks as a whole, as [they] appear in the marketplace."  *Id*. (internal quotation marks and citation omitted); *see also Sleekcraft*, 599 F.2d at 351 ("Similarity of the marks is tested on three levels: sight, sound, and meaning.").  Similarities between marks generally weigh more heavily than differences, *id.*, and the amount of similarity required to support a likelihood of confusion decreases where the services at issue are themselves similar, *La Quinta*, 762 F.3d at 876 (citations omitted).

### a. Sight

There are undeniable visual similarities between the "Pinterest" and "Pintrips" marks. Each mark begins with the word "pin" and then continues with another word (or portion of another word) beginning with the letter "t." The marks are also the same approximate length: nine letters for Pinterest and eight letters for Pintrips. However, this is not a case where the allegedly infringing mark differs in only one or two inconspicuous letters in the middle of the mark, *see Sleekcraft*, 599 F.2d at 351 (Sleekcraft and Slickcraft), or is identical save for different emphasis on one of the letters, *see Pom Wonderful LLC v. Hubbard*, 775 F.3d 1118, 1128 (9th Cir. 2014) (observing the "o" in "POM" is heartshaped, and the "o" in "pom" has a breve over it). Here, the second half of each mark bears significant differences (*i.e.*, "terest" and "trips"). While the differences in the latter half of the marks do not completely overcome the visual similarities identified above, they lessen the weight the Court gives to this sub-factor. Accordingly, this sub-factor weighs only slightly in favor of a finding of confusion.

### b. Sound

"Sound is also important because reputation is often conveyed word-of-mouth." *Sleekcraft*, 599 F.2d at 351. "Slight differences in the sound of trademarks will not protect the infringer." *Id*. at 352 (internal quotation marks and citation omitted). Pintrips argues that the marks do not sound the same because Pintrips is a two-syllable word, while Pinterest is a three-syllable word. Def. Br. at 17. Although Pintrips may be correct as a matter of grammar, the Court accepts Pinterest's argument (which is consistent with the pronunciations used by counsel and witnesses at the trial) that, in the real world, Pinterest often may be pronounced with two syllables (*i.e.*, "Pin-trist"). Regardless, whether pronounced with two or three syllables, there is sufficient similarity in the sound of each mark to plausibly cause consumer confusion. The first syllable of each mark is identical, as is the first letter of the second syllable, followed very closely (although not immediately in the Pinterest mark) by an "r". Accordingly, while the marks do not sound identical when spoken, they sound sufficiently similar for this sub-factor to favor a finding of confusion.

United States District Court
Northern District of California

11

### c. Meaning

"Closeness in meaning can itself substantiate a claim of similarity of trademarks." *Sleekcraft*, 599 F.2d at 352.  In this case, both marks are "made up" words that do not appear in the dictionary.  Pinterest is a "mashup" or "telescoped" word, in that it combines two words (pin and interest) but does not repeat the two shared letters at the end of pin and the beginning of interest.  Pintrips is a compound word comprised of two words (pin and trips) with no shared letters removed.  Although both words suggest that consumers will be able to perform the well-known computer operation of pinning, each mark also suggests that the services permit consumers to pin different things: interests for Pinterest and trips for Pintrips.  In other words, the only shared meaning associated with the two marks is based on the descriptive term "pin."  When viewed as a whole, the Court finds that the meanings of these made-up words do not support a finding of likelihood of consumer confusion.  Accordingly, this sub-factor weighs in favor of Pintrips.

*          *          *

In summary, the sight sub-factor weighs slightly in favor of Pinterest, the sound sub-factor weighs in favor of Pinterest, and the meaning sub-factor weighs in favor of Pintrips.  Considering all three similarity sub-factors together, the Court finds that this *Sleekcraft* factor weighs slightly in favor of a finding of consumer confusion.

### 4. Evidence of Actual Confusion

"Evidence that use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352.  However, due to "the difficulty in garnering such evidence, the failure to prove instances of actual confusion is not dispositive. . . . [T]his factor is weighed heavily only when . . . the particular circumstances indicate such evidence should have been available." *Id.*; *see Brookfield Commc'ns*, 174 F.3d at 1050 ("[D]ifficulties in gathering evidence of actual confusion make its absence generally unnoteworthy.").

As observed by the Ninth Circuit in many other cases, it is unsurprising that there is little evidence of actual confusion here.  Pinterest points to a single email sent to Pintrips' customer support, in which an individual emailed Pintrips concerning her Pinterest login and password.  One potentially confused consumer, standing alone, is not sufficient evidence of actual confusion

United States District Court
Northern District of California

1   for this factor to weigh in favor of Pinterest.  Moreover, even this email does not suggest that the

2   consumer's confusion affected her purchasing decision—*i.e.*, that she visited or used the Pintrips

3   website mistakenly believing it was the Pinterest website.  *See, e.g. Instant Media, Inc. v.*

4   *Microsoft Corp.*, No. 07-cv-02639-SBA, 2007 WL 2318948, at *14 (N.D. Cal. Aug. 13, 2007)

5   ("Relevant confusion is that which affects purchasing decisions, not confusion generally.").  On

6   the other hand, because Pintrips has relatively few users, the Court would not expect significant

7   evidence of confusion.  Accordingly, the absence of evidence of confusion by actual Pinterest or

8   Pintrips users neither helps nor hurts either party. [1]

9        At trial, Pinterest offered the findings of two surveys to support its claim of consumer

10   confusion.  The first survey, conducted by Dr. Jacob Jacoby, showed one group of participants a

11   still mockup of Pintrips' actual website landing page (without the URL bar), and another group of

12   survey participants an altered landing page with the name "Cliptrips" and an associated "clip"

13   button in place of the name Pintrips and its actual pin button.  Dr. Jacoby's survey then asked each

14   participant to identify the source of the website they were shown.  The second survey was

15   conducted by Dr. Deborah Jay.  Dr. Jay altered United Airlines' website landing page by placing

16   Pintrips' pin button next to Facebook and Twitter's social media icons as they appear on the real

17   United Airlines website, and then asked survey participants to identify the company responsible

18   for the inserted pin button.  Pinterest argues that the results produced by these surveys demonstrate

19   consumer confusion sufficient to tilt this factor in its favor.

20        The Court strongly disagrees.  As described below, fatal defects in the design of each

21   survey render their results meaningless to the resolution of this lawsuit.

22

23

24

25

26   _____

27   [1] The Court does not find testimony that the mother-in-law of the CEO of Pintrips mistakenly
     believed Pinterest was the name of her son-in-law's company to be persuasive evidence of
     confusion.  The trial evidence established that English is Mr. Gotlieb's mother-in-law's third

28   language, that she has difficulty enunciating English words, and that she just started using the
     Internet in 2013.

United States District Court
Northern District of California

### a. Dr. Jacoby's Survey

Pintrips' pretrial filings sought to exclude Dr. Jacoby's testimony on the ground that his survey tested whether respondents were likely to associate the combination of the Pintrips name and its pin button with Pinterest, as opposed to the Pintrips name alone. Dkt. No. 147. Pintrips argued that including the pin button in the stimulus provided to respondents was a fundamental flaw in Dr. Jacoby's survey design because Pinterest did not have a right to prohibit Pintrips from using the word pin to represent the well-known computer function of pinning. *Id.* The Court denied Pintrips' motion *in limine*, holding that whether Pintrips had a right to use that term was a question of fact to be determined at trial, and could not supply a basis for excluding testimony before trial began. *See* Dkt. No. 191 at 5.

Having now made the determination that Pintrips' use of the pin button on its website constitutes fair use under 15 U.S.C. § 1115(b)(4), *see* Section IV.B, the Court agrees with Pintrips that the results of Dr. Jacoby's survey answer a different question than that posed to the Court by this lawsuit. Instead of measuring consumer confusion as to the Pintrips mark alone, Dr. Jacoby's survey measured consumer confusion arising from the Pintrips mark and the Pintrips' pin button when viewed *in combination*. However, confusion caused by Pintrips' fair use of its pin button cannot support a finding of confusion between the Pinterest and Pintrips marks. *See KP Permanent Make–Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 123 (2004) ("If any confusion results [from the defendant's fair use of a descriptive term], that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase.") (internal quotation marks and citation omitted). As Dr. Susan McDonald convincingly explained in her critique of Dr. Jacoby's survey design, it is impossible to disaggregate the responses of survey respondents who associated Pintrips' website with Pinterest (1) based in some way on its pin button or pinning functionality from those that (2) were influenced by the Pintrips name alone. *See* Tr. at 1010:6-1011:5; *id.* 1011:2-5 ("So when you use a [stimulus] that essentially . . . embodies two things at once, you are deprived of the ability to attribute causality to either one of those. You can't parse it."). Dr. Jacoby agreed that his survey was not designed to distinguish respondents' answers in that manner. Tr. at 973:18-25 (agreeing to the statement that

14

1  "there is no way for you to separate out . . . what confusion was because of the name and what

2  confusion was not because of the name . . . because the control didn't include the pinning

3  functionality in it").

4        Although the possibility that survey respondents were confused by the fair use of Pintrips'

5  pin button would by itself justify affording no weight to Dr. Jacoby's survey results, the

6  explanations provided by many survey respondents confirm that they were influenced by Pintrips'

7  fair use of the word pin.  As Dr. McDonald explained, "based on the open end[ed questions] . . .

8  it's abundantly clear that the pinning functionality was a very meaningful factor for some of the

9  respondents."  *Id*. at 1010:3-5.  A review of the open-ended answers of purportedly confused

10  respondents reveals that a great number cited the simple fact that Pintrips permitted users to pin

11  content as a reason to associate the service with Pinterest.  *See* TX206, Appendix F2 ("it uses the

12  phrase pin flights," "because you pin it," "the pins and the social media aspects," "the pin trips

13  statement," "pin," "the use of pins to highlight features," "the use of pins," "pinning your trips

14  planned from various sites," "you are pinning your desired selections").  These responses do not

15  support the claim that consumers confused Pintrips' website with Pinterest because of the alleged

16  similarity of the *Pintrips* word mark.

17        Moreover, the Court finds that Dr. Jacoby's survey cannot be saved simply by disregarding

18  the confusion of survey respondents who affirmatively listed Pintrips' pin button as the cause of

19  their confusion.  This is because Dr. Jacoby's survey was not designed to identify how many other

20  respondents were influenced by Pintrips' pin button, but, for whatever reason, did not take the

21  time to write down the pin button as his or her reason for associating the Pintrips website with

22  Pinterest.  *See* Tr. at 1010:20-25 ("People don't say everything in an open end, but they often say

23  things that are top of mind.  I wouldn't ever want to trust the absence of a particular reference or

24  description of -- of why someone had made an attribution.").  In short, Dr. Jacoby's survey design

25  does not permit the Court to draw any inference about whether—absent the influence of the pin

26  button and numerous references to the Pintrips website's pinning features—*any* survey

27

28

1    respondents would have associated the Pintrips website with Pinterest.[2]

2            **b.  Dr. Jay's Survey**

3            Pintrips' pretrial filings sought to exclude Dr. Jay's testimony on the ground that her

4    survey measured whether adding the Pintrips pin button to the bottom of the United Airlines

5    website would lead to consumer confusion, despite the fact that Pintrips' pin button has never

6    been used in that manner.  *See* Dkt. No. 150.  Pinterest opposed that motion, arguing that internal

7    emails sent shortly before the initiation of this action demonstrated that Pintrips discussed adding

8    this feature, and that courts outside of this circuit have considered planned activities when

9    deciding whether to order injunctive relief.  *See* Dkt. No. 163-3 at 3-4 (citing *MetLife, Inc. v.*

10   *Metro. Nat'l Bank*, 388 F. Supp. 2d 223 (S.D.N.Y. 2005) and *U.S. Polo Ass'n, Inc. v. PLR USA*

11   *Holdings, Inc.*, 800 F. Supp. 2d 515 (S.D.N.Y. 2011)).

12           In its order denying Pintrips' motion to exclude Dr. Jay, the Court found that the facts at

13   issue in the cases cited by Pinterest provided only marginal support for its argument.  Dkt. No. 191

14   at 6.  In both *MetLife* and *U.S. Polo,* the imminency of the alleged infringement at issue made it

15   unmistakably clear what the future allegedly infringing conduct would look like.  In contrast, the

16   Pintrips emails purportedly providing the basis for Dr. Jay's survey demonstrated that Pintrips was

17   still considering how to implement the injection of its pin button on third-party websites and, even

18   assuming it was successful in convincing any third parties to do so, how that pin button would

19   look.  TX39 at PINTRIPS_00006777; TX233.  Pintrips' plans—to the extent it had plans at all—

20   were clearly in the formative stage.  This presented a significant difficulty for Dr. Jay's survey

21   design in that she had to guess, at the very least: (1) what the Pintrips "pin" button would look

22   like; and (2) where it would appear on the third-party travel website.  Accordingly, the Court was

23   deeply skeptical of Dr. Jay's decision to place the hypothetical pin button next to the Facebook

24   and Twitter icons at the bottom of the United Airlines home page, as that choice did not appear to

25   be supported by any evidence in the record.

26

27   _____
     [2] Because the Court assigns no weight to the results of Dr. Jacoby's survey on this ground, the
28   Court will not address the other significant issues of survey design and interpretation that
     compromise its results.

United States District Court
Northern District of California

Despite these misgivings, the Court permitted Dr. Jay to testify on the chance that her testimony "could possibly provide some minimal probative value given that the development of Pintrips' API button had passed the purely hypothetical stage." Dkt. No. 191 at 6. But Dr. Jay's testimony at trial did not reach even this minimal level of probative value. As numerous trial exhibits and testimony made clear, the email discussion upon which Dr. Jay based her survey did not concern the insertion of a pin button in a row of links to social media websites at the bottom of a third party's webpage. *See* TX233 at PINTRIPS_00006939 (email from Mr. Gotlieb stating that adding a button to third-party websites that directs users to the Pintrips website is "[d]efinitely not something to try and tackle right now"). In fact, that placement would be entirely inconsistent with the purpose of the Pintrips pin button, which is to allow users to select particular itineraries to be stored on their personal Pintrips Tripboard. Dr. Jay's proposed placement of the pin button at the bottom of an airline's webpage would serve no purpose, other than to transform it into something that it is not: a social media badge like the Twitter and Facebook icons already appearing on United Airlines' website. As Mr. Raiteri credibly and convincingly explained during his examination:

> Q. All right. Was there ever any discussion, June 8th until you left the company, about putting a Pintrips pin button on the bottom of that home page, for example, as an example, next to Facebook and Twitter social media badges?
>
> A. No; that wouldn't have made any sense.
>
> Q. Why not?
>
> A. Um, those buttons perform a different function than the Pintrips button. Those buttons are a way of expressing brand loyalty or brand identification. Which is not what the Pintrips button is for. The Pintrips button is to save the information for later perusal. It's not to broadcast to the world that you like the flight or that the flight is amazing. It's so that you can go back later and compare that flight to another flight before you buy it.

Tr. at 671:3-17.

Instead, the evidence presented at trial made clear that, to the extent Pintrips sought to have third-party websites inject its pin button in the future, it contemplated that the button would be inserted in the same general manner as it is seen when current Pintrips users download Pintrips'

1   Chrome plug-in (*i.e.*, the pin button would appear next to each itinerary).  As Mr. Gotlieb

2   explained:

3           Q.  . . . When you say you want your travel partners to inject a
        button, what did you mean?

4           A. Well, I meant, basically, instead of a user having to download our

5       extension when they would go to a travel site like United and see
        different itinerary options, that our pin button would be there

6       automatically.

7           [. . .]

8           Q. I'm sorry, let me back up. Right now you have a browser

9       extension which puts the image of a pin button on a travel site like
        Kayak; correct?

10          A. That is correct.

11          [. . .]

12          Q. And if you were to develop an API bit of technology code to
        provide to Kayak --

13          A. Yes.

14

15          Q. -- would that be to replace the browser button, but put it in the
        same place?

16          A. Yes, it would.  It's the same code.

17

18  Tr. at 235:23-237:2.  In other words, Dr. Jay's survey is completely untethered from how Pintrips

19  works now or has even been contemplated to work in the future.  The Court finds the results of Dr.

20  Jay's survey are not relevant to its analysis.

21                              *          *          *

22          For these reasons, the Court finds no persuasive evidence of actual confusion between the

23  Pinterest and Pintrips marks.  However, because the Court also finds that Pintrips' small user base

24  suggests that evidence of confusion would likely not be available, this *Sleekcraft* factor does not

25  weigh in favor of either party.

26          **5.  Marketing Channels**

27          "Convergent marketing channels increase the likelihood of confusion."  *Sleekcraft*, 599

28  F.2d at 353.  When examining the marketing channels used by the competing companies, the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Court considers "where the goods or services are sold, the sales and marketing methods employed,

2    and the class of purchasers exposed to the marketing efforts." *La Quinta*, 762 F.3d at 876-77

3    (citation omitted).  For example, the Ninth Circuit has found this factor to weigh in favor of a

4    likelihood of confusion where the retail dealers of the parties both advertised their boats by

5    "participating in smaller boat shows and by advertising in local newspapers and classified

6    telephone directories."  *Sleekcraft*, 599 F.2d at 353.  Pinterest argues that this factor weighs in

7    favor of a finding of consumer confusion in this case because both Pinterest and Pintrips advertise

8    on the Internet through Facebook and Twitter, as well as through word of mouth.  *See* Pl. Br. at

9    10.

10          However, the Ninth Circuit has declined to place substantial weight on this factor where

11   the shared marketing channels are shared by numerous companies in addition to the parties at

12   issue.  *See Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1028 (9th Cir.

13   2004) ("PEI and the advertisers use identical marketing channels: the Internet.  More specifically,

14   each of their sites appears on defendants' search results pages.  Given the broad use of the Internet

15   today, the same could be said for countless companies.  Thus, this factor merits little weight.");

16   *see also Entrepreneur Media*, 279 F.3d at 1151 ("*Some* use of the Internet for marketing, however,

17   does not alone and as a matter of law constitute overlapping marketing channels.") (emphasis in

18   original).  The Ninth Circuit's observation in *Playboy* is truer today than it was when the decision

19   was issued over a decade ago: almost every company advertises on the Internet.  The same can be

20   said of "word-of-mouth" advertising, which practically all businesses seek to encourage.  Pinterest

21   has pointed to no advertising activity that distinguishes Pintrips' Internet advertising from the

22   Internet advertising undertaken by most other companies.

23          Accordingly, like the Ninth Circuit in *Playboy*, the Court finds that this *Sleekcraft* factor

24   does not tilt in favor of either party given the circumstances presented in this case.

25              **6.  The Type of Goods and the Degree of Care Exercised by Purchasers**

26          "Low consumer care . . . increases the likelihood of confusion."  *Playboy*, 354 F.3d at

27   1028.  Under this factor, the Court must evaluate "the type of good or service offered and the

28   degree of care one would expect from the average buyer exercising ordinary caution."  *See La*

                                                    19

*Quinta*, 762 F.3d at 877 (internal quotation marks and citation omitted).  "When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely."  *Sleekcraft*, 599 F.2d at 353.  "Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely."  *Id*.

On one hand, like many website-based companies, both Pinterest and Pintrips offer their services for free.  Accordingly, a case can be made that this factor weighs in favor of a finding of confusion.  *See Brookfield Commc'ns*, 174 F.3d at 1060 ("[W]hen dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely.").  On the other hand, unlike many inexpensive goods, Pintrips and Pinterest services do not sit next to each other on the grocery-store shelf waiting for a consumer to make an impulsive purchase.  Both websites require consumers to create an account before they can start pinning.  *See* Tr. at 54:4-55:25; *id.* at 465:20-466:5.  Pintrips also requires users to download and install a special Chrome browser extension in order to use its service.  *See id.* at 466:6-12.

The Court agrees with Pintrips that the threshold activities required to gain access to the parties' services force consumers to exercise more care than they normally would be expected to take with regard to free products.  For example, in order to reach the point where a potentially confused consumer can actually use the Pintrips service, that consumer must click through several web pages that describe the Pintrips product in detail, as well as download an extension onto his or her browser.  *See id..* at 464:2-474:14.  These steps provide potentially confused consumers the opportunity to realize their mistake at multiple points before they are in a position to start comparing itineraries.

Accordingly, the Court finds that this *Sleekcraft* factor is neutral or weighs slightly against a finding of confusion.

### 7.  Pintrips' Intent in Selecting Its Mark

"[I]ntent to deceive is strong evidence of a likelihood of confusion."  *Entrepreneur Media*, 279 F.3d at 1148 (internal quotation marks and citation omitted).  "When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can

accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354.

"This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge,

actual or constructive, that it was another's trademark." *Brookfield Commc'ns*, 174 F.3d at 1059.

In this case, Pinterest argues that Pintrips intentionally selected the Pintrips mark in order

to take advantage of Pinterest's brand recognition.  In support of its position, Pinterest cites to

evidence that Mr. Gotlieb learned of Pinterest on June 10, 2011 when Mr. Raiteri sent him an

email directing him to "[t]ake a look at Pinterest.com in relation to our alpha[,]" *see* TX69 at

PINTRIPS00006890, and that Pintrips did not obtain its Pintrips-related domain names until

several days later, Tr. at 655:11-22.  The Court agrees that the evidence introduced at trial fairly

establishes this sequence of events.  However, the Court finds that Pinterest's suggestion that

Pintrips was still deciding whether to use the Pintrips name by as late as the end of 2011 is not

supported by the trial evidence.

During his direct examination, Mr. Raiteri explained the process by which he came up with

the Pintrips name.  His explanation was both credible and detailed.  From June 8, 2011 through

June 10, 2011, Mr. Gotlieb and three members of Mr. Raiteri's travel incubator (Mr. Raiteri,

Timothy O'Neil Dunne, and Paul Addy) participated in a brainstorming workshop to flesh out Mr.

Gotlieb's business ideas.  Tr. at 643:5-12.  During that meeting, they discussed several travel-

related products.  The first was Mr. Gotlieb's idea for a consumer-facing website intended to

"personaliz[e] the travel shopping experience and minimiz[e] frustration." *Id*. at 645:2-4.  The

second, which Mr. Raiteri characterized as the "real revenue opportunity," was a product that

would use the back-end "data that we could collect by understanding a travel shopper's

preferences." *Id*. at 645:4-6.  As Mr. Raiteri explained, "we wanted one business which would be

revenue-neutral, that would provide a service to travelers, and in the process, collect data.  That

data would be used by the second business to establish a dynamic pricing algorithm and market

for airlines." *Id*. at 645:15-19.

The Flightrax product that Mr. Gotlieb devised during his business school class was to be a

consumer-facing product. *Id*. at 645:20-646:13.  However, even going into the June 2011

workshop, Mr. Raiteri, Mr. O'Neil Dunne, and Mr. Addy all considered the Flightrax name

United States District Court
Northern District of California

United States District Court
Northern District of California

1  unworkable.  *Id*. at 645:23-646:7.  During a brainstorming session on a new name for the Flightrax

2  product, Mr. Addy stood at the whiteboard "going back and forth from a drawn-up mockup of a

3  travel website like Expedia, where the itineraries were listed, and another drawn-up mockup of a

4  canvas where different itineraries were compared."  *Id*. at 647:3-7.  He repeated "[a]nd you pin

5  this over here, you pin this trip to this board over here, and then you pin this trip to this board over

6  here," *id*. at 647:8-10, until Mr. Raiteri said "[t]hat's what it is.  Pinning trips.  'Pintrips[,]'" *id*. at

7  649:2-3.  By the end of the brainstorming session, Mr. Raiteri had selected Pintrips as the name

8  that he wanted for the consumer-facing product.  *Id*. at 654:14-655:10.  Mr. Raiteri did not learn

9  about Pinterest's existence until later that day when he "told [his wife] about how [the Pintrips

10  product] would work, and how you would pin your trips to a pin board, and that we'd use

11  bookmarklet technology to get it done, or maybe we'd build a Chrome extension."  *Id.* at 665:19-

12  666:13.  Mr. Raiteri's wife volunteered that the Pintrips website sounded like it would operate like

13  Pinterest, "where you install a bookmarklet, and then when you're browsing, you can pin photos

14  to your page."  *Id.* at 666:11-13.

15      Although Mr. Gotlieb and the other participants in the June 2011 workshop learned of

16  Pinterest's existence when Mr. Raiteri emailed them that night, TX69, Mr. Raiteri credibly

17  explained that he sent that email (1) before he had even seen the Pinterest website; (2) in relation

18  to whether the Pintrips alpha could feasibly use bookmarklet technology; and (3) not because he

19  did or did not think Pinterest sounded like Pintrips.  *See id*. at 667:7-15.  No evidence was

20  introduced at trial that suggested that the Pintrips mark was selected to take advantage of

21  Pinterest's brand recognition.  In fact, no evidence suggests that Pinterest had substantial brand

22  recognition as of June 2011 that Pintrips would want to appropriate.  In June of 2011, Pinterest

23  was still an invitation-only website, *id*. at 667:16-24, with only approximately 500,000 unique

24  monthly visitors (as represented to the Court by Pinterest's demonstrative offered during closing

25  argument).  None of the articles submitted to the Court as evidence of Pinterest's reputation had

26  yet been published.  *See* Pl. FFCL ¶¶ 31-35.  In short, Pinterest simply has not offered evidence to

27  support its theory.  Instead, the evidence was clear that the name Pintrips was chosen because it

28  was the best option to come out of the three-day workshop, which Mr. Raiteri conceived without

United States District Court
Northern District of California

1    any knowledge of Pinterest's existence.  Mr. Raiteri registered several Pintrips domain names just

2    five days later.  *See* Tr. at 658:3-15; TX1107.

3         Pinterest's contention that Pintrips was still deciding between the names "Pintrips" and

4    "Goodr" late into 2011 misconstrues the evidence introduced at trial.  As Mr. Raiteri explained,

5    Pintrips and Goodr were conceived as different products.  Tr. at 645:2-19.  One would provide a

6    service to travelers and another would amass the traveler data for later use.  *Id.* (explaining that the

7    information gathered from the first product could be used by the second business "to establish a

8    dynamic pricing algorithm and market for airlines"); *see also id.* at 461:14-19 (Mr. Gotlieb

9    explaining that the second product could, "based on the knowledge of that specific user, behavior

10   and whatnot, recommend, you know, when to take a cab to the airport, which flight they would

11   take, and which airline, and arrive in which airport.  Basically, automate the entire process as a

12   travel agent would, but through a website.").  Mr. Raiteri registered both the Pintrips and Goodr

13   domains not as possible names for the same product, but as distinct names for two different

14   products.  *See* Tr. at 655:20-22 ("I registered the two domain names that we were going to use for

15   the two different products.  Pintrips and Goodr.").  Although Pinterest has identified emails in

16   which the name Goodr was occasionally used to refer to the consumer-facing product, *see* TX120;

17   TX122, the Court finds that the evidence, when viewed as a whole, most persuasively supports the

18   interpretation that Pintrips intended to use both the Pintrips and Goodr names in some capacity

19   within no more than a few days of the June 2011 workshop.

20        Accordingly, the facts found by the Court present an unusual case.  On the one hand, the

21   Court credits the testimony that Pintrips' founders came up with the Pintrips name before they had

22   ever heard of Pinterest.  This finding would normally tilt this *Sleekcraft* factor in favor of the

23   defendant.  On the other hand, Pintrips learned of Pinterest within a day of coming up with the

24   Pintrips name, and months before it ever started to use the Pintrips name in commerce.  In

25   addition, Pinterest presented evidence that Mr. Gotlieb—while not admitting that the Pintrips

26   mark was selected with Pinterest in mind—was certainly not upset that his company's name

27   turned out to be similar to a much more well-known mark.  *See* Tr. at 333:16-334:3 ("[I]t's a

28   coincidence.  But it might play to our hand.").  These facts could fairly be read to favor the

1    plaintiff.  The closest factual circumstance to this case appears to be found in the Ninth Circuit's

2    decision in *Brookfield Communications*, where the plaintiff demonstrated that the defendant had

3    knowledge of the plaintiff's senior mark when it launched its website, but not necessarily when it

4    registered the allegedly infringing domain name.  174 F.3d at 1059.  Even where, unlike here, the

5    two marks ("MovieBuff" and "moviebuff.com") were "nearly identical," the Ninth Circuit held

6    the intent factor of the *Sleekcraft* analysis "indeterminate."  *Id*. at 1058-59.

7           The Court finds the same conclusion warranted here.  This *Sleekcraft* factor does not favor

8    either party.

9                        **8.   Likelihood of Expansion of the Product Lines**

10          When there is "a strong possibility that either party may expand his business to compete

11   with the other," this factor weighs in favor of finding "that the present use is infringing."

12   *Sleekcraft*, 599 F.2d at 354 (internal quotation marks omitted).  "When goods are closely related,

13   any expansion is likely to result in direct competition."  *Id.*  The Court must determine whether the

14   allegedly infringing mark is "hindering the plaintiff's expansion plans."  *Surfvivor Media*, 406

15   F.3d at 634.  A plaintiff must offer proof beyond mere speculation or generalized expansion goals.

16   *See id.* (holding that mere "expressed interest in"—rather than "concrete evidence" of—expansion

17   tilted factor in favor of defendant); *Official Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1394 (9th

18   Cir. 1993) (holding evidence of alleged intent to expand did not demonstrate that the parties would

19   "compete with a similar product in the same market").  For example, in *Sleekcraft*, the Ninth

20   Circuit held that this factor weighed in favor of the plaintiff where the evidence demonstrated that

21   the parties—who each manufactured slightly different varieties of recreational boats—were

22   diversifying their product lines and thus had the strong possibility of entering the other's

23   speedboat submarket in the future.  *See* 599 F.2d at 354.

24          Pinterest has offered no persuasive evidence that could tilt this factor in its favor.  As

25   explained in greater detail in Section IV.A.2, Pinterest has no travel booking function; is not

26   working on a travel booking function; and has no concrete plan to begin working on a travel

27   booking function in the future.  *See* Tr. at 88:14-15 ("We've discussed [expanding Pinterest's

28   products to facilitate booking travel], but we haven't specifically set a date when we would start

24

working on something like that.").  Pinterest's suggestion that it may, at some unknown time in the future, create a travel booking tool like Pintrips falls well short of the "strong possibility" of expansion a plaintiff is required to demonstrate in order for this factor to weigh in favor of a finding of confusion.  *See Surfivor Media*, 406 F.3d at 634 ("Although [the plaintiff] expressed interest in expanding his product line, mere speculation is not evidence.").

Accordingly, this *Sleekcraft* factor weighs heavily in favor of Pintrips.

### 9.   Balancing of the *Sleekcraft* Factors

The relative import of each *Sleekcraft* factor is case-dependent.  In this case, most of the factors are neutral.  Two factors favor Pinterest (the strength of the Pinterest mark and the similarity of the Pinterest and Pintrips marks), but those factors favor Pinterest by only a slight margin.  On the other hand, the two factors that favor Pintrips (the similarity of the parties' services and likelihood of expansion) support Pintrips to a significantly greater degree.  Having weighed these factors in light of the unique facts of this case, the Court finds that Pinterest has not met its burden to prove a likelihood of consumer confusion as to the Pinterest and Pintrips marks under the *Sleekcraft* test.

### B.   "Pin" vs. "Pin"

Pinterest next asserts that Pintrips infringes its "Pin" and "Pin it" marks through the use of the word "pin" on the Pintrips website's pin button (and related content).  As with the Pinterest mark, Pinterest's "Pin" mark is registered and Pinterest's use of that mark is senior to the existence of Pintrips.[3]  However, the Court's analysis of Pintrips' use of the word pin is different than the analysis undertaken above.  Pintrips argues that Pinterest's infringement claim fails because Pintrips' use of the word pin qualifies as "fair use" under the Lanham Act.  *See* 15 U.S.C. § 1115(b)(4).

"If the trademark holder were allowed exclusive rights [to describe a person, a place or an

---

[3] Pinterest does not have a federally registered trademark for its "Pin It" mark, and thus seeks to enforce its rights to the "Pin It" mark based on its common law trademark rights, if any.  Pl. FFCL ¶¶ 14-18.  The Court does not address whether Pinterest has a right to prohibit others' use of the "Pin It" mark because it finds that Pintrips' use of the term pin on its pin button qualifies as fair use, making the existence of Pinterest's common law right to the term "Pin It" irrelevant.

United States District Court
Northern District of California

attribute of a product], the language would be depleted in much the same way as if generic words

were protectable." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 306 (9th Cir.

1992); *see also William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 529 (1924) ("The use

of a similar name by another to truthfully describe his own product does not constitute a legal or

moral wrong, even if its effect be to cause the public to mistake the origin . . . of the product.").

Accordingly, trademark law recognizes a defense to liability where the defendant's allegedly

infringing use of the plaintiff's mark is "a use, otherwise than as a mark, . . . of a term or device

which is descriptive of and used fairly and in good faith only to describe the goods or services of

such party, or their geographic origin." 15 U.S.C. § 1115(b)(4). In other words, "[t]he 'fair-use'

defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his

exclusive use and so prevent others from accurately describing a characteristic of their goods."

*New Kids*, 971 F.2d at 306 (internal quotation marks and citation omitted).

To prevail on a "fair use" defense, the alleged infringer is "not required to 'negate

confusion.'" *Fortune Dynamic*, 618 F.3d at 1039 (quoting *KP Permanent*, 543 U.S. at 118). "The

common law's tolerance of a certain degree of confusion on the part of consumers followed from

the very fact that in cases like this one an originally descriptive term was selected to be used as a

mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use

of a descriptive term simply by grabbing it first." *KP Permanent*, 543 U.S. at 122; *see also id.* ("If

any confusion results, that is a risk the plaintiff accepted when it decided to identify its product

with a mark that uses a well known descriptive phrase.") (internal quotation marks and citation

omitted). However, the fact that a defendant may prevail on a fair use defense even where its use

has the possibility to cause consumer confusion "does not foreclose the relevance of the extent of

any likely consumer confusion in assessing whether a defendant's use is objectively fair." *Id.*

How a "mark is categorized as a matter of conceptual strength has no bearing on whether [a

defendant] is entitled to the fair use defense." *Fortune Dynamic*, 618 F.3d at 1039.

Pintrips argues that its use of the word pin constitutes fair use because it uses that word (1)

"otherwise than as a mark" and "only to describe [its] goods or services"; and (2) "in good faith."

15 U.S.C. § 1115(b)(4). The Court finds that Pintrips prevails on its "fair use" defense for the

United States District Court
Northern District of California

reasons set forth below.

### 1. Pintrips Uses "Pin" to Describe a Feature of its Service, Not as a Mark

The first and second factors under the fair use analysis consider whether Pintrips uses the word pin "otherwise than as a mark" and "only to describe [its] goods or services." *Id*. The Lanham Act defines a trademark as something used "to identify and distinguish . . . goods . . . and to indicate the source of the goods." *Id.* § 1127. "To determine whether a term is being used as a mark, we look for indications that the term is being used to 'associate it with a manufacturer.'" *Fortune Dynamic*, 618 F.3d at 1040 (quoting *Sierra On-Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir. 1984)). The Ninth Circuit has identified at least two factors that indicate whether a term is being used as a trademark: (1) "whether the term is used as a symbol to attract public attention, which can be demonstrated by the lettering, type style, size and visual placement and prominence of the challenged words"; and (2) "whether the allegedly infringing user undertook precautionary measures such as labeling or other devices designed to minimize the risk that the term will be understood in its trademark sense." *Id*. (internal quotation marks and citations omitted).

In this case, Pintrips has provided overwhelming evidence that its use of the word pin is used to describe the common act of pinning—*i.e.*, one of the services offered by the Pintrips website—and not to identify, distinguish, or indicate the source of those goods or services. Pintrips produced substantial evidence at trial that the terms pin and pinning have concrete and well-known meanings in both the computing field generally and the social media field specifically. The Court credits the unrebutted testimony of Pintrips' expert Peter Kent, who explained that early software designers traditionally used real-world metaphors such as folders, files, desktops, and bulletin boards to describe new technological functions. Tr. at 544:20-545:21. Mr. Kent's testimony and the exhibits accepted into evidence demonstrate that the words pin and pinning have been used for over twenty years to describe the act of attaching one virtual object to another, much like one would use a physical pin to attach an object to a cork board. *See* TX1040 (excerpt from book published in 1994, noting that messages sent to computer bulletin boards are "left 'pinned up' for future reference"); TX1041 (excerpt from book published in 1997, noting that

1    Internet users may post an email message to a bulletin board in much the same way that they

2    would pin a note on a cork board).

3         Pintrips also presented evidence that some of the largest and most successful software and

4    Internet companies have, for over a decade, used the word pin for this common and well-known

5    purpose.  For example, Microsoft's 2001 operating system, Windows XP, provided its users the

6    ability to pin certain virtual objects—such as programs, folders, or files—to the operating system's

7    start menu.  *See* Tr. at 557:12-558:19; *see also* TX1053 (article dated January 17, 2007 describing

8    the "pinned items list" feature of Windows XP).  Mr. Kent further testified that Microsoft also

9    included the pinning functionality in its Word, Access, Excel, and PowerPoint programs, as well

10   as its web browsers.  *See* Tr. at 559:3-25 (Internet Explorer 9 allowed users to pin web pages

11   hosted by third parties to their web browser); *id*. at 568:9-569:11 (programs in Microsoft's suite of

12   office products each permitted users to pin files to a recent document list); *see also* TX1055;

13   TX1076.  In addition, Google offers its users a downloadable add-on toolbar for web browsers,

14   which allows users to pin certain virtual buttons for easy access, Tr. at 571:14-573:6, and also

15   included the pinning functionality in its Android smartphone and tablet operating system, *id*. at

16   573:7-574:9.  In short, the Court found Mr. Kent's testimony (and the exhibits introduced during

17   his testimony) to be credible and persuasive evidence that the word pin and the act of pinning are

18   common and well-understood terms across virtually all major forms of computer technology

19   purchased and used by the public.

20        Mr. Kent provided evidence that large social media websites similar to Pinterest use the

21   term pin to describe the same functionality.  For example, Facebook permits users to pin posts to a

22   "group" and to pin messages, photos, and videos to each user's personal Facebook "timeline."  Tr.

23   at 590:1-592:3; TX1065; TX1068.  Numerous media articles—many of which predate the genesis

24   of Pinterest—report the terms pin and pinning as used in the same fashion by other companies.

25   *See* TX1339 ("The UK's largest retailer aims to revolutionise the way people shop online with an

26   interactive desktop that . . . aims to replicate a typical family fridge door. . . . Users can . . . 'pin'

27   digital photos and messages to the screen[.]"); TX1340 (describing photo map that permits users

28   to "share photos from your adventures around the globe by pinning them to a map for friends to

United States District Court
Northern District of California

28

click through"); TX1043 (discussing new Microsoft publishing system that would allow users to "lock down a Montage in time by pinning news stories, photos, videos, and more to a page").[4]  In short, the words pin and pinning are regularly used to describe a particular, well-known, and decades-old computer operation.

Accordingly, Pintrips' pin button must be viewed in light of the long and pervasive use of similar pinning features and buttons employed by all manner of software and Internet companies. With that context in mind, no reasonable weighing of the evidence presented at trial could lead to the conclusion that Pintrips used the term pin as a way to identify, distinguish, or indicate the source of its goods or services.  In fact, any attempt to *distinguish* Pintrips by use of its pin button would be futile, given that the words pin and pinning have been used to describe the same feature by many of the most popular and well-known software and Internet products since well before Pintrips' creation.  The home page of the Pintrips website reinforces this interpretation.  The Pintrips website expressly describes its pin button as a feature of the website that permits users to perform the same well-known pinning function offered by the numerous software products and Internet websites discussed above.  *See* TX240 ("Pin any flight from any site"); *id.* ("Use the 'Pin' Button to save flights from any travel site"); *id.* ("With the Pintrips Pin Button, you can shop around for flights and pin the ones you want to save into a personal trip board").  The Court finds that these repeated descriptions, which alert the user that the term pin is being used to describe an aspect of the Pintrips service (as opposed to being used as a mark), strongly militate against a finding that Pintrips uses pin as a mark.  *See Fortune Dynamic*, 618 F.3d at 1040 (noting that whether the alleged infringer used "precautionary measures such as labeling or other devices designed to minimize the risk that the term will be understood in its trademark sense" is relevant

---

[4] The Court does not consider these news sources for the truth of the matter asserted—*i.e.*, that the products described in these articles existed or contained the functionality discussed.  Instead, the Court considers these articles for the non-hearsay purpose of how the media (as a stand-in for the public) uses the term at issue in the relevant context.  *See Premier Nutrition, Inc. v. Organic Food Bar, Inc.*, No. 06-cv-00827-AG, 2008 WL 1913163, at *7 (C.D. Cal. Mar. 27, 2008) ("None of the statements in the articles are used to prove the truth of the matter asserted.  Plaintiff refers to the articles merely to show the use of the term 'organic food bar' by the public.") (citation omitted), *aff'd*, 327 F. App'x 723 (9th Cir. 2009).

United States District Court
Northern District of California

1  to fair use analysis).

2  Although not precedential, the Ninth Circuit's persuasive reasoning in the unpublished

3  case *Webceleb, Inc. v. Procter & Gamble Co.*, 554 F. App'x 606 (9th Cir. 2014), confirms the

4  Court's conclusion.[5]  In *Webceleb*, the plaintiff sued several defendants under the Lanham Act and

5  California's Unfair Competition Law for their allegedly infringing use of the plaintiff's "web

6  celeb" mark.  The Ninth Circuit affirmed the district court's order granting summary judgment to

7  the defendants, holding that no reasonable jury could find that the defendants used the term "web

8  celeb" as a source identifier.  *Webceleb*, 554 F. App'x at 607.  Instead, the Court found that each

9  of the defendants' allegedly infringing uses used the term in its "common parlance" as a

10  description of "Internet celebrities."  *Id.*  Of particular significance to this case, the Court found

11  that "[t]he use of 'web celeb' *as part of a stylized 'button'* and a headline on defendants' online

12  magazine is also not a trademark use."  *Id.* (emphasis added).  Instead, "'[w]eb celeb' headlined

13  stories about Internet celebrities and the 'Favorite Web Celeb' contest, *much like the stylized*

14  *'AWW' button denoted cute or 'aww'-inspiring content*."  *Id.* (emphasis added).

15  Similar to the "web celeb" button used by the defendants in *Webceleb*, Pintrips took a

16  word with a well-known definition (*i.e.*, the act of attaching one virtual object to another) and

17  placed it on a button to inform users that the button, once clicked, would perform that commonly-

18  understood operation.  In fact, this case presents an easier question than the "web celeb" button

19  addressed by the Ninth Circuit because (1) unlike a "web celeb" button, which ostensibly could

20  perform any number of operations, the word pin describes exactly what the button does; and (2)

21  numerous other companies have used similar buttons and features to perform the same pinning

22  feature for decades.  In short, much like the words "save" and "print"—which are placed on

23  buttons, icons, and drop-down menus in all manner of computer programs and websites—the word

24  pin describes an operation that will be performed once clicked.  Under 15 U.S.C. § 1115(b)(4),

25  Pinterest cannot prohibit other companies from using the word pin to describe that well-known

26  operation, which is exactly how the evidence demonstrates that Pintrips uses the word pin here.

27

28  [5] Unpublished Ninth Circuit decisions may be considered for their persuasive value.  *See Rounds v. Comm'r Soc. Sec. Admin.*, 795 F.3d 1177, 1185 (9th Cir. 2015)

1          The Court finds Pinterest's arguments to the contrary unpersuasive.  First, Pinterest argues

2    that "[u]nlike a print button, the very purpose of the word 'pin' in this context is to associate the

3    button in a user's mind with a unique source: Pintrips.  Otherwise, Pintrips' 'pin' button would not

4    convey to users which website the 'pinned' content would appear on."  Pl. Reply Br. at 14.

5    Pinterest's brief cites no evidence introduced at trial that plausibly supports this argument, and the

6    Court's review of the trial testimony and exhibits accepted into evidence unearthed none.  Instead,

7    the evidence presented during trial establishes the contrary.  As described above, numerous other

8    software products and Internet websites include a pinning function, which allows its users to

9    attach certain virtual objects to a particular area on the user interface.  In other words, the purpose

10   of the word pin on a pin button is not necessarily to associate the button with its source.

11   Facebook, Google, and Windows all permit users to pin virtual objects, and because they all use

12   the same word to identify the pinning operation, that word could not plausibly serve to identify

13   their unique brand.  Instead, and exactly like the "print" button Pinterest attempts to distinguish,

14   the Pintrips pin button simply identifies the well-known operation that the button will perform if

15   clicked.

16          Pinterest's argument also ignores that, in order for the Pintrips pin button to even appear

17   on a third-party website, a consumer must have already (1) created an account at

18   www.pintrips.com and (2) downloaded Pintrips' browser extension.  *See* Tr. at 465:20-466:13.  In

19   other words, consumers who see Pintrips' pin button on third-party websites already know "which

20   website the 'pinned' content would appear on," Pl. Reply Br. at 14, because they had to take

21   several affirmative steps through the Pintrips website in order for that button to appear in the first

22   place.

23          Second, Pinterest argues that "the button's stylized nature—with multiple colors and a pin

24   icon matching the pin icon in the Pintrips logo—furthers the conclusion that it is intended to

25   attract attention and indicate source, rather than merely describe Pintrips' services."  *Id.* at 14.  The

26   Court disagrees.  As an initial matter, the Court is guided by the Ninth Circuit's decision in

27   *Webceleb*, which found that even a "stylized 'button'" bearing the words "web celeb" did not

28   amount to trademark use.  554 F. App'x at 607.  Moreover, what little "styling" is present on the

United States District Court
Northern District of California

31

button (most prominently, the image of a pin) actually reinforces the non-trademark purpose of the pin, *i.e.*, that it will perform the pinning operation if clicked.  Accordingly, much like the image of a printer next to a print button or the image of a (now archaic) floppy disk next to a save button, the Court does not consider the styling of Pintrips' pin button to support an inference that the word pin will be seen as a mark.  If anything, the styling of the button cuts against Pinterest.  When combined with the fact that multiple statements on the Pintrips homepage expressly inform the user that the button will perform a particular service offered by Pintrips, the Court find no basis for Pinterest's argument that the button's styling demonstrates that the pin button is being used as a mark.

Third, Pinterest argues that "[t]he existence of numerous alternatives for labeling content creation buttons like Pinterest's Pin It and Pintrips' 'pin' buttons confirms that Pintrips' use of 'pin' was not descriptive."  Pl. Reply Br. at 15.  But the *Fortune Dynamic* case cited by Pinterest does not support that broad statement.  In *Fortune Dynamic*, the Court found that the word "delicious" was more suggestive than descriptive because the defendant had a number of alternative words that could adequately capture its goal of providing a "playful self-descriptor" on the front of its tank top.  618 F.3d at 1042.  The Ninth Circuit's observation does not mean that any word with a synonym must be suggestive.  For example, the term "copy and paste" is no less descriptive because other words, such as "reproduce and insert," could also be used to accurately describe the same computer operation.  In fact, Pinterest's proposal that Pintrips use an alternative word for pin similar to "tweet," "stumble" or "luv"—none of which are descriptive terms of the kind contemplated by 15 U.S.C. § 1115(b)(4)—suggests that Pinterest's real argument is that Pintrips does not have a right to use the common descriptive word pin so long as it could create its own branded non-descriptive word as a stand-in.  That position is flatly inconsistent with 15 U.S.C. § 1115(b)(4).  Pintrips may avail itself of the fair use defense whether or not it could have dreamed up a non-descriptive word to use in place of pin.

Finally, Pinterest attempts to distinguish its use of the word pin from the common usage discussed above.  According to Pinterest, when its website refers to the word pin as a noun, it is not talking about the method of affixing a virtual object in place; it is actually talking about the

virtual object affixed.  *See* Pl. Br. at 18 ("Pinterest uses PIN as a noun to refer to the entire piece of content that a user has created by importing content from another site, editing, captioning it, and choosing to place it on a specific board on Pinterest.").  Pin as a verb, for its part, is the process of creating that piece of digital content on Pinterest.  *Id.* ("Pinterest uses PIN as a verb to refer to the process of creating a Pin on Pinterest.").  Pinterest characterizes these uses as "non-standard," *id.*, going as far as to say that it "pioneered the use of PIN-formative terms in the context of social media and bookmarking."  Dkt. No. 134 (Second Amended Complaint) ¶ 9.

As an initial matter, the Court is not convinced that, to the extent Pinterest's use of the word pin is non-standard, that non-standard use is different in a way that would affect the Court's analysis.  In essence, Pinterest's "pioneering" linguistic change is identical to that already applied to many common terms used in software programs and Internet websites.  For example, "print" can mean both the act of printing a document, as well as the document printed (*i.e.*, a "print" or a "printout").  Similarly, "copy" is both the act of copying and the document copied, and "post" is both the act of posting and the picture or text posted.  The transition of the word pin from the act of attaching a virtual object to the virtual object pinned is not exactly a revolutionary development.  More important, Pinterest has provided no authority suggesting that the first company to adopt such a minor linguistic change to a purely descriptive term is provided the right to exclude all others from using that same description.

However, the Court need not reach this question, because Pinterest has not provided evidence that Pintrips uses the term pin in the same, purportedly novel, way that Pinterest does.  Instead, the evidence demonstrates that Pintrips uses the term pin in the exact same way as Microsoft, Facebook, and the many other companies that have come before it: as a verb for attaching one virtual object to another.  The Pintrips website is explicit that the virtual object pinned by the Pintrips pin button is a *flight*.  The home page of the Pintrips website alone states this three times.  *See* TX240 ("Pin any *flight* from any site") (emphasis added); *id.* ("Use the 'Pin' Button to save *flights* from any travel site") (emphasis added); *id.* ("With the Pintrips Pin Button, you can shop around for *flights* and pin the ones you want to save into a personal trip board") (emphasis added).  Even the trial testimony *cited by Pinterest* in support of its position

demonstrates that Pintrips uses the word pin for the well-known meaning described above:

> Q. Would you please describe for the Court what we are looking at here.
>
> A. This is basically Step 2 which is, again, the Pintrips pin button. And we're telling -- we're showing them what the pin button looks like, and saying this is -- pin any flight from any site.  And then call to action, which is again the pin button.

Tr. at 465:20-466:1; Pl. FFCL ¶ 120 (citing same).

> Q. Would you please, with your finger, circle where your pin button is injected?
>
> A. (Indicating) It's a little bit off, sorry. Trying to -- mine has shifted.
>
> Q. So that's where your pin button is injected?
>
> A. Yes. And as we scroll down, it's injected next to each itinerary.
>
> [ . . . ]
>
> Q. So let's pick a flight, then.  All right?  I'll start with the first one, the Delta flight, 9:15 p.m.  Do you see that?
>
> A. Yes, I do.
>
> Q. Let's click on pin button, and go to the next page.
>
> [ . . . ]
>
> Q. Now, what are we seeing here?
>
> A. So we see a couple of things. The first one is the pin button turned into a pinned button.  Show that an action was taken, and that that specific itinerary has been pinned to the Pintrips board that was created.

Tr. at 471:23-472:23; Pl. FFCL ¶ 120 (citing same).

Pintrips simply does not use the word pin as a noun to refer "to the entire piece of content that a user has created by importing content from another site, editing, captioning it, and choosing to place it on a specific board."  Pl. Br. at 18.  Pinterest's observation that less prominent portions of the Pintrips website use pin as a noun—making it theoretically ambiguous as to whether Pintrips is referring to a piece of digital content in the way Pinterest supposedly does—is not convincing given the multiple unequivocal statements on the Pintrips home page.  Those

United States District Court
Northern District of California

statements are flatly inconsistent with Pinterest's definition.  Accordingly, even assuming that

Pinterest's slightly modified use of the word pin entitles it to prevent others from also describing

digital content as a pin (an argument the Court views skeptically), the Court finds that Pintrips has

not done so here.

After weighing the evidence presented at trial and considering the arguments made by the

parties, the Court concludes that Pintrips satisfies the first two elements of the fair use analysis in

that it uses the term pin "otherwise than as a mark" and "only to describe [its] goods or services."

15 U.S.C. § 1115(b)(4).

### 2.  Pintrips Exercised Good Faith

The last factor of the fair use defense asks whether the defendant has exercised "good

faith." 15 U.S.C. § 1115(b)(4).  In analyzing this factor, courts are to consider "whether defendant

in adopting its mark intended to capitalize on plaintiff's good will."  *Fortune Dynamic*, 618 F.3d at

1043 (quoting *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc*., 228 F.3d 56,

66 (2d Cir. 2000)); *see also id*. (observing this factor "involves the same issues as the intent factor

in the likelihood of confusion analysis").  Here, Pinterest argues that "Pintrips adopted the Pintrips

name and 'pin' button with the specific intent of piggybacking off Pinterest's goodwill and

reputation in the marketplace."  Pl. Reply Br. at 14.

However, the evidence cited by Pinterest does not support that conclusion.  Each of the

trial testimony excerpts and emails referenced in paragraph 89 of Pinterest's findings of fact and

conclusions of law concern the choice of the Pintrips mark, not the use of the word pin on the

Pintrips pin button.  *See* Pl. FFCL ¶ 89.  The Court also finds irrelevant the allegation that,

according to Pinterest, Pintrips was considering changing its pin button to a pin it button.  *See id*.

¶ 91 (citing emails in which Pintrips executives considered "mockups" of a "pin it" button); *but

see* Tr. at 190:4-7 ("We never asked [the person creating the mockups] to write 'pin it' on it.  We

just told him we wanted to do a visual redesign of our buttons.  And it was the ones that he created

said 'pin it' on it.  We never had any intentions of changing it to 'pin it.'").  Whether Pintrips may

have intended (or even currently intends) to transition from a pin button to a pin it button simply

does not factor into the analysis of whether Pintrips uses the term pin on its current button in good

1    faith.

2    Instead, the evidence introduced at trial overwhelmingly supports the conclusion that

3    Pintrips decided to use the term pin to describe the well-known computer operation of pinning

4    before it had even heard of the website Pinterest.  Mr. Gotlieb testified that by January 2011 he

5    had created "mockups" of the Pintrips website (then called Flightrax) that included a pin icon for

6    users to pin their flights.  Tr. at 454:11-455:16.  Mr. Gotlieb further testified that he had not heard

7    of Pinterest by this date, and that he decided to use the term pin to describe the pinning function of

8    his contemplated website because "it's widely used across the Internet."  Tr. at 456:15-20.  This

9    testimony was unrebutted at trial, and the Court found Mr. Gotlieb to be credible on this point,

10   especially considering the long history of the term pin described in Section IV.B.1.  The Court

11   also credits the testimony of Mr. Raiteri, who testified that he came up with the name Pintrips

12   during the June 2011 workshop based in part on his knowledge that "the word 'pinning' in travel

13   was already ubiquitous at that time[.]"  Tr. at 650:11-14; *see also id.* at 650:14-17 ("In fact, during

14   the workshop, we looked at examples of other travel sites that pinned itineraries on their travel

15   site.  Kayak was one, in specific.  FareCompare was another."); *id*. at 651:1-4 ("I would say the

16   first time that I became familiar with the concept of pinning a graphical user interface or pinning

17   data was probably in the mid-eighties when I was writing Motif and X11 user interface

18   software.").

19   Accordingly, the Court concludes that Pintrips satisfies the third element of the fair use

20   analysis in that it uses the term "pin" in good faith.

21                              *          *          *

22   After weighing the evidence and testimony admitted at trial, the Court finds that Pintrips'

23   use of the word pin with respect to the pinning feature of its website satisfies all three elements of

24   fair use under 15 U.S.C. § 1115(b)(4).

25   **C.    Trademark Dilution**

26   The purpose of the Federal Trademark Dilution Act (the "FTDA") "is to protect famous

27   trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage

28   it, even in the absence of a likelihood of confusion."  *Moseley v. V Secret Catalogue, Inc*., 537

United States District Court
Northern District of California

36

United States District Court
Northern District of California

1    U.S. 418, 431 (2003).  Accordingly, the FTDA extends dilution protection only to those whose

2    mark is a "household name."  *Nissan Motor Co. v. Nissan Comput. Corp*., 378 F.3d 1002, 1011

3    (9th Cir. 2004) (internal quotation marks and citation omitted).  "For example, Tylenol

4    snowboards, Netscape sex shops and Harry Potter dry cleaners would all weaken the commercial

5    magnetism of these marks and diminish their ability to evoke their original associations.  These

6    uses dilute the selling power of these trademarks by blurring their uniqueness and singularity,

7    and/or by tarnishing them with negative associations."  *Mattel, Inc. v. MCA Records, Inc.*, 296

8    F.3d 894, 903 (9th Cir. 2002) (internal quotation marks and citation omitted).

9          While Pinterest has brought dilution claims under both federal and California state law, the

10   analysis under each is the same.  *See Jada Toys, Inc. v. Mattel, Inc*., 518 F.3d 628, 634 (9th Cir.

11   2008).  In order to prevail on its dilution claims, Pinterest must show that "(1) the mark is famous

12   and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use

13   began after the mark became famous; and (4) the defendant's use of the mark is likely to cause

14   dilution by blurring or dilution by tarnishment."  *Id.*  Although neither federal nor California state

15   law requires a showing of competition or likelihood of confusion to succeed on a dilution claim,

16   the plaintiff must establish that "the mark used by the alleged diluter [is] identical, or nearly

17   identical, to the protected mark" in order to satisfy the second element of the dilution analysis.  *Id*.

18   (quoting *Thane Int'l, Inc. v. Trek Bicycle Corp*., 305 F.3d 894, 905 (9th Cir. 2002)).  Whether

19   dilution by blurring is likely is assessed with reference to six factors provided by statute.  *See* 15

20   U.S.C. § 1125(c)(2)(B).

21         However, the Court need not engage in the full dilution analysis because it finds that—

22   even assuming Pintrips' use of the words Pintrips and pin was likely to cause dilution—Pinterest

23   has not established that its own marks were famous by the time Pintrips first made use of its marks

24   in commerce.

25            **1.  Pintrips First Used its Name in Commerce by October of 2011**

26         In order to prevail on a claim of trademark dilution, the plaintiff must establish that its

27   mark was famous when the defendant first began to use the mark in commerce.  The Ninth Circuit

28   has interpreted this portion of Section 1125 to mean *any use* of the mark in commerce by the

defendant, not necessarily the particular use being challenged in the litigation.  *See Nissan*, 378

F.3d at 1012-13.  "If it were otherwise, and first use for purposes of § 1125(c) turned on whatever

use the mark's owner finds particularly objectionable, '[o]wners of famous marks would have the

authority to decide when an allegedly diluting use was objectionable, regardless of when the party

accused of diluting first began to use the mark.'"  *Id.* (quoting *The Network Network v. CBS Inc.*,

No. 98-cv-01349-NM, 2000 WL 362016, at *3 (C.D. Cal. Jan. 18, 2000)).  To fix the date by

which the plaintiff must demonstrate fame, the defendant's use of the challenged mark in

commerce need not be "substantial or cover a wide geographic area[.]"  *Id.* at 1012 (quoting *Enter.

Rent-A-Car Co. v. Advantage Rent-A-Car, Inc.*, 330 F.3d 1333, 1342 (Fed. Cir. 2003)).

In this case, the parties proposed different dates by which Pinterest should be required to

demonstrate fame: September 2011 and November 2012.  Pintrips argues that September 2011 is

the appropriate date because that is when it promoted Pintrips to the public as the name of the

company's product by attending a trade show where a Pintrips banner was displayed and where

fliers and product demos were distributed.  *See* Def. Reply Br. at 10.  Pinterest suggests November

2012, when Pintrips "officially switched from a small test group to a service actually offered to the

public."  Pl. Br. at 11.

The Court largely agrees with Pintrips, although the Court believes the appropriate date is

October 2011, not September 2011.  In September 2011, Pintrips employees attended a travel-

related trade show and promoted their fledgling company under the Pintrips name.  Mr. Gotlieb

testified that he personally picked up the "Pintrips" banner used at that trade show from the print

shop.  Tr. at 223:20-25.  However, because no Pintrips employee who attended that trade show

testified at trial, the Court was not presented with evidence concerning the number of trade show

attendees or the promotional activities actually undertaken by Pintrips.  While Pintrips' activities

at the September 2011 trade show may very well have been sufficient to establish commercial use

of the Pintrips mark by themselves, the Court cannot make that conclusion on the evidence

presented at trial.

However, other evidence presented at trial establishes that Pintrips used its name in

commerce shortly after that trade show.  Within six weeks of Pintrips' June 2011 strategy meeting,

1     Pintrips had created a "flash" website launch page with its logo and an invitation for visitors to

2     submit their email address to receive notifications from Pintrips. *See id*. at 669:8-25. Pintrips

3     collected 300-400 email addresses through its website until, in October of 2011, it "sent out emails

4     to ask people to install the Chrome extension." *Id*. at 670:7-12. Mr. Raiteri estimated that, when

5     combined with the employees' personal email lists, Pintrips sent approximately 5,000 email

6     invitations for people to install and use the Pintrips product. *See id*. at 670:5-19. This activity

7     constitutes use of the mark in commerce, especially considering the Ninth Circuit's admonition

8     that any use of the mark in commerce, regardless of whether that use is "substantial or cover[s] a

9     wide geographic area," is sufficient to set the date in time at which the plaintiff must demonstrate

10    fame. *Nissan*, 378 F.3d at 1012 (citation omitted).

11            This level of commercial activity is very different than the facts at issue in *RIPL Corp. v.*

12    *Google Inc.*, which Pinterest cites in support of its proposed November 2012 date. No. 12-cv-

13    02050-RSM, 2014 WL 1350810 (W.D. Wash. Apr. 3, 2014). As an initial matter, the question

14    addressed by the Western District of Washington in *RIPL* was whether the plaintiff had abandoned

15    its mark, not when a defendant had used the allegedly diluting mark in commerce for the first

16    time. *Id*. at *3-7. But even assuming that the abandonment inquiry conducted in *RIPL* is

17    equivalent to the question of first commercial use facing this Court, the facts of *RIPL* are easily

18    distinguishable. In *RIPL*, the court found that after the launch of the plaintiff's product in 2007,

19    the plaintiff provided "no evidence of commercial activity, no evidence that the website, service,

20    or mark was sufficiently public to create an association between the mark and its owner, and no

21    evidence of marketing activity beyond maintaining the website past 2007." *Id*. at *5. In contrast,

22    Pintrips offered unrebutted testimony that it established a website in July or August of 2011, that it

23    promoted its product at a trade show in September 2011, and that it affirmatively invited

24    thousands of people to download and actually use its product in October of 2011. While Pintrips'

25    beta launch in November of 2012 clearly expanded the scope of its commercial activities, it was

26    not the first time that it used the Pintrips mark in commerce.

27            Accordingly, the Court finds that Pintrips first used its marks by no later than October of

28    2011. In order to prevail on its dilution claim, Pinterest must demonstrate that its marks were

39

1    famous by that date.

2              **2.  Pinterest Was Not Famous by October 2011 (or by November 2012)**

3          A "famous" mark is one that "is widely recognized by the general consuming public of the

4    United States as a designation of source of the goods or services of the mark's owner." 15 U.S.C.

5    § 1125(c)(2)(A).  In order to qualify as "famous," the asserted mark must have "such powerful

6    consumer associations that even non-competing uses can impinge on their value." *Avery*

7    *Dennison Corp. v. Sumpton*, 189 F.3d 868, 875 (9th Cir. 1999).  "[T]he FTDA extends dilution

8    protection only to those whose mark is a household name." *Nissan*, 378 F.3d at 1011 (internal

9    quotation marks and citation omitted); *see also Apple, Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-cv-

10   01846-LHK, 2012 WL 2571719, at *7 (N.D. Cal. June 30, 2012) ("The Ninth Circuit has

11   recognized that fame requires a high standard of consumer awareness beyond the trademark

12   owner's specific market—the mark should be a 'household name' or 'part of the collective

13   national consciousness.'") (citation omitted).  "[T]o meet the 'famousness' element of protection

14   under the dilution statutes, 'a mark [must] be truly prominent and renowned.'" *Avery*, 189 F.3d at

15   875 (citation omitted).

16         In determining whether a mark is famous, a court may consider "all relevant factors,"

17   including: (1) "[t]he duration, extent, and geographic reach of advertising and publicity of the

18   mark"; (2) "[t]he amount, volume, and geographic extent of sales of goods or services offered

19   under the mark"; (3) "[t]he extent of actual recognition of the mark"; and (4) whether the mark is

20   registered.  15 U.S.C. § 1125(c)(2)(A)(i)-(iv).  This is a high standard.  The Ninth Circuit has

21   routinely found even very old and commercially successful marks insufficiently famous under

22   § 1125(c).  *See, e.g., Avery*, 189 F.3d at 876-77 (finding Avery and Dennison marks not famous

23   despite decades of use, $3 billion in annual sales, and $5 million in advertising); *Fruit of the*

24   *Loom, Inc., v. Girouard*, 994 F.2d 1359, 1362 (9th Cir.1993) (finding that "fruit" mark "is far

25   from being in the class" of "Tiffany," "Polaroid," "Rolls Royce," "Kodak," "Century 21," and

26   "Oscar" marks).

27         Pinterest has provided no persuasive evidence that any of its marks were famous by

28   October of 2011.  Virtually all of the news articles offered by Pinterest were published after that

United States District Court
Northern District of California

40

United States District Court
Northern District of California

1  date, and are thus irrelevant.  *See, e.g.,* Pl. FFCL ¶¶ 29-35 (citing news articles primarily from late

2  2011 and 2012).  Pinterest had approximately 1 million monthly users by August of 2011 (less

3  than half a percent of the United States population), *see* Tr. at 92:1-4, and, according to a Pinterest

4  demonstrative summarizing data included in a Pinterest report, just less than 5 million monthly

5  users by November 2011 (just under two percent of the United States population).  Neither figure

6  comes close to suggesting that Pinterest had attained the level of prominence necessary for a brand

7  to become part of the collective national consciousness.  In fact, the Pinterest website was still

8  operating as a closed, invitation-only website just several months before.  *See* Tr. at 667:19-24

9  ("[In June of 2011] it was still in closed beta, so all I could do was wait for an invitation.  I think

10  they had a video describing how it worked that you could see.  But . . . you couldn't use the site

11  unless you were invited.").  In addition, the "Pinterest" mark was not even registered until May of

12  2012.  *See* TX23.  No reasonable weighing of these facts could satisfy the first element of the

13  dilution analysis.

14      Moreover, Pinterest's dilution claim would fail on the same ground even were the Court to

15  adopt Pinterest's proposed November 2012 date.  Pinterest presented four types of evidence in

16  support of its position: (1) contemporaneous news articles discussing Pinterest; (2) the volume of

17  traffic on its website; (3) a survey conducted by a consulting service in July of 2012; and (4) the

18  registration of its "Pinterest" mark.  The Court will address each category in turn.

19      First, Pinterest presented approximately a dozen news articles published before November

20  of 2012 that discuss Pinterest and its rapid growth.  *See* Pl. FFCL ¶¶ 29-35.  These articles were

21  published by prominent newspapers and media outlets, including *The New York Times*, *The Wall*

22  *Street Journal*, *The Los Angeles Times*, and *Fortune*.  *Id.* ¶ 31.  Of course, receiving publicity from

23  the national media raises the awareness of a brand.  However, it is clear from the content of these

24  articles that Pinterest had not yet achieved the level of prominence necessary for a finding of fame

25  at the time of publication.  For example, many of the articles begin with a description of what

26  Pinterest is and what it does, which would be unnecessary (or even baffling) for famous brands

27  like Coca-Cola or Barbie.  *See, e.g.*, TX160 (CNET article beginning with the sentence "Pinterest,

28  an invitation-only site that describes itself as a pinboard to organize and share things you love, is

1    growing at a phenomenal pace."); TX173 (*Wall Street Journal* article which begins by describing

2    Pinterest as "the online scrapbooking website that has become a Silicon Valley darling because of

3    its rapid user growth").  Other articles commented on how, until extremely recently, even local

4    technology media barely knew of Pinterest's existence.  *See* TX168 (CNN article observing that

5    "[t]he web-based 'pinboard,' which launched almost two years ago, barely got a mention on

6    Silicon Valley news sites until six months ago, when early adopters suddenly realized that a site

7    with millions of monthly users had sprung up almost unnoticed by the tech press").

8            In short, these articles demonstrate that Pinterest had enjoyed rapid (and even

9    unprecedented) growth in its user base in a very short period of time, which made the relatively

10   new company a newsworthy subject for a number of publications.  These articles also demonstrate

11   that the articles' authors were not sure that their readership would know what Pinterest was

12   without immediate explanation.  A dozen (or even a few dozen) articles commenting on the

13   newsworthy growth of a website does not suggest that the website has attained the level of fame

14   necessary to prevail on a dilution claim.  *See Fruit of the Loom*, 994 F.2d at 1363 ("We need not

15   decide the exact degree of strength a protectable mark must reach, but it must at least be *mature*

16   *and well-known*.") (emphasis added).  In fact, the tenor of the articles submitted strongly suggests

17   the opposite.

18           Second, Pinterest presented evidence that its website drew 25 million monthly active users

19   by October of 2012, *see* Pl. Br. at 12, which is about 8% of the U.S. population.  However, the

20   number of monthly users drawn by Pinterest in late 2012 is only a fraction of the number drawn

21   by Yelp, the website at issue in the only case Pinterest cites in which a court referred to the

22   number of monthly users as supporting a finding of fame.  *See Yelp Inc. v. Catron*, 70 F. Supp. 3d

23   1082, 1096 (N.D. Cal. 2014) ("The reach of publicity of the Yelp Marks is extensive, as the Yelp

24   Site averaged *102 million monthly unique visitors* between January and March 2013.") (emphasis

25   added).

26           Third, Pinterest introduced a survey conducted in July of 2012, which found that 75% of

27   the survey respondents recognized the name Pinterest.  *See* TX133.  However, Pinterest did not

28   call a witness with personal knowledge of how the survey was conducted or from where its pool of

42

United States District Court
Northern District of California

1    survey respondents was drawn.  Accordingly, no testimony at trial established that the pool of

2    survey respondents was drawn from the general public as opposed to a sub-group of individuals

3    predisposed to be familiar with Pinterest.  *See Avery*, 189 F.3d at 879 (rejecting the findings of

4    three market research surveys where respondents were drawn from sub-groups of the general

5    population more likely to be familiar with the plaintiff's marks).  In fact, there is a high likelihood

6    that the survey pool was not drawn from the general public, given that it was comprised of a

7    disproportionate percentage of female vs. male respondents: out of 837 interviews, 70% of

8    respondents were female and 30% male.  *See* TX133 at PIN00017216.  In addition, all

9    respondents to the survey reported spending at least 90 minutes online in an average day for

10   personal purposes alone, not including any time spent on work matters.  *Id.*  In short, Pinterest has

11   not established that the July 2012 survey was conducted with a pool of respondents drawn from

12   the general public, and, accordingly, the Court cannot consider its findings as evidence that the

13   general public was familiar with Pinterest's marks.

14          Fourth, the Court agrees with Pinterest that the fact that its Pinterest mark was registered

15   before November 2012—albeit only six months before—weighs slightly in favor of a finding of

16   fame.  *But see Avery*, 189 F.3d at 876 ("To be capable of being diluted, a mark must have a degree

17   of distinctiveness and 'strength' beyond that needed to serve as a trademark.") (citations omitted).

18          When these facts are weighed together, it is clear that Pinterest had not attained the status

19   of a household name by November of 2012.  The facts presented at trial suggest that Pinterest was

20   a relatively new company that had received favorable media attention in response to its early

21   growth.  However, the number of Pinterest's monthly users in November of 2012 is dwarfed by

22   the number of monthly users of Yelp, the company at issue in the only case cited by Pinterest on

23   this point.  That a sizeable (but still relatively small) sliver of the United States population used

24   Pinterest in November of 2012 does not, without more, suggest that non-users would be familiar

25   with its services.  *See Apple*, 2012 WL 2571719 at *7 ("The Ninth Circuit has recognized that

26   fame requires a high standard of consumer awareness beyond the trademark owner's specific

27   market—the mark should be a 'household name' or 'part of the collective national

28   consciousness.'") (citation omitted).  Pinterest simply has not demonstrated the extraordinarily

high level of public awareness that a mark must reach in order to qualify as famous under the FTDA.  *See Nissan*, 378 F.3d at 1014 (finding material disputed issue of fact regarding whether fame existed where the plaintiff introduced evidence of $898 million in sales over a five year period and 65% consumer recognition); *see also* 4 McCarthy on Trademarks and Unfair Competition § 24:106 (4th ed.) (recommending a high standard for fame, such as at least 75% consumer recognition in a survey response).  Accordingly, even if November 2012 were the appropriate date by which to measure fame, Pinterest's dilution claim still would fail.

## V.   CONCLUSION

For the foregoing reasons, the Court finds in favor of Pintrips on all causes of action asserted by Pinterest in its Second Amended Complaint.  The Court does not reach Pintrips' Counterclaims, as Pintrips has represented that invalidation of Pinterest's "Pin" marks would only be necessary if Pintrips' marks were interpreted to infringe.  Def. Br. at 24.  The Clerk shall terminate all pending motions, enter judgment, and close the file.

**IT IS SO ORDERED.**

Dated:  10/21/2015

HAYWOOD S. GILLIAM, JR.
United States District Judge